RICHARD H. FOSTER AND SARA B. FOSTER, T. JACK FOSTER, JR., AND PATRICIA FOSTER, JOHN R. FOSTER AND CAROLINE FOSTER, AND ESTATE OF T. JACK FOSTER, DECEASED, GLADYS H. FOSTER, EXECUTRIX AND GLADYS H. FOSTER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1717–78.     Filed January 11, 1983.

---

*Valentine Brookes* and *Lawrence V. Brookes*, for the petitioners.

*Joyce E. Britt* and *Charlotte Mitchell*, for the respondent.

DAWSON, *Judge*: Respondent determined the following deficiencies in petitioners' Federal income taxes and additions to tax under sections 6651(a)(1) and 6653(a): [1]

| Petitioner | Year | Deficiency | Addition to tax |
|---|---|---|---|
| Richard H. Foster | 1963 | $108,513.06 | --- |
| and Sara B. Foster | 1964 | 177,066.45 | --- |
| | 1965 | 277,166.65 | --- |
| | 1966 | 5,630.26 | --- |
| | 1967 | 133,246.08 | --- |
| | | 701,622.50 | |
| | | | |
| T. Jack Foster, Jr., | 1963 | 110,067.16 | --- |
| and Patricia Foster | 1964 | 184,431.45 | --- |
| | 1965 | 283,634.67 | --- |
| | 1966 | 5,764.04 | --- |
| | 1967 | 137,755.12 | --- |
| | | 721,652.44 | |
| | | | |
| John R. Foster | 1963 | 108,997.49 | --- |
| and Caroline Foster | 1964 | 176,869.03 | $8,843.45 |
| | 1965 | 275,674.76 | --- |
| | 1966 | 4,268.35 | --- |
| | 1967 | 129,602.81 | --- |
| | | 695,412.44 | [2] 8,843.45 |
| | | | |
| Estate of T. Jack | 1963 | 116,054.13 | 6,612.89 |
| Foster and Gladys | 1964 | 195,258.35 | 9,762.92 |
| H. Foster | 1965 | 280,017.84 | 14,000.89 |
| | 1966 | 12,502.37 | 625.12 |
| | 1967 | 111,748.15 | 5,587.41 |
| | | 715,580.84 | [3] 36,589.23 |

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in issue.

[2] Sec. 6651(a)(1).

[3] Sec. 6653(a).

In their petition, the petitioners claim overpayments in the following aggregate[4] amounts:

| Year | Amount |
|------|--------|
| 1963 | $30,069.78 |
| 1964 | 9,394.27 |
| 1965 | 16,386.46 |
| 1966 | 19,939.93 |
| 1967 | 29,913.76 |
| | 105,704.20 |

Despite a number of concessions by the parties, there remains a variety of issues for us to decide. They include nine substantive issues and six preliminary issues related to certain evidentiary and procedural matters. The substantive issues are as follows:

1(a) and 3(a). Whether section 482 is unconstitutional as an invalid delegation of legislative power.

1(b) and 3(b). Whether respondent's determinations under section 482 are reviewable for an abuse of discretion or pursuant to some lesser standard.

1(c) and 3(c). Whether, in order to prevent the avoidance of taxes, section 482 may be applied to a taxable disposition of property previously acquired in a nonrecognition transaction.

1(d). Whether respondent abused his discretion under section 482 in reallocating income from the sale of lots in Neighborhood One from the Alphabet Corporations to the Foster partnership.

3(e). Whether respondent abused his discretion under section 482 in reallocating income from the sale of lots in Neighborhood Four from Foster Enterprises, Ltd., to the Foster partnership.

1(f) and 3(f). In the alternative, whether the Foster partnership is an association and hence taxable as a corporation.

1(g) and 3(g). In the alternative, whether section 482 must be employed to effect a consolidation of the Foster partnership

---

[4]Petitioners do not allege the amount of overpayment claimed for each specific set of petitioners.

with all of the Foster-controlled corporations purportedly involved in the development of Foster City.

2(a). Whether respondent's contention on brief is consistent with his ground for the adjustment set forth in the notice of deficiency, or, conversely, whether it represents a new issue.

2(b). Whether certain promissory notes, purportedly executed to reacquire corporate stock, are part of the Foster partnership's basis in Neighborhoods Two and Three, or, conversely, whether they represent an obligation to pay additional interest on money borrowed for the purchase of Brewer's Island.

2(c). If the notes represent an obligation to pay additional interest, whether such interest can be capitalized under section 266 as part of the Foster partnership's basis in Neighborhoods Two and Three, notwithstanding the fact that such interest was not actually paid during the taxable years in issue.

4. Whether the amount received by the Foster partnership and a related corporation for the grant of a sway easement should be applied against their bases in all of their land or conversely against their bases in only that part of their land described by the easement.

5(a). Whether respondent is entitled to rely on a ground for the disallowance of a deduction which was not expressly set forth in the notice of deficiency.

5(b). Whether the transfers of three parcels of land by the Foster partnership for school and church sites are deductible as charitable contributions under section 170.

5(c). If the transfers are not deductible, whether the partnership must capitalize the cost of the school site as part of its basis in all of its remaining land in Foster City.

6. Whether a payment made by the Foster partnership pursuant to a law firm's statement for services rendered is deductible as a business expense under section 162.

7(a). Whether adjustments related to the payment of the Fosters' personal expenses were so arbitrary and excessive as to shift the burden of proof to respondent.

7(b). If petitioners bear the burden of proof, whether they can carry it through evidence that their recordkeeping system

was designed to differentiate between business and personal expenses.

7(c). Whether the disallowance of deductions under section 274 at the corporate level precludes the taxation of those expenses as constructive dividends at the shareholder level.

8. Whether certain amounts received by Gladys H. Foster constitute dividends or compensation for personal services.

9. Whether the Estate of T. Jack Foster and Gladys H. Foster are liable for additions to tax under section 6653(a) for negligence or intentional disregard of rules and regulations.

The preliminary issues are as follows:

A(1). Whether the deposition of T. Jack Foster, taken in connection with a State court proceeding, is admissible in this proceeding as an admission of a party-opponent under Federal Rules of Evidence 801(d)(2)(A).

A(2). If it is admissible on that basis, whether petitioners can object to any part of the deposition on grounds of relevancy.

B(1). Whether the deposition of the Fosters' former tax planner, taken in connection with a State court proceeding, is admissible in this proceeding as former testimony under Fed. R. Evid. 804(b)(1).

B(2). If it is admissible on that basis, whether petitioners can object to any part of the deposition on grounds of relevancy, opinion, and double hearsay.

B(3). If it is admissible on that basis, whether the deponent's testimony should be completely disregarded because of bias.

C(1). Whether the deposition of T. Jack Foster, Jr., taken in connection with a State court proceeding, is admissible in this proceeding as an admission of a party-opponent under Fed. R. Evid. 801(d)(2)(A).

C(2). If it is admissible on that basis, whether petitioners can object to any part of the deposition on grounds of relevancy, opinion, and "double hearsay."

D(1). Whether the deposition of the Fosters' former banker, taken pursuant to an application filed with this Court under Rule 82[5] prior to the commencement of the present case, is admissible in this proceeding.

---

[5]Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure.

D(2). If it is admissible under that rule, whether respondent can object to any part of the deposition on relevancy and a variety of other grounds.

E(1). Whether the Court properly sustained an objection at trial to a question calling for a conclusion by a party.

E(2). If so, whether the identical question propounded to that party at a deposition must be stricken from the record.

F. Whether the burden of proof in respect of the three major substantive issues involved in this case should be allocated contrary to the general rule of Rule 142(a).

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners Richard H. (Dick) Foster and Sara B. Foster, T. Jack (Jack, Jr.) Foster, Jr., and Patricia Foster, and John R. (Bob) Foster and Caroline Foster are husband and wife. The three male petitioners are brothers. Together with their respective spouses, they timely filed joint Federal income tax returns for the calendar years 1963 through 1967 with the Internal Revenue Service Center at Ogden, Utah.

Petitioner Gladys H. (Gladys) Foster is the widow of T. Jack (Jack) Foster and the executrix of his estate. Jack Foster died on March 15, 1968. Together with his spouse, he also timely filed joint Federal income tax returns for 1963 through 1967 with the Ogden Service Center. Jack Foster and Gladys Foster are the parents of the three male petitioners.

At the time that they filed their petition in this case, all of the petitioners resided in the San Francisco Bay area.

Except for Gladys Foster's involvement in Issue 8, the female petitioners are parties to this action solely by virtue of having filed joint returns with their respective spouses. Accordingly, "the Fosters" will only refer to the principals involved in this case, i.e., Jack Foster, Jack Foster, Jr., Dick Foster, and Bob Foster.

During the years in issue, the Fosters were equal partners in a general partnership known as T. Jack Foster & Sons (the Foster partnership or simply the partnership). Like the individuals, the Foster partnership utilized the cash method of accounting. The principal issues in this case involve substantial adjustments made by respondent to partnership items of

income and deduction. The adjustments, in turn, generally relate to the partnership's activities in developing a 2,600-acre tract of unimproved land known as Brewer's Island into a city of 35,000 people christened Foster City, Calif. Before discussing those activities, however, it would be helpful to briefly recount the business background of the Fosters, including the formation and organization of their partnership.

## I. Facts Related to the Business Background of the Fosters

Jack Foster was born in 1902. During the 1920's, he attended the law school at the University of Oklahoma and was subsequently admitted to the Oklahoma bar. He was twice elected mayor of Norman, Okla.; he also served one term as the city attorney.

During the depression era, Foster became interested in the real estate business. Among the first projects which he undertook was the construction of a hotel in Norman. His base of operations became Oklahoma City.

From 1946 through 1955, Foster engaged in the real estate development business with an individual by the name of V. B. Likins. Likins was a successful and wealthy businessman who had connections with the Republic National Bank of Dallas (Republic or simply the bank). It was also during this period that Foster retained A. O. "Del" Champlin, an Oklahoma C.P.A., to provide financial, accounting, and tax planning services. Both Republic and Champlin later played important roles in the development of Foster City.

Foster and Likins engaged in a variety of projects during their association. Their most notable achievement was the construction of several thousand units of military housing in several States including Kansas, Texas, California, and Hawaii.

Foster and Likins did business in both corporate and partnership form. In 1952, they incorporated Likins-Foster Honolulu Corp. That corporation eventually became the parent company for most of the corporations formed during the Likins-Foster period of business activity. Likins-Foster Honolulu Corp. is involved in several of the issues presented in this case.

In February 1955, Foster and Likins terminated their

business relationship. They entered into an agreement the relevant terms of which provided for the dissolution of their partnership and the acquisition by the Fosters, pursuant to an option, of Likins' interest in Likins-Foster Honolulu Corp. Upon the exercise of that option, Jack Foster owned 75 percent of that corporation's stock, and his sons, the remaining 25 percent, in equal shares.

FORMATION AND ORGANIZATION OF THE FOSTER PARTNERSHIP

Concurrently with the termination of his business relationship with Likins, Jack Foster entered into an agreement with his sons to form the Foster partnership for the transaction of their business. According to the partnership agreement, the purpose of the partnership was—

to own and to acquire land or interests in land, construct houses or other buildings; to rent or sell such real property or leasehold estates either in an improved or unimproved condition; to own stocks, bonds, debentures, or other evidences of indebtedness in any corporation; to buy, own, develop and operate oil and gas leasehold estates, or mineral rights or royalties; and to generally engage in the business of buying or owning property, real, personal or mixed; to act as contractors or principals or agents in any business transaction; to borrow or to lend money with or without security; to act as guarantors on the contracts of others; and generally to engage in any business which the partners may agree upon among themselves.

The partnership agreement further provided that contributions to the capital of the partnership were to be made one-half by Jack Foster and one-sixth by each of his sons, and that profits and losses from its operation were to be shared in the same proportion. The agreement also designated Jack Foster as the managing partner, authorized him to make all routine decisions for the partnership, but provided that matters of policy should be determined by all of the partners. The agreement also authorized the payment of a salary to Jack Foster as managing partner.

At this point, mention should be made of the activities of Jack Foster's sons. The oldest, Jack Foster, Jr., attended the University of Oklahoma, majored in finance, and obtained a degree in business administration in 1951. He then served 2 years in the Air Force. Immediately after his discharge, he joined the Likins-Foster organization in Hawaii as a management trainee. After Foster and Likins terminated their

business relationship in 1955, Jack, Jr., managed the Hawaiian operations of Likins-Foster Honolulu Corp. and its several subsidiaries. In November 1960, he returned to the mainland on behalf of the partnership to become the general manager of the Foster City project. (The partnership's role in the development of Foster City will be discussed later in detail.)

Dick Foster also attended the University of Oklahoma, majored in accounting, and graduated in 1957. He too became involved in the family business. In 1960, he moved to Honolulu in order to manage the Fosters' operations and thereby allow Jack, Jr., to assume his responsibilities at Foster City. While in Hawaii, he supervised the construction of several projects, including the Foster Tower Hotel, which plays a role in one of the issues involved herein. In July 1963, he left Hawaii for California in order to actively participate in the development of Foster City.

Bob Foster also attended the University of Oklahoma and graduated in 1958 with a major in geology. For approximately 2 years, he managed the family's oil and gas interests in Oklahoma. In October 1960, he too moved to California in order to take an active part in the development of Foster City.

By 1959, Jack Foster's sons had all graduated from college and had assumed active and increasingly responsible roles in the family business. Accordingly, in January 1959, the Fosters amended their partnership agreement to provide for their equal participation in the profits and losses resulting from the operation of the partnership. No adjustment was made, however, in their capital accounts nor were any of the above-described provisions modified in any way except to specifically authorize the payment of salaries to all of the partners. These amendments to the partnership agreement were made at a time when the Fosters were actively assessing the feasibility of developing Foster City.

The Fosters restated their partnership agreement in August 1963. The purpose of the partnership remained unchanged, and no modifications were made to any of the provisions described above. But two new provisions were added. One authorized any two general partners to bind the partnership by any deed, contract, or other written document within the general scope of the partnership; and the other declared that

all stock in any corporation in which shares had been equally issued to the Fosters was a partnership asset.

## II. FACTS RELATED TO THE CREATION OF FOSTER CITY

While living in Pebble Beach, Calif., in 1958, Jack Foster was contacted by a fellow builder and real estate developer by the name of Richard Grant about the possibility of participating in the development of Foster City, then known as Brewer's Island. Brewer's Island was a 2,600-acre undeveloped and uninhabited tract of land located about 12 miles south of San Francisco in San Mateo County. It was separated from the city of San Mateo by a narrow estuary on its western bounds but otherwise surrounded by the waters of San Francisco Bay. The island was partially submerged, partially tideland, and partially firm land behind existing levees. It was owned by the Leslie Salt Co. (Leslie) and the Schilling Estate Co. (Schilling) and was used for agriculture and as salt ponds. Grant had been negotiating with its owners for several years but had not been successful in even obtaining an option for its purchase.

Foster had several discussions with Grant about the development potential of Brewer's Island but remained unconvinced. He agreed, however, to solicit the views of his partners. Accordingly, he called his sons to California. The Fosters reviewed the preliminary feasibility study and soil test that Grant had previously commissioned. They determined that the proposed project had sufficient merit to warrant further scrutiny and agreed to finance certain additional studies. Grant and the Fosters agreed that if these studies were favorable and they decided to go forward with the project (assuming, of course, that they could purchase the land), they would do so as partners on a 50/50 basis. As for the Fosters, themselves, they proceeded in partnership form, with Jack Foster continuing to act as managing partner.

The Fosters determined that the principal engineering problem facing the proposed project was to secure an adequate supply of landfill. Acting on behalf of the partnership, Jack Foster retained Dames & Moore (D & M), a San Francisco engineering firm specializing in soil analysis, to survey the southern part of San Francisco Bay for the purpose of locating sand deposits which could be used as fill. Suitable deposits were located about 5 miles east of the San Francisco Interna-

tional Airport at San Bruno Shoal. A dredging permit in Jack Foster's name was subsequently obtained in October 1959 from the U.S. Army Corps of Engineers. During this period, various studies were also conducted on Brewer's Island, itself.

Throughout 1959, Jack Foster actively negotiated with Leslie and Schilling over the terms of the proposed purchase. Discussions were frequent, occurring about twice a week.

By the fall of 1959, the Fosters had become sufficiently enthusiastic about the proposed project to commission a major feasibility study. In November 1959, again acting on behalf of the partnership, Jack Foster retained Wilsey, Ham & Blair (W H & B), a firm of civil engineers and land planners, to prepare a proposal for the development of Brewer's Island. D & M was also retained to conduct soil studies and otherwise assist in the preparation of the engineering part of the proposal.

In December 1959, Jack Foster and Richard Grant succeeded in obtaining an option from Leslie and Schilling for the purchase of Brewer's Island for $12,800,000. The option was acquired for $200,000 and had to be exercised no later than August 19, 1960. It was acquired solely with Foster funds. Contemporaneously with its acquisition, Grant and Foster agreed for the latter (acting for the partnership) to purchase the former's interest in the project for $3 million if the option were eventually exercised. They also agreed that the Fosters would be solely responsible for all engineering and feasibility studies.

Foster arranged to buy out Grant because he thought the property was potentially worth far more than its option price and because he preferred to proceed with only his sons as his partners if the project were undertaken. However, Grant's anticipated contributions to the project were considered so significant that the Fosters would not have undertaken it without assurance of his continued involvement. Accordingly, Foster (again acting for the partnership) also arranged to retain Grant on a full-time basis as an independent contractor at an annual fee of $24,000 if the project were actually undertaken.

At the time the option was acquired, the Fosters were faced with several major problems if they exercised it and committed themselves to the development of Brewer's Island. The major engineering problem related to the reclamation of the

land. The major financial problem related to their dependence on outside financing not only to develop Brewer's Island (originally estimated by Jack Foster to require $55,500,000) but also to complete its purchase price.

In July 1960, WH & B submitted its proposal. The engineering plan for reclaiming Brewer's Island called for dredging a lagoon across the center of the property, installing flood gates in order to permit water draining into the lagoon to flow back into the bay, and then filling the land in the shape of a large saucer about 14 feet above sea level at the outer edge and 1½ feet above sea level near the center. It was determined that the necessary fill, approximately 18 million cubic yards, could be obtained at a cost which would make the operation economically feasible.

WH & B's proposal also contemplated using municipal bonds issued by a municipal improvement district to finance the improvements to Brewer's Island. This concept actually originated with Richard Grant, who had previously discussed it with the Fosters. They were sufficiently receptive to the idea that Jack Foster, acting on behalf of the partnership, retained a San Mateo law firm specializing in municipal finance to draft proposed legislation. WH & B provided technical assistance by specifying the powers that such a district would need in order to successfully undertake the contemplated development. Sometime thereafter, the Estero Municipal Improvement District Bill was introduced into the California legislature as Senate Bill No. 51 by the local State senator and State assemblyman. The former was also the Fosters' personal attorney. The bill called for the creation of a local government body which could issue bonds and impose taxes in order to raise the funds necessary to improve the land within its jurisdiction. In March 1960, San Mateo County endorsed the bill. It was subsequently passed by the legislature and approved by the Governor in May 1960. The Estero Municipal Improvement District (Estero or simply the district) played an important role in the development of Brewer's Island.

In his discussions with Leslie and Schilling, Jack Foster had negotiated a downpayment of $2,500,000 for the purchase of Brewer's Island. Payment of such an amount, however, was not compatible with the partnership's anticipated cash needs if the project were actually undertaken. During the spring or

early summer of 1960, the Fosters discussed with senior officials of the Republic National Bank the possibility of financing the partnership's downpayment if the property were purchased. A $2 million loan was eventually arranged. However, certain of its terms are in dispute and give rise to one of the three major issues which we must decide. This matter is described later in greater detail.

By July 1960, the Fosters had expended considerable amounts assessing the development potential of Brewer's Island. For example, they had spent approximately $250,000 on the studies made by WH & B and D & M. In the process, however, they had determined that the project was feasible and had made the necessary arrangements for financing both the development and acquisition of Brewer's Island. Accordingly, they undertook to acquire the property.

On August 16, 1960, Jack Foster, acting on behalf of the partnership, acquired Richard Grant's interest in the option for $3 million as previously agreed. Foster executed a promissory note payable without interest and solely from the proceeds from the sale or use of the property subject to the option. The note was secured by an unrecorded deed of trust. On August 19, 1960, Foster, again acting on behalf of the partnership, exercised the option and acquired Brewer's Island for $12,800,000. The $2,500,000 downpayment included the amount paid for the option ($200,000) and the amount borrowed from Republic for that purpose ($2 million). Foster executed promissory notes to the sellers for the balance, or $10,300,000. These notes were secured by a deed of trust and were payable no later than August 19, 1967.

Title to Brewer's Island was taken in the name of Jack Foster as nominee of the Foster partnership. Later, in August 1963, the partnership filed a "Statement of Partnership" with San Mateo County pursuant to the California Corporations Code.[6] At that time, Foster transferred record title (except to certain acreage, described later, which in the interim had been conveyed to certain Foster-controlled corporations) to the partnership.

With the purchase of Brewer's Island by the Foster partner-

---

[6]See Cal. Corp. Code sec. 15010.5 (West 1977).

ship, that tract of land was on its way to becoming Foster City. At this point, therefore, it would be appropriate to briefly describe the contemplated development.

Foster City was envisioned as a completely planned and self-contained city consisting of nine residential neighborhoods, an industrial park, and a town center. Each neighborhood was to be built around an elementary school. Of the 2,600 acres, approximately 1,360 were to be zoned residential, 310 acres, industrial, and 150 acres, commercial. The remaining acreage was to be divided among schools, churches, parks, lagoons, streets, and municipal buildings. A population of approximately 35,000 was contemplated. The total number of housing units was estimated at 11,000, with single-family detached homes accounting for about 5,000 units and townhouses and garden and highrise apartments the remainder. Each neighborhood was to include both waterfront (lagoon and bay) and non-waterfront lots and a mix of single-family and multiple-family dwellings, as well as some commercial development.

### III. FACTS RELATED TO THE SALE OF LOTS IN NEIGHBORHOOD ONE (ISSUE 1)

Foster City was developed neighborhood by neighborhood. As land in each neighborhood was reclaimed and the soil compacted, various improvements were immediately begun with a view towards platting so that individual lots could be sold to builders. The principal income of the project was derived from the sale of such lots. Given the magnitude of the project, the Fosters lacked the financial resources to undertake the actual construction, itself. However, in several instances, they did do some building, principally commercial buildings which they intended to hold for investment purposes.

The first neighborhood to be developed was Neighborhood One.[7] Sales of lots in Neighborhood One began in June 1963 and continued for the next several years. On October 3, 1962, Jack Foster, acting on behalf of the Foster partnership, deeded undivided 25-percent interests in 127 acres of land in both

---

[7]During the period when the Fosters were the developers of Foster City, neighborhoods were developed in the numerical sequence of One, Two, Three, Four, Nine, Eight, and Six.

Units 1 and 2 of Neighborhood One to each of four corporations as tenants-in-common. (Neighborhood One was divided into two units and consisted of a total of 216 acres.) The four corporations were known as Foster J. Corp., Foster D. Corp., Foster B. Corp., and Foster T. Corp. (hereinafter referred to collectively as the Alphabet Corporations or simply the Alphabets). Each of the Alphabet Corporations was solely owned by one of the Fosters: Foster J. by Jack, Jr., Foster D. by Dick, Foster B. by Bob, and Foster T. by Jack (T. Jack). In the notice of deficiency, respondent allocated to the partnership the net income reported by the Alphabets[8] from the sale of lots in Neighborhood One as follows:

| 1963 | 1964 | 1965 | 1966 | 1967 |
|------|------|------|------|------|
| $680,459.55 | $293,766.18 | $134,735.03 | ($2,521.67) | $350.26 |

This allocation was made under authority of section 482.

In order to understand the factual predicate of the Neighborhood One issue, it is necessary to describe the roles played by Estero, the Foster partnership, the Alphabets, and Del Champlin in the development of Foster City in general and Neighborhood One in particular.

### A. ESTERO MUNICIPAL IMPROVEMENT DISTRICT

As previously stated, the consultants retained by the Fosters recommended using municipal bonds issued by a municipal improvement district to finance the improvements to Brewer's Island. The district that was created for this purpose was Estero.

### 1. *The Enabling Legislation*

Estero was a "special act" district, i.e., it was created by special act[9] of the California legislature rather than pursuant to an existing general statute. As an independent special district, it was a public agency. However, as we shall see, Estero was designed to be subservient to the Fosters.

---

[8]Any adjustments that respondent may have made to the net income reported by the Alphabets from the sale of these lots is not in issue.

[9]Estero Municipal Improvement District Act, 1961 Cal. Stat. 1st Extra Sess. 1960, ch. 82, p. 459, hereinafter referred to as "the Estero Act" or simply "the act."

The Estero Act recited the need for the district, prescribed its boundaries, organization, and powers, and defined the methods for its operation, management, and financing. The act described its purpose as follows:

Article 15. Need for Special Act

SEC. 215. The purpose of this act is to form the Estero Municipal Improvement District in order that the area benefited may be provided with various municipal improvements. Special facts and circumstances, applicable to the general area within which the district lies and not generally, make the accomplishment of this purpose impossible under existing general laws and therefore special legislation is necessary. The special facts are as follows:

*       *       *       *       *       *       *

(d) There is urgent need for the improvements which the district is empowered to construct under this act, but other municipal powers which could be exercised by a city are not required, and would result in more government than the area needs or wants.

(e) There are not existing general laws under which the area could be provided with the facilities it needs short of incorporation as a city. Therefore, the only way in which the particular needs of the area can be provided is by special act.

(f) The land in the district is not owned by residents. The owners are the ones primarily concerned with the district and the ones who will be supporting the district. The owners should therefore hold the voting power. Since no general law district with the necessary powers provides for voting by owners, special legislation is necessary.

The act provided that the territorial jurisdiction of Estero was coterminous with Brewer's Island. It also restricted the right to vote to landowners and provided that voting was to be upon the basis of assessed valuation of land, with each voter to have one vote for each $1 in assessed valuation of land owned by him.[10]

The act also provided that Estero was to be governed by a

---

[10]In this regard, the act provided as follows:

SEC. 17. "Land" means land in the district and does not include improvements or personal or utility property.

*       *       *       *       *       *       *

SEC. 19. "Owner" means the owner of land as shown on the last equalized county assessment roll.

SEC. 20. "Voter" means an owner, or the officer appointed therefor by the board of directors of a corporation owner, or the legal representative of the owner.

*       *       *       *       *       *       *

SEC. 64. Each voter shall have one vote for each one dollar ($1) in assessed valuation of land owned by him as shown by the last equalized assessment roll.

SEC. 65. A majority of the votes cast shall be required to elect a director or approve a

board of three directors elected to serve staggered, 4-year terms. Only owners or their officers or legal representatives were eligible to be directors. The officers of the district consisted of the board members, a secretary, and such other officers as the board might create. The district was entitled to employ such engineers, technical experts, and other employees as it deemed necessary.[11]

Estero was vested with a broad spectrum of general governmental powers. For example, it was empowered to reclaim land, make provision for street lighting, sewage, storm drainage, garbage and water service, and parks and playgrounds. It was also empowered to construct small craft harbors, provide fire and police protection, condemn land, enter into contracts, and make and enforce such regulations as were necessary and proper to the exercise of its enumerated powers. A violation of any such regulation constituted a misdemeanor.[12]

---

proposition.

See also sec. 215(f) of art. 15 quoted above in the text.

[11]The provisions described above were expressed in the act as follows:

SEC. 26. The board is the governing body of the district and shall consist of three (3) members, one of whom shall be president. The officers of the district are the three members of the board and a secretary. The district may have a finance officer, and other officers as the board may from time to time create. An owner may nominate an officer or a legal representative for each office to be filled by election or appointment.

SEC. 27. The first district board shall be elected at an election conducted by the [San Mateo County] board of supervisors immediately following the formation of the district. The first district board shall classify itself by lot so that one director will hold office for two years and two directors will hold office for four years following the district formation or until their successors have been elected or appointed and qualified.

SEC. 28. The directors shall be owners, or officers or legal representatives of owners.

SEC. 29. The term of each director, after the first board, shall be four years, or until the election or appointment, and qualification of his successor.

    *        *        *        *        *        *        *

SEC. 32. Once each year, the board shall elect one of its members to serve as president, shall appoint a secretary and shall fill any other offices as it may from time to time create.

    *        *        *        *        *        *        *

SEC. 34. The board shall act only by ordinance, resolution, motion or contract. No question of interest shall affect the legality of any contract or the right of any officer to act.

SEC. 35. A majority of the board shall constitute a quorum for the transaction of business.

SEC. 36. No ordinance, resolution, motion or contract shall be passed or become effective without the affirmative vote of at least the majority of the members of the board.

    *        *        *        *        *        *        *

SEC. 94. The district may appoint, employ and fix the compensation of engineers, attorneys, assistants and other employees as it deems proper.

[12]The powers described above were expressed in the act as follows:

SEC. 77. The district may acquire, construct, reconstruct, alter, enlarge, lay, renew, replace, maintain and operate, street and highway lighting facilities; facilities for the

Despite its impressive array of powers, Estero was intended to initially function as a reclamation district whose purpose was to finance the reclamation of a 2,600-acre tract of undeveloped and uninhabited land. As that tract was reclaimed, Estero was intended to function as an improvement district whose purpose was to finance the construction of general land improvements such as streets and sewers. As the land was improved, subdivided, and sold, and further improved by the construction of dwelling and other buildings, Estero was intended to function as a general governance district whose function was to provide the usual municipal-type services such as fire and police protection.[13] This functional evolution of Estero was facilitated by the comprehensive powers bestowed upon it by the enabling legislation.

In order to finance the reclamation of Brewer's Island and the construction of general land improvements, the Estero Act authorized the district to issue both general obligation and revenue bonds, as well as other types of securities. Issuance of

---

collection, treatment and disposal of sewage, industrial wastes, storm waters, garbage and refuse; the production, storage, treatment and distribution of water for public and private purposes; parks, playgrounds and works to provide for the drainage of roads, streets, and public places, including, but not limited to curbs, gutters, sidewalks and grading and pavement; and the reclamation of submerged or other land by watering or dewatering.

SEC. 78. The district may acquire or construct the reclamation of land for private small craft harbor purposes * * *

SEC. 79. The district may acquire, construct, maintain and operate facilities for providing fire protection to the district and its occupants or inhabitants, including buildings, engines, hose, hose carts, or carriages, and other appliances and supplies for the full equipment of fire companies or departments and a police department, to protect and safeguard life and property.

SEC. 80. The district may take, acquire, hold, use, lease and dispose of property of every kind within or without the district, necessary, expedient or advantageous to the full exercise and economic enjoyment of its purposes and powers.

SEC. 81. The district may exercise the right of eminent domain for the condemnation of private property for public use within but not without the district. * * *

*         *         *         *         *         *         *

SEC. 83. The district may make and accept contracts, deeds, releases and documents that, in the judgment of the board, are necessary or proper in the exercise of any of the powers of the district.

*         *         *         *         *         *         *

SEC. 97. The district may make and enforce all necessary and proper regulations, not in conflict with the laws of this State, for the removal of garbage and refuse and the supplying of sewage, light, water, storm water and fire and police protection service. A violation of a regulation of the district is a misdemeanor punishable as such. * * *

[13]Estero ceased to function in this latter capacity in April 1971 when Foster City was incorporated as a city.

these bonds required approval by the district electorate; however, a "voter" continued to be defined as a landowner. The act did not limit or restrict the amount of bonded indebtedness that could be incurred by the district. The payment of interest was expressly authorized to be funded as part of Estero's bonded indebtedness "for the period of construction and for twelve (12) months thereafter." In other words, the act authorized the face amount of a bond issue to include the interest that would have to be paid on the bonds during the specified period.[14] The significance of such capitalization of interest will be described later in greater detail.

Because of a scandal during the early 1960's involving the

---

[14]The financial powers described above were expressed in the act as follows:

SEC. 87. The district may incur bonded indebtedness and issue bonds in the manner herein provided.

\* \* \* \* \* \* \*

SEC. 90. Any bonds issued by the district organized under the provisions of this act are given the same force, value and use as bonds issued by any municipality and shall be exempt from all taxation within the State.

#### Article 6. General Obligation Bonds

SEC. 105. The district may issue bonds as provided in this article for any of the purposes stated in Sections 77, 78, 79 and 80. [See note 12 *supra*.]

SEC. 106. By resolution, when in its judgment it is advisable, the board may call an election and submit to the voters of the district the question of whether bonds shall be issued.

\* \* \* \* \* \* \*

SEC. 112. If, at the election, two-thirds of the votes cast are in favor of the issuance of bonds, the board may issue and dispose of the bonds.

#### Article 8. Revenue Bonds

SEC. 135. The district may create revenue bond indebtedness for the acquisition and construction, or acquisition or construction of any improvements or property or facilities contained within its powers.

SEC. 136. Proceedings for the authorization, issuance, sale, security, and payment of revenue bonds shall be had, the board shall have the powers and duties, and the bondholders shall have the rights and remedies, all in substantial accordance with and with like legal effect as provided in the Revenue Bond Law of 1941 \* \* \* ; provided, however, that qualified voters at the election therein provided shall be voters as defined in this act, and the method of voting shall be as herein provided. \* \* \*

#### Article 12. Funds

SEC. 178. The bond moneys may also be used for interest and working capital for the period of construction and for twelve (12) months thereafter, and also to pay the costs of their authorization and issuance including fees for legal, engineering, fiscal, economic or other service.

Embarcadero Municipal Improvement District in Santa Barbara, another special act district that was virtually identical to Estero in legal form,[15] the California legislature requested the State attorney general to conduct an investigation of both districts. The legislature also conducted hearings in 1962. The committee report[16] found as follows:

> The Embarcadero and Estero Municipal Improvement Districts are similar public agencies with general taxing and bonding powers, specially created to aid specific land developments. The organizational requirements of these districts placed each of them under the direct control of the developers and in addition anticipated and encouraged self-dealing between the developer and the district—all without any independent audit controls or other review procedures.
>
> The grand theft and fraud which occurred in the Embarcadero District appear to have been facilitated by this type of district organization. The success of the Estero District, on the other hand, may be attributed to the integrity of the developer and his willingness voluntarily to secure county approval of his development and to provide other public safeguards. The salient fact, however, is that the district organization itself does not appear significantly able to forestall abuses.

In June 1963, the Estero Act was amended[17] to require that one of the three directors of the board be a public member designated and appointed by the San Mateo County Board of Supervisors.[18] The act was also amended to require that the finance officer be bonded for $250,000.[19] Finally, the exculpatory provision of section 34 of the act (quoted above in note 11) was deleted.

---

[15]Compare 1961 Cal. Stat. ch. 81, p. 441 (1st Extra Sess. 1960) (Embarcadero) with ch. 82, p. 459 (Estero).

[16]The report, prepared by the Assembly Committee on Municipal and County Government, focused generally on the uses of special assessment procedures and independent special districts to aid land development.

[17]1963 Cal. Stat. ch. 995, p. 2257.

[18]Sec. 28 of the act, quoted above in note 11, was amended to read as follows:

SEC. 28. Two directors shall be owners, or officers or legal representatives of owners and shall be nominated and elected or appointed in accordance with Article 4 ["Elections"]. Commencing in the year 1964 and each four years thereafter one of the expiring terms of director shall be filled by a public member designated and appointed by the county board of supervisors.

As will be seen, the Fosters had anticipated this amendment and had provided for a public member of Estero's board since June 1961.

[19]The Fosters also anticipated this amendment although Estero's finance officer was originally bonded for only $25,000.

In August 1967, the Estero Act was again amended,[20] this time because of pressure brought by the residents of Foster City. As amended, the act provided for a scheduled shift of power over a 4-year period from the landowners to the residents. Thus, the board of directors was immediately enlarged to five members, two of whom represented landowners and two of whom represented residents; the fifth member was a "public director" appointed by the county. By 1969, the fifth member was to be elected by the residents, and by 1971, all five members were to be elected by the residents. The reason for this reform will be discussed later in greater detail.

In December 1966, a resident of Foster City by the name of Cooper judicially challenged the validity of the Estero Act, alleging, inter alia, that it violated the California constitution. His action was subsequently dismissed on the ground that it failed to state a cause of action. In 1969, the California Supreme Court affirmed the dismissal.[21]

## 2. *Estero's Board, Officers, and Contractors*

Estero was formally organized on September 8, 1960. Its first board of directors consisted of Richard Grant, who was elected president, William Innes, and George Shannon. Grant, of course, was the individual who first interested the Fosters in developing Brewer's Island and whom they arranged to retain for his help and assistance if the project were actually undertaken. Innes was a C.P.A. and former employee of Arthur Andersen & Co. He was hired by Jack Foster in 1950 and had become a trusted executive within the Foster organization. Shannon was a career city manager who had worked in Texas, California, and Alaska. He had been recommended to the Fosters by the president of the Republic National Bank and was sought out by them because of his expertise in

---

[20]1967 Cal. Stat. ch. 1511, p. 3593.

[21]*Cooper v. Leslie Salt Co.*, 70 Cal. 2d 627, 451 P.2d 406, 75 Cal. Rptr. 766 (1969). See also *Cooper v. Estero Municipal Improvement District*, 70 Cal. 2d 645, 451 P.2d 417, 75 Cal. Rptr. 777 (1969), for related litigation. Compare Justice Mosk's concurring and dissenting opinion in *Cooper v. Leslie Salt Co.*, *supra*, and *Burrey v. Embarcadero Municipal Improvement Dist.*, 5 Cal. 3d 671, 488 P.2d 395, 97 Cal. Rptr. 203 (1971), a case involving Estero's sister district in which the California Supreme Court held unconstitutional a provision under which the right to vote was limited to landowners.

municipal government. Both Innes and Shannon served as directors through the years in issue.

In June 1961, Grant resigned from Estero's board "in order to better represent the District in an independent capacity." C. W. Olmo, a contractor, was appointed his successor and elected president. Olmo became one of the Fosters' subcontractors when they built the Wells Fargo Bank Building in Foster City in 1965. He had been recommended to the Fosters by the San Mateo County Board of Supervisors. He too served as director through the years in issue.

In addition to being a director, George Shannon held a variety of other positions with Estero. At the initial organizational meeting of the board, he was appointed secretary. He also served as district tax assessor and tax collector, after those offices were created in February 1961, and became general manager (a position which consolidated his other offices and made him the chief executive officer for the district), after that position was created in August 1962. At that time, it was agreed that Shannon would be placed on the district's payroll and would no longer be employed by Likins-Foster Honolulu Corp.

Shannon served as Estero's general manager until 1969. Immediately after the residents of Foster City gained control of the board, he was terminated. Shortly thereafter he was reemployed by the Fosters.

William Innes also held several positions with Estero in addition to that of director. In March 1961, he was appointed district finance officer. In February 1964, he was appointed assistant secretary.

For the first several years of its existence, Estero's offices were located within the Fosters' offices in Burlingame, a neighboring community. During this period, one or more of the Fosters customarily attended meetings of the district's board of directors. Jack Foster, Jack Foster, Jr., and Bob Foster were all present at the board's first meeting on September 8, 1960.

Estero retained many of the same contractors as the Fosters. For example, in November 1960, it retained as bond counsel the law firm that the partnership had retained to draft the Estero Act. It had previously retained that same firm as general counsel. In September 1960, Estero contracted with WH & B for the performance of engineering and surveying

services necessary to complete the reclamation of Foster City. In August 1961, it again contracted with WH & B for the preparation of the design, plans, and specifications for all the community facilities (e.g., sewers and drains, water mains, pavement and sidewalks, curbs and gutters, and street lights) to be constructed in Neighborhood One. At the same time, it contracted with D & M for the performance of the soil studies necessary for the construction of those facilities and for other related engineering services. Other contracts were subsequently entered into with both WH & B and D & M.

Estero accepted the assignment of, and assumed the full indebtedness under, certain contracts which Jack Foster had entered into on behalf of the Foster partnership in 1959 and 1960. These contracts will be described later in greater detail. Estero also contracted with the partnership and certain of the Fosters' corporations for various services. For example, at its inception, Estero entered into an agreement with Likins-Foster Honolulu Corp. for administrative services. Other contracts will also be described later.

### 3. *Municipal Finance*

Estero entered into numerous contracts in its own name for the reclamation of land and the construction of various improvements such as levees, lagoons, roadways, water and sewer lines, and a sewage disposal plant. In order to finance this development, Estero issued long-term bonds. Estero's success in selling its bonds to the general public was due, in part, to its deliberate choice of a particular appraisal method which served to accelerate land value. On the other hand, the Fosters' success in minimizing district taxes was due to the unique manner by which Estero capitalized interest. Each of these matters will be discussed in turn.

George Shannon, the district tax assessor, appraised undeveloped land within Estero on a benefit-to-be-received basis. Under this method, land was appraised as if all the bonded improvements were in place, i.e., as if the land were fully reclaimed and the streets, sewers, and other improvements completely constructed. The assessor of San Mateo County, on the other hand, appraised raw land on the basis of comparable sales of undeveloped tracts. (Both the district and the county used comparable sales to value improved real estate.) Because

of the basic difference between these two appraisal techniques, Estero's appraised value of undeveloped land was 3½ to 6 times greater than that of the county. In the mid–1960's, after considerable development had occurred, Estero appraised the value of all the land within the district at $102 million whereas the county appraised it at $41 million.

Estero appraised undeveloped land on a benefit-to-be-received basis in order to accelerate land value. This in turn facilitated bond sales. Potential buyers would have been hesitant about purchasing bonds if the district's bonded indebtedness exceeded the value of the security. Use of the benefit method allowed a comfortable margin. On the other hand, if the county's method had been used, Estero's bonded indebtedness in the mid–1960's (approximately $51 million) would have exceeded the aggregate land value by about $10 million.

By facilitating bond sales, the higher appraised value benefited the landowner. Bonds, after all, were the source of funds for the reclamation and development of the land. There was, however, a potential downside. Higher appraised value should ordinarily lead to greater taxes for the landowner. In the case of the Fosters, however, this disadvantage was minimized through the manner in which Estero capitalized interest.

"Capitalized interest" is interest which is built into the face amount of a bond. It is equal to the amount of interest which will have to be paid on the bond over some initial period of years. That period is typically the time needed to construct the particular improvement for which the bond is issued, plus some additional period such as 12 or 24 months. By capitalizing interest for this period, the payment of interest is effectively postponed until the improvement can begin to pay for itself. Capitalizing interest on bonds issued to finance the construction of a toll bridge provides an illustration.

The Estero Act specifically authorized interest to be capitalized "for the period of construction and for twelve (12) months thereafter." This provision was construed, however, not to refer to the construction of the particular improvement for which the bond was issued, the usual interpretation given to such language by bond experts, but rather to the construction of Foster City, itself. This interpretation was not disclosed in

any prospectus published by Estero to promote bond sales. Estero thus capitalized interest not only on current bond sales but also on prior bond sales. In other words, bond proceeds were used to service prior debt, thereby reducing the current property tax impact on the landowner. Prior to the change in its board of directors in 1967, Estero was capitalizing approximately 60 percent of the interest falling due on all prior bonds, and as much as 40 to 50 percent of the total bond proceeds were being utilized to pay capitalized interest. Not surprisingly, very little principal was retired during the 1960's. Between 1961 (the year of the first bond sales) and 1972, approximately $66 million in bonds was sold. Of this amount, about $64 million remained outstanding in 1972.

By the mid–1960's, the residents of Foster City had become concerned about Estero's bond practices, particularly its practice of using proceeds from the current sale of bonds to service prior debt. They realized that this practice was causing debt to pyramid and recognized that when it stopped, as it had to at some point, they would be faced with an enormous, and perhaps unmanageable, bond-related tax increase. Accordingly, they organized a homeowners association and sought to discuss their concerns with Estero. The board, however, referred them to the Fosters.

The homeowners association never succeeded in obtaining assurance from the Fosters that there would be any measure of stability in future district taxes. Some animosity developed after the association endorsed a proposal (authorizing an increase in the total amount of bonded indebtedness) in March 1967 in exchange for what it thought was the Fosters' guarantee to hold taxes to the highest projected level. The Fosters, however, subsequently refused to enter into any such agreement. Accordingly, the homeowners association drafted legislation to democratize election to the Estero board. This legislation was introduced into the California legislature in April 1967 and enacted in August 1967. As described above, it programed the transfer of voting power over a 4-year period from the landowners to the residents.

During the transition period, as power was shifting, changes were made in Estero's scheme of municipal finance. There were no further bond authorizations for land reclamation or the construction of water, sewer, or street improvements. Only

bonds previously authorized for these purposes were sold. Bond authorizations for other purposes, such as parks and recreation, were meager in amount. Interest was not invariably capitalized, but when it was, it was limited to a maximum period of 24 months from the time of the bond sale. Moreover, interest was capitalized only in respect of a particular bond sale and not in respect of outstanding bonds as had previously been the practice. In order to compensate for such past practices, the residents voted in 1968 to double their taxes, hoping to avoid an oppressive future increase.

During the transition period, the most significant change, however, was Estero's decision to finance the construction of only the major streets and major water and sewer lines. No longer was the development of the developer's private land to be financed with public funds. Rather, the developer was henceforth required to finance all on-site and local improvements (such as streets and water and sewer lines) that would be necessary to subdivide a particular tract. As a consequence, Estero was relieved of most of the expense that it would otherwise have had to incur.

By 1972, the community's finances were sound enough to permit bond sales at par. During the 1960's, bonds had been almost invariably sold at a discount.

Finally, mention should be made of the fact that during the transition period, the Fosters decided to withdraw from Foster City as developers. In 1969, negotiations were entered into with Centex Corp., an unrelated third party, and in 1970, a sale was consummated with its subsidiary, Centex West, Inc.

### B. DEVELOPMENT OF NEIGHBORHOOD ONE

We turn now to the development of Neighborhood One and the roles played by Estero, the Foster partnership, and the Alphabet Corporations. To the extent relevant, their roles in the development of other neighborhoods will also be briefly discussed.

As the developer of Foster City, the Foster partnership played the leading role in the development of that community in general and Neighborhood One in particular. However, the partnership acted largely through Estero. The importance of the district's role, therefore, cannot be overemphasized. Accordingly, we shall begin our discussion with Estero.

## 1. *Estero*

Estero was incorporated on July 7, 1960, and was formally organized at the first meeting of its board of directors on September 8, 1960.

In September 1960, Estero contracted with WH & B for the performance of the engineering and surveying services necessary to complete the reclamation of the entire 2,600-acre tract. Plans and specifications were prepared and submitted to the district in December 1960. Bids for the necessary reclamation work were immediately solicited from area contractors. A contract for the preliminary field work had been previously awarded to a local contractor.

In order to finance the reclamation of Brewer's Island, Estero called a special election in December 1960 to authorize bonded indebtedness of $22 million. The bond issue passed by a vote of 138,025 to zero. At the election, the only authorized voter was the landowner, the Foster partnership.

At about this time, Estero resolved to commence a judicial proceeding to validate its creation and determine its right to issue bonds. Such a proceeding was expressly authorized by the Estero Act.[22] Estero thought that this action would facilitate both the awarding of contracts and the sale of its bonds. In July 1961, a judgment was rendered in an uncontested in rem proceeding in the Superior Court of San Mateo County which purported to establish the constitutionality of the act and the validity of the district's bonds.

In March 1961, Estero determined that the bids received for the proposed reclamation exceeded both its engineer's estimate and the district bond authorization. Accordingly, it rejected them and determined instead to negotiate directly with qualified contractors. Estero also adopted a procedure for the payment of claims and the issuance and payment of warrants. This procedure was adopted, in part, to enable the district to pay some of the outstanding bills against it in the form of warrants. Also that month, the Planning Commission

---

[22]SEC. 121. The board may, in its discretion, before or after issuance, commence in the superior court of the county, a special proceeding to determine its right to issue the bonds and their validity * * * The board may use the same procedure to validate the creation of the district and any annexations thereto.

of San Mateo County commenced formal review of the general plan of Foster City.

In June 1961, Estero awarded the sale of its first series of bonds (land reclamation general obligation bonds which had been authorized the previous December) to the Republic National Bank. The face amount of these bonds was $2,300,000, and their repayment was guaranteed by the Fosters. Estero also adopted an official map for purposes of district taxes. Later that month, the San Mateo County Board of Supervisors approved both the district's general plan and its agreement with the county for the maintenance of its drainage system.

In July 1961, Estero determined that the necessary reclamation work could be performed most economically by contracting with Midwest Dredging Co. (Midwest) to furnish dredged material for landfill and another contractor for land preparation. Midwest was a corporation 90 percent of whose shares were owned by the Fosters and which was incorporated during that month. Accordingly, in August, a contract was entered into calling for Midwest to provide hydraulic fill from San Bruno Shoal at a guaranteed contract price per cubic yard. Under the contract, Midwest was to furnish all labor and supplies while Estero was to furnish the equipment under a lease-purchase agreement. It was understood that Associated Dredging Co., an unrelated third party, would serve as Midwest's subcontractor and would actually operate the equipment.

Immediately upon contracting with Midwest, Estero arranged for the purchase of the necessary dredging equipment at a cost of approximately $575,000. Several months were consumed in modifying this equipment. The sand barges, for example, were located on the Great Salt Lake in Utah at the time of their purchase by the district; they had to be cut into pieces and shipped by train to Oakland, where they were reassembled. Thus, the actual filling operation did not begin until spring 1962.

The landfill operation was the major engineering feat in the development of Foster City. Accordingly, it would be helpful to digress for a moment in order to briefly describe it.

The first step of the operation involved dredging sand from San Bruno Shoal and pumping it into barges. The barges were

then moved by a tugboat to the shore of Foster City where the sand was dumped into the bay. The sand was then redredged and pumped by a 3500-horsepower engine through a large pipe to the particular area being filled. It was carried by the medium of water, which was then pumped back into the bay, leaving the sandfill. By moving the pipe, the island was filled, neighborhood by neighborhood, at the rate of approximately 4 million cubic yards per year. As each area was filled, the next stage of reclamation—land preparation—would begin, starting with the grading and contouring of the fill.

Estero subsequently canceled its contract with Midwest after the State attorney general questioned the arrangement as a possible conflict of interest. During the life of the contract (August 1961 to December 1962), the district made payments of approximately $2,400,000 to Midwest for the design and mobilization of the dredging equipment, dredging operations, and various other related expenses.

After Estero canceled its contract with Midwest, it entered into a new contract with an unrelated dredging company. Under the new contract, the district agreed to furnish and retain ownership of the equipment, and the contractor agreed to perform all services and to maintain the equipment.

In August 1961, Estero also entered into a variety of other contracts. It contracted with a construction company for land reclamation work related to the digging of the lagoons and other land preparations. It contracted with WH & B for engineering services related to the design of a sewage disposal plant and the community facilities to be constructed in Neighborhood One. It also contracted with D & M for certain soil and foundation investigation services, including test borings necessary for the construction of various community facilities and again with D & M for other soil engineering services.

In October 1961, Estero contracted with a Palo Alto firm for engineering services related to aerial mapping and the design of the Hillsdale-Marina Lagoon bridge. This bridge was intended to provide the principal access to Foster City. At the time, the only other access was a narrow, wooden bridge that went past the San Mateo sewer plant and garbage dump and was otherwise inadequate for the traffic. The Fosters considered the new bridge essential to their marketing plans. In May

1962, Estero accepted a bid from a builder for the construction of the bridge, and work began immediately. The bridge was opened to traffic in May 1963.

By October 1961, subdivision plans for Neighborhood One had been submitted to San Mateo County and a development schedule had been prepared by Estero's engineers. It was anticipated that funds would be needed in early 1962 to begin the construction of water, sewer, and street improvements, as well as to meet outstanding commitments related to the mobilization of the dredging equipment. Accordingly, Estero resolved to call a special election to authorize bonded indebtedness of $3 million for a water project, $19 million for lighting and drainage, including street improvements, $4 million for a sewer project, and $1,500,000 for parks and playgrounds, as well as revenue bonds of $2 million for water facilities and $4 million for sewer facilities. Estero also resolved to call for bids on $10,900,000 of the general obligation land reclamation bonds that had been previously authorized as well as $1,700,000, $3,500,000, and $1,700,000, respectively, of general obligation water bonds, street improvement bonds, and sewer bonds.

At the special election in November 1961, each of the five bond issues passed by a vote of 7,667,010 to zero. At the election, the only authorized voters were the landowners, the Foster partnership, and a Foster-controlled corporation, Foster Bayou Corp., which was owned by the partnership and to which a small parcel of land had been previously conveyed. (Foster Bayou Corp. plays a role in Issue 2, *infra*.) At the same time, Estero awarded the sale of $2,600,000, $500,000, $800,000, and $600,000, respectively, of general obligation land reclamation bonds, water bonds, street improvement bonds, and sewer bonds to an underwriter; the remaining bonds were not sold at that time.

In January 1962, Estero contracted with WH & B for engineering services related to the preparation of plans and specifications for the major drainage facilities to be used in the land reclamation project. Estero also approved the plans and specifications, previously submitted by WH & B, for a water supply line to connect the district with the water mains of the San Francisco Water Department in San Mateo. The waterline was to cross into Foster City, suspended from the bottom of the

Hillsdale-Marina Lagoon Bridge. At the same time, Estero approved a contract with San Mateo authorizing the district to install and maintain the waterline under the public streets of that city. In February 1962, a contract was awarded to an Oakland company for the actual construction of the waterline. Easements from private parties were also obtained to permit the installation and maintenance of the line.

In April 1962, Estero approved a contract for the construction of a 6,300-foot sewer outfall line. It also extended an earlier contract for additional lagoon excavation and land preparation. Another contract was awarded to an electrical contractor.

In May 1962, Estero obtained an easement from the State of California for the construction, operation, and maintenance of the sewer outfall line. As previously mentioned, the district also approved a contract for the construction of the Hillsdale-Marina Lagoon Bridge. Later that month, it awarded to an underwriter the sale of $7 million, $750,000, $1,450,000, and $800,000, respectively, of general obligation land reclamation bonds, water bonds, street improvement bonds, and sewer bonds, all of which had been previously authorized.

During July 1962, Estero executed a number of additional work orders under existing contracts with several contractors. It also entered into an agreement with Pacific Gas & Electric Co. for the use of the latter's right-of-way to construct a waste water channel. Another contract was entered into with D & M for consulting services related to soil engineering.

In August 1962, Estero contracted with a consulting firm for city planning services. The contract was designed to insure that the basic features of the general plan were coordinated with the specific engineering plans for the various community facilities that were being constructed by the district. Estero also awarded a contract for the construction of the sewage disposal plant.

In September 1962, Estero awarded a contract for the construction of lagoon shoreline improvements. The previous month, it had approved the plans and specifications prepared by WH & B.

From September 1961 through October 1962, Estero issued checks in the following aggregate amounts for reclamation and other development from the indicated funds:

|      |                      | *Reclamation* | *Other development*[23] | *Total* |
|------|----------------------|---------------|--------------------------|---------|
| 1961 | September - December | ---           | ---                      | $690,853.43 |
| 1962 | January              | $501,464.79   | $162.12                  | 501,626.91 |
|      | February             | 443,770.03    | 128,197.47               | 571,967.50 |
|      | March                | 354,684.93    | 33,170.99                | 387,855.92 |
|      | April                | 461,976.39    | 102,149.52               | 564,125.91 |
|      | May                  | ---           | ---                      | ---     |
|      | June                 | 84,643.50     | 58,202.69                | 142,846.19 |
|      | July                 | 405,944.65    | 82,687.50                | 488,632.15 |
|      | August               | 200,118.27    | 163,617.14               | 363,735.41 |
|      | September            | 366,026.07    | 312,036.83               | 678,062.90 |
|      | October              | 280,724.69    | 188,600.68               | 469,325.37 |

Subsequent to October 1962, Estero continued to contract for the development of Neighborhood One. Major contracts were awarded in February 1963 for the construction of community facilities in unit 1 and in August 1963 for the construction of community facilities in unit 2. Landscaping contracts were awarded in January and April 1965.

Estero also continued to call special elections to approve bonded indebtedness intended to finance the overall development of Foster City. For example, in March 1964, an additional $26,100,000 in general obligation bonds were approved for land reclamation ($8,505,000) as well as the construction of street improvements ($3,710,000), parks and playgrounds ($335,000), fire stations ($600,000), water projects ($5,440,000), and sewer projects ($7,510,000). At this election, the bond issues again passed unanimously (10,285,000 to zero) with the landowners, principally the Foster partnership, being the only authorized voters.

Estero also continued to regulate development. For example, in July 1964, it passed a sewer ordinance.

The 216 acres of Neighborhood One had been reclaimed and were available for building no later than mid–1963. By March 1964, unit 1 had been completed with sewer and waterlines, storm drains, paved streets, street lights, and underground electric and telephone utilities. By January 1965, unit 2 had been similarly completed.

It should be emphasized that the development of Foster City was a continuous, ongoing undertaking. As land in one neighborhood was being improved, land in another was being reclaimed. During the 1960's, Estero played a crucial role in

---

[23]General fund, water fund, sewage fund, and street improvement fund.

the reclamation and improvement of the various neighborhoods by contracting for and financing their development. Contracts which Estero awarded in respect of the other neighborhoods resembled those described above. A representative sampling of major contracts includes agreements for the construction of three additional bridges, one in February 1964 and two in April 1965; agreements for land preparation in Neighborhoods Four, Seven and Eight, and Five and Six in November 1964, September 1965, and May 1966, respectively; agreements for the paving of roadways in Neighborhoods Two, Three, and Four in October 1964, April 1965, and June 1965, respectively; and agreements for the construction of improvements in Neighborhoods Nine and Eight in June 1966 and January 1968, respectively. Certain of these contracts exceeded $1 million.

## 2. *The Foster Partnership*

The role played by the Foster partnership in the development of Foster City prior to September 8, 1960, the date on which Estero was formally organized, has already been described. Accordingly, only its role subsequent to that date will be discussed. We start, however, with the supporting roles played by its partners.

Jack Foster was the ultimate authority among the Fosters at Foster City. He took particular interest in, and responsibility for, the financial aspects of the project. During the 1960's, he resided in Pebble Beach, Calif., approximately a 2-hour drive from Foster City. During that period, he generally spent 3 or 4 days per week in the San Mateo area working on the Foster City project. The balance of his time, he spent at home involved in other projects in California and elsewhere. In 1965, Jack Foster discovered that he had cancer. Over the next couple of years he became increasingly less active in the Foster City project. By early 1967, he was confined to bed and never returned to his office in Foster City. He died in March 1968.

Jack Foster, Jr., was general manager of the Foster City project from November 1960 until the Fosters sold their interest as developers in 1970. As general manager, he was responsible for the overall development of the project and was in charge in his father's absence. With the decline in his father's health, he assumed even greater responsibility. Until

he moved to Foster City, he resided in a neighboring community approximately 5 minutes away. Virtually all of his time was devoted to the Foster City project.

Principally because of his training in geology, Bob Foster was assigned primary responsibility for monitoring the progress of the landfill operation. His function was to insure that the land would be suitable for home construction after the fill and grading were completed. He was also responsible for insuring that a particular earthquake-resistant foundation was installed by all builders in Foster City.

Finally, Dick Foster came to Foster City in July 1963 from Hawaii. His principal role involved supervising the construction of various commercial buildings which the Fosters intended to hold for investment purposes.

At least through 1967, the year in which the composition of Estero's board of directors began to change, the Foster partnership and the district had a very close working relationship. They were united in their goals for the reclamation of the land, the sale of the lots, and the construction of improvements, and they cooperated fully in the development process. One or more of the Fosters frequently attended board meetings, especially during Estero's formative period, and were generally familiar with the agenda ahead of time. George Shannon, one of Estero's directors and its secretary, tax assessor and collector, and later its general manager when the preceding offices were consolidated, regularly attended the Fosters' weekly planning sessions. The Fosters served as judges and inspectors at the district's elections and never protested the value at which their land was appraised.

On occasion, the Fosters acted as agents for Estero. For example, in 1961 Jack Foster, Jr., negotiated the purchase for the district of land in San Mateo which was needed for the approach to the Hillsdale-Marina Lagoon Bridge. All of the Fosters, particularly Jack Foster, actively promoted the sale of Estero bonds to banks and other potential purchasers.

The Foster partnership also loaned money to Estero when the district's finances required such assistance. For example, lacking street funds, Estero obtained a $75,000 loan from the partnership in January 1962 so that it could acquire the bridge approach which Jack Foster, Jr., had negotiated for it the previous month. Because of inadequate bond sales, Estero

obtained a commitment in November 1962 from the partner-ship to loan sufficient funds to permit land reclamation to continue. In October 1967, the district obtained a temporary loan from the partnership in the amount of $2,325,000 for various improvement projects.

Jack Foster assigned to Estero various permits and licenses which he had obtained on behalf of the Foster partnership and which were essential to the dredging operation. For example, no later than September 1960, Foster assigned a permit to dredge San Bruno Shoal which had been obtained in 1959 from the U.S. Army Corps of Engineers. In October 1962, he assigned a mineral lease with the California State Lands Commission permitting the extraction of sand from San Bruno Shoal.

Jack Foster also assigned to Estero various contracts which he had previously entered into on behalf of the Foster partnership. In March 1961, he assigned, and Estero assumed the full indebtedness under, an engineering contract which had been entered into with WH & B in November 1959. This contract involved the preparation of the general planning and engineering guide for the reclamation of land on Brewer's Island. In March 1961, he assigned, and Estero again assumed the full indebtedness under, engineering contracts which had been entered into with D & M in March and July 1960. These contracts involved site investigation on Brewer's Island and additional sand exploration of San Bruno Shoal.

In May 1961, Estero approved the payment of claims in the amount of $368,809.34 to the Foster partnership for expenses incurred on behalf of the district. A significant amount of the those expenses was for services rendered by WH & B and D & M before the district was established. In November 1961, Estero approved the payment of claims in the amount of $66,843.28. Most of this amount related to payments made by the partnership to WH & B for engineering services. In February and April 1962, Estero again approved the payment of claims in the respective amounts of $75,336.71 and $48,916.49 for expenses incurred by the partnership on behalf of Estero.

The Foster partnership granted various interests in land to Estero. In February and July 1962, easements were granted for the purpose of constructing and maintaining water supply

lines. In April 1965, a parcel in fee and two easements were granted in Neighborhood Three for boating and water usage. In December 1965, an easement was granted for the maintenance of the Neighborhood Four lagoons. Other easements which the partnership granted will be described hereinafter.

Estero contracted with the Foster partnership for specific services. In August 1964, for example, Estero entered into an agreement with the partnership for financial and accounting services.

The Foster partnership participated in the construction of improvements in Foster City by entering into a variety of contracts. For example, at the time that Estero awarded the contracts for the construction of community facilities in Neighborhood One, the partnership separately contracted for the necessary underground utility work. Other contracts entered into by the partnership in respect of Neighborhood One will be described hereinafter. Contracts in respect of other neighborhoods include tripartite agreements entered into by the partnership, Estero, and San Mateo County: in June 1964, for the construction of improvements in Neighborhood Two; in July 1965, for the construction of community facilities in Neighborhood Three; in November 1965, for the construction of community facilities in Neighborhood Four; in February 1967, for the construction of community facilities in Neighborhood Nine; in March 1968, for the construction of improvements in Neighborhood Eight; and a bilateral agreement entered into by the partnership and Estero for the electrical work in the industrial park. The partnership entered into several of these contracts at times when acreage in several affected neighborhoods was titled in the names of other Foster entities. This matter will be discussed subsequently.

Finally, the Foster partnership held itself out and was regarded as the developer of Foster City. For example, the "Foster City Report," a promotional newsletter published by the Fosters, referred to the partnership as the developer. Estero's bond prospectuses also referred to the partnership as the developer. Correspondence between the Fosters and the Federal Housing Administration characterized the partnership as the developer of Foster City.

3. *The Alphabet Corporations*

The Alphabet Corporations were formed in September or October 1962. On October 3, 1962, they acquired their equal, undivided interests as tenants-in-common in the 127 acres of land in units 1 and 2 of Neighborhood One.

The Alphabets acted in concert through Foster T. Corp. They did not open separate bank accounts but rather maintained a single account in the name of Foster T. Corp. which was opened in June 1963 and remained active through October 1968. They had no employees or office space separate from the partnership and the other Foster entities. The Alphabets filed Federal income tax returns for the taxable years 1963 through 1969.

From July 1963 through December 1965, the Alphabets collected $2,023,900 from the sale of lots in Neighborhood One. These proceeds were deposited into the bank account of Foster T. Corp. During that same period, the Alphabets transferred $2,052,500 in stated loans to the partnership for its use in the further development of Foster City.

During the course of the development of Neighborhood One, the Alphabets entered into agreements with, and granted easements to, Estero. However, they were joined in these acts by either the Foster partnership or Jack Foster acting on behalf of the partnership. For example, in January and October 1963, agreements were entered into by the Alphabets, the partnership, Estero, and San Mateo County for the construction of improvements in two tracts of Neighborhood One. In April 1963, the Alphabets and the partnership granted an easement to Estero for the maintenance and operation of lagoons in Neighborhood One.

The Alphabets also entered into agreements with other parties. Again, however, they were joined in these contracts by either the Foster partnership or Jack Foster acting on behalf of the partnership. For example, in May and December 1963, the Alphabets and the partnership entered into agreements with Pacific Gas & Electric Co. to provide gas and electric service to unit 1 of Neighborhood One.

Included within the 127 acres of land in Neighborhood One were a number of waterfront (lagoon) lots. These lots were not sold but rather leased by the Alphabets to builders who would construct and sell homes subject to 75-year ground leases. The

income derived by the Alphabets from this activity was not reallocated by respondent.

The involvement of the Alphabet Corporations in Foster City was not confined to Neighborhood One. In January 1964, the Alphabets and the partnership contracted with Estero for the construction of improvements in part of the industrial park. In May 1967, the Alphabets purchased lots in the industrial park from Lomita Homes, a subsidiary of Likins-Foster Honolulu Corp., which had previously purchased them from the partnership in 1964 and 1965. In late 1965, the Alphabets undertook to construct the Commodore Apartments, the first section of which was completed in early 1967. These apartments were located in Neighborhood One and were built on land owned by the Foster partnership. Their construction was financed in part by bank and insurance company loans and in part by proceeds derived from the sale of lots in Neighborhood One. In 1968, the Commodore Apartments were sold to a third party in order to obtain working capital. At the time, the Foster partnership was experiencing a serious cash flow problem and the sale of the apartments was part of a program to partially liquidate investment property in order to insure the survival of the Foster City project.

### C. SALE OF LOTS IN NEIGHBORHOOD ONE

The Fosters originally anticipated that income from the sale of lots in Neighborhood One would first be derived in 1962. However, the first block of sales was delayed primarily because the filling operation took longer than had been anticipated. By November 1962, the Fosters were projecting income by January 1963.

Negotiations between the Fosters and interested builders for the sale of lots in unit 1 of Neighborhood One began in 1962. The Fosters discovered that there were so many contractors in the Bay area who were eager to build in Foster City that it was not necessary to reduce the asking price.

In January 1963, a subdivision map of unit 1 of Neighborhood One was recorded with the county of San Mateo. The map had previously been reviewed by both the county planning commission and engineer and approved by the board of supervisors. Sales of lots were not permitted until the map was recorded. However, recordation necessitated the posting of a

subdivision bond by the developer to insure that all improvements would be completed to the county's satisfaction. Recordation also precipitated a reappraisal for real estate tax purposes and generally higher taxes. Accordingly, it was usually advantageous for the developer to delay recordation until sales were anticipated.

Unit 1 of Neighborhood One consisted of 626 lots. Of this number, 410 were tract lots for outright sale and 216 were waterfront (lagoon) lots which were to be leased to builders who would construct and sell custom homes subject to 75-year ground leases.

The first sales were made in June 1963 to three prominent west coast builders for between $5,000 and $6,000 per lot. In August, construction began, and the first homes were completed that fall. In 1963, a total of 247 tract lots were sold and 11 waterfront lots were leased to four different builders. Additional lots were sold and leased in 1964 and 1965. The disposition of certain lots was delayed, however, because of FHA regulations regarding fill and foundation.

### D. ROLE OF DEL CHAMPLIN

A. O. "Del" Champlin was born in 1911. He attended the University of Oklahoma, majored in accounting, and graduated in 1932. In 1935, he became licensed to practice as a certified public accountant in Oklahoma and had offices in Oklahoma City. For most of his career, he practiced accountancy as a partner in various accounting firms which typically employed a number of staff accountants. Champlin supervised the detail work involved in matters such as performing audits and preparing returns and personally provided income tax, business, and financial planning services to his clients.

Champlin met Jack Foster through V. B. Likins, for whom he had been performing accounting services, and was retained by him. Champlin serviced both Foster individually and the various Likins-Foster businesses and became one of their principal tax planners. He was frequently called upon to structure transactions in order to achieve favorable tax consequences. One of his favorite techniques was multiple incorporation and as a consequence Foster and Likins ended up with many different corporations.

After Jack Foster severed his business relationship with

Likins in 1955 and went into partnership with his sons, Champlin and his firm continued to perform a broad range of accounting services for the Fosters. He continued to function as one of their principal tax planners. Certain transactions which he structured during the immediate post-Likins period resulted in litigation before this Court.[24]

Champlin remained in Oklahoma after Jack Foster moved to California in 1958. However, as the Fosters became increasingly interested in the prospect of undertaking the Foster City project, Champlin began spending more and more time in California. At the request of Jack Foster, he moved to San Mateo in January 1961 and became licensed to practice as a C.P.A. in California. Although he continued to function as an independent contractor, the Fosters were virtually his only client and he shared their offices. The rest of his firm continued to service the Foster account from Oklahoma.

At Foster City, Champlin became the Fosters' principal tax adviser and architect of their tax planning. He was expected to minimize their taxes to the extent possible and to postpone the payment of those taxes which could not be avoided because the Foster partnership needed to retain as much cash as possible for the development of Foster City. The value of money on hand to the Fosters far exceeded any interest that might eventually have to be paid on a tax deficiency, especially when the rate of interest that the Government charged was less than that charged by commercial banks. Accordingly, a particular tax strategy was not necessarily rejected merely because it might result in litigation or even ultimately fail. The more important criterion was the extent to which that strategy would promote the immediate availability of cash for the partnership's use in developing Foster City.

In order to minimize taxes, Champlin sought to shift income among multiple entities. He was responsible for the creation of numerous trusts and corporations. In 1962, Jack Foster claimed that he alone owned some 52 corporations. This multiplicity of entities frequently complicated the Fosters' operations. Champlin also sought to postpone the payment of

---

[24]*Foster v. Commissioner*, T.C. Memo. 1966–273, and T.C. Memo. 1967–207, modified and remanded sub nom. *Likins-Foster Honolulu Corp. v. Commissioner*, 417 F.2d 285 (10th Cir. 1969).

taxes by engaging in a variety of stalling tactics whenever the Commissioner undertook to audit the Fosters or one of their entities. For example, the adjustments in the case involving Likins-Foster Honolulu Corp., et al. (see note 24, *supra*), took nearly 10 years to ultimately resolve.

The Fosters regarded Champlin as the "steward" of their taxes. They reposed great confidence in his tax-planning abilities and trusted him implicitly. They never challenged his recommendations but rather adopted them without critical analysis and implemented them immediately. They never questioned him concerning his reasons for transferring acreage between entities or structuring a transaction in a particular manner. As a consequence, they frequently did not understand why certain measures were being taken.

Champlin's recommendations dictated the basic organizational structure within which the Fosters undertook to develop Foster City. He determined that it would be advantageous from a tax standpoint for them to begin in partnership form. Losses incurred during the early years could be utilized by the partners to reduce income on their personal returns. Later, as land was developed, acreage could be transferred to a corporation in an effort to shift income to a taxpayer subject to a lower rate of tax.

In 1962, Champlin determined that corporations should be formed for the purpose of taking title to some of the land in Neighborhood One. Accordingly, the Alphabets were incorporated, and the 127 acres were transferred to them. Champlin even designated the particular acreage that was conveyed. The Fosters did not question the transfer nor did they inquire about the reason for it. Rather, they assumed that it was for the purpose of minimizing their income taxes.

### E. ULTIMATE FINDINGS OF FACT

Estero was controlled and dominated by the Foster partnership.

The Foster partnership used Estero as its instrument for the development of Foster City.

The Foster partnership was responsible for the development of Neighborhood One.

The Foster partnership earned the income derived from the sale of lots in Neighborhood One.

The 127 acres of land in Neighborhood One were conveyed to the Alphabet Corporations in order to shift income from the Foster partnership and split it among four other taxpayers.

The 127 acres of land in Neighborhood One were conveyed to the Alphabet Corporations in order to avoid Federal income taxes.

## IV. Facts Related to the Sale of Lots in Neighborhoods Two and Three (Issue 2)

Neighborhoods Two and Three were the next neighborhoods to be developed. Each consisted of 215 acres. The land in Neighborhood Two was completely reclaimed and improved and available for building by mid–1965, and the land in Neighborhood Three, by mid–1966. The Foster partnership sold lots in these neighborhoods during the taxable years involved in this case and reported the income and deducted the expenses related to those sales on its information returns.

In the notice of deficiency, respondent adjusted the cost claimed by the Foster partnership in respect of its sale of lots in Neighborhoods Two and Three as follows:

| 1963 | 1964 | 1965 | 1966 | 1967 |
|------|------|------|------|------|
| ($203.52) | $1,000,842.67 | $1,580,722.23 | $67,473.87 | ($164,504.72) |

This adjustment was described in the notice as follows:

1.b. Cost of lot sales, neighborhoods 2 & 3

It has been determined [that] the cost of lot sales reported should be adjusted as shown in Exhibit G–3 and supporting exhibits referred to therein. The principal change is due to a disallowance of a $3,000,000.00 obligation incurred in the "Westway Transaction" as not being part of land basis because: (1) there is no business substance to such transaction and (2) if this is a valid business obligation, it is not a capital expenditure to be added to land basis.

Only the "Westway" component of this adjustment is in dispute.

Also in the notice of deficiency, respondent made a related adjustment in favor of the Foster partnership to gain it reported in 1964. This adjustment was described in the notice as follows:

1.e. If it is ruled by a court that there is no business substance to the form of the "Westway Transaction" as specified in item (b) above, and thus should be disregarded, then it is held [that] the gain of $84,143.52 reported by the

partnership on its exchange of 500 shares of Foster California Corporation stock for 196.38 acres of land received from that corporation, will also be disregarded, such exchange being part of the "Westway Transaction."

As the above two explanatory paragraphs indicate, the factual predicate of the issue involving Neighborhoods Two and Three lies in the Westway transaction. That transaction consisted of a complicated series of steps, the crucial one of which involved the delivery of certain promissory notes which the parties refer to as the Westway notes. We must ultimately determine whether those notes were part of the partnership's basis in Neighborhoods Two and Three, as petitioners' maintain, or whether they represent an obligation to pay additional interest on money borrowed for the purchase of Brewer's Island, as respondent maintains. At this time, however, we shall merely describe the Westway transaction.

### A. GENESIS OF THE WESTWAY TRANSACTION

As previously stated, the terms negotiated by Jack Foster for the purchase of Brewer's Island contemplated a downpayment of $2,500,000. However, the immediate payment of that amount was not compatible with the need for cash anticipated by the partnership once the Foster City project was actually underway. Accordingly, the Fosters determined that most of the downpayment would have to be financed. At that point, they turned to the Republic National Bank.

The Fosters turned to Republic for financial assistance because they were frequent customers of that bank and enjoyed a good credit rating. Jack Foster in particular had a long and cordial business relationship with the bank that dated from the 1940's. Over the years, he had borrowed millions of dollars and had never been refused a loan. Republic had been the Fosters' major source of financing for their previous real estate transactions and had also acted as their lender for certain other of their undertakings such as oil and gas ventures. Never, however, had Republic ever assumed any role in relation to the Fosters other than that of lender.

Shortly after the enactment of the Estero Act in May 1960, the Fosters met in Dallas with senior bank officials to discuss the possibility of financing the partnership's downpayment on Brewer's Island. Participants at this meeting included Fred Florence, Republic's chairman of the board; James Aston, its

president; and Oran Kite, a senior vice president. The Fosters recognized that it was customary for developers to furnish their own downpayment and finance only the balance of the purchase price. In order to induce Republic to advance the necessary funds, they proposed to pay not only interest at the prevailing market rate but also a bonus equal to the total amount borrowed from the bank to acquire Brewer's Island. The bonus, however, would be payable only from half the profits derived from the project in 5 years' time. As an additional inducement, the Fosters proposed to structure the bonus so that it would be taxed to the bank as capital gain rather than ordinary income. Del Champlin had conceived this part of the proposal.

At the conclusion of the Fosters' presentation, Republic's chairman patted Jack Foster on the leg and remarked, "I guess we're partners." The parties then shook hands. The terms of their agreement were not subsequently reduced to writing. As in previous dealings between the Fosters and the bank, negotiations were concluded and terms agreed upon by handshake.

On August 19, 1960, Jack Foster purchased Brewer's Island on behalf of the partnership for $12,800,000. The $2,500,000 downpayment included $2 million which was obtained on August 16, 1960, by virtue of the agreement that had previously been negotiated with Republic. The loan documents which were executed on that date, however, reflect the involvement of the Hoblitzelle Foundation and the Howard Corp. Before proceeding further, we should briefly introduce those two entities.

The Hoblitzelle Foundation was affiliated with the Republic National Bank. It was founded by Karl Hoblitzelle, who was Republic's chairman prior to Fred Florence. James Aston, Republic's president and later its chairman, served at various times as the foundation's president and a member of its board of directors. The Howard Corp. was a corporation the stock of which was owned by trustees for the benefit of Republic's shareholders.

On August 16, 1960, the Fosters entered into a purported loan agreement with the Howard Corp. in which the latter agreed to arrange a $2 million loan from an unspecified lender in exchange for a $50,000 service fee. The agreement provided,

inter alia, that the loan proceeds were to be used for the downpayment on Brewer's Island. It also restricted the Fosters' right to sell or mortgage any part of Brewer's Island without the lender's consent. However, transfers between the Fosters and their controlled corporations were expressly exempted from this restriction.

On August 16, 1960, the Fosters also executed a $2 million promissory note payable to the Hoblitzelle Foundation. That note was unsecured, bore interest at the prevailing market rate (6 percent per year), was payable quarterly, and was due absolutely and in all events in 2 years. The cash advanced against that note was the source of most of the partnership's downpayment for its purchase of Brewer's Island.

Finally, on August 16, 1960, the Howard Corp. agreed with the Hoblitzelle Foundation to purchase the Fosters' note, if called upon to do so by the foundation, for an amount equal to the unpaid balance plus accrued interest at the time of such purchase. In addition, it agreed to pay the foundation an amount equal to $3\frac{1}{2}$ percent per year on the unpaid balance of the note during the period of the foundation's ownership.

Notwithstanding the involvement of the Hoblitzelle Foundation and the Howard Corp. in making the $2 million loan, the Fosters at all times regarded Republic as their lender. Accordingly, the fact that their note was made payable to an entity other than the bank never led them to question whether their agreement to pay the 100-percent bonus might not apply.

As previously stated, Jack Foster executed promissory notes to the sellers (Leslie and Schilling) for the balance of the purchase price of Brewer's Island ($10,300,000). The payment schedule for those notes called for payments of $500,000 on August 19, 1961, and August 19, 1962. On each of those dates, the partnership borrowed the entire amount of the payment from Republic. Because those amounts represented part of the purchase price of Brewer's Island, they were subject to the agreement to pay the 100-percent bonus.

On August 19, 1962, the original $2 million loan from the Hoblitzelle Foundation was extended to August 19, 1963. On August 17, 1963, the Fosters satisfied this loan by borrowing $2 million from Republic.

### B. MECHANICS OF THE WESTWAY TRANSACTION

By August 19, 1962, the Fosters had borrowed a total of $3 million from Republic and its affiliated foundation for the purchase of Brewer's Island. By the following year, all of this amount was owed to the bank. Under the terms of the agreement negotiated in 1960, Republic was therefore entitled to a bonus of $3 million payable from half the profits in 5 years' time. (The provision that the bonus be paid from half the profits was subsequently waived by the Fosters.) Republic was also entitled to the bonus on a capital gains basis. Del Champlin was assigned primary responsibility for structuring a transaction to achieve this result. What was devised was the Westway transaction. We shall defer discussion of the tax planning surrounding that transaction until after we describe the form of its several steps. Suffice it to say for now that the transaction was designed not only to insure favorable tax consequences to Republic but to the Fosters as well.

1. On August 4, 1961, Jack Foster, acting on behalf of the Foster partnership, conveyed 200.17 acres of land in Neighborhoods Eight and Nine to Foster Bayou Corp. (Foster Bayou) in exchange for 100 percent of that corporation's stock, which was titled in the name of the partnership. This exchange was treated as a nontaxable transaction. Foster Bayou had been formed by the partnership on or slightly before that date. Other than the land, it had no assets. It also had no bank account and never paid any dividends. At the time of the conveyance, the 200.17 acres was dry land which had previously been leased by the Federal Aviation Administration to erect and maintain radio transmitters. (Foster City is located about 5 miles south of San Francisco International Airport and 10 miles southwest of Oakland Airport.) This lease constituted Foster Bayou's only business activity.[25] Unlike the rest of the land on Brewer's Island, the 200.17 acres had a legal description. However, being part of Neighborhoods Eight and Nine, it was not scheduled for early development. In fact, development of Neighborhood Nine was only initiated in 1967; by the end of

---

[25]The lease was actually managed by the Foster partnership or Likins-Foster Honolulu Corp. for which service a substantial management fee was charged.

1969, Neighborhood Eight was only in a state of token development.

2. On August 7, 1962, the Foster partnership transferred its stock in Foster Bayou to Westway Investment Co. (Westway) for a named consideration of $5,000 in cash and a non-interest-bearing note due August 7, 1967, in the amount of $100,000. Westway was a subsidiary of the Howard Corp. As previously stated, the sole asset of Foster Bayou was the 200.17 acres of land in Neighborhoods Eight and Nine. On the date of the transfer, this land was in essentially the same condition as when it was originally acquired by the Foster partnership. Westway did nothing to improve it during the period that it held the Foster Bayou stock (Aug. 7, 1962—May 4, 1964). Moreover, during that same period, Foster Bayou's expenses (such as real estate taxes) were paid by the partnership or Likins-Foster Honolulu Corp. whenever its rental income was insufficient in amount.

3. On April 23, 1963, the Esteroy Corp. (Esteroy) was formed by the Foster partnership. Other than a $10,000 capital contribution, Esteroy had no assets. It used as its address the same post office box as the partnership. On its Federal income tax return for the taxable year beginning April 23, 1963, and ending February 29, 1964, Esteroy reported no gross income and claimed deductions in the aggregate amount of $188.06, including amortization of organizational costs in the amount of $83.06 and franchise taxes of $105.

4. On December 3, 1963, the Foster partnership conveyed 196.638 acres of land in Neighborhoods Two and Three to Foster California Corp. (Foster California) in exchange for 500 shares, or one-half, of that corporation's authorized stock.[26] This exchange was treated as a nontaxable transaction. Foster California had been formed by the partnership on January 17, 1961, but had been dormant since its incorporation. Prior to the first meeting of its board of directors on December 3, 1963, it had not even issued stock. Prior to the conveyance of the 196.638 acres of land, it had no assets other than its initial capital contribution of $1,200. Foster California had no bank account, conducted no business activity, and paid no dividends.

---

[26]The remaining 500 shares of Foster California's stock was not issued until June 5, 1964. See par. 8, *infra*.

5. Also on December 3, 1963, the Foster partnership transferred its 500 shares of Foster California stock to Foster Enterprises, Ltd. (Foster Enterprises). Foster Enterprises was a corporation which had been formed in 1960 to hold the Foster Tower Hotel in Honolulu and was solely owned by the Fosters in equal shares. It treated the transfer of the Foster California stock as a contribution to its capital. (Foster Enterprises also plays an important role in Issue 3, *infra*.)

6. In January and February 1964, Esteroy and Westway negotiated what was in form a purchase and sale of all of the Foster Bayou stock for a named consideration of $3,105,000, consisting of $5,000 to be paid in cash at the closing and non-interest-bearing promissory notes for the balance, or $3,100,000. This latter sum was payable in the amounts of $2 million on August 19, 1966, $100,000 on August 7, 1967, $500,000 on August 19, 1967, and $500,000 on August 19, 1968. The promissory notes for these amounts are the so-called Westway notes. Although they were executed by Esteroy, they represent the first written agreement evidencing the partnership's obligation to pay the 100-percent bonus which had been negotiated in 1960. Moreover, the notes were unconditional, i.e., payment was not conditioned upon the earning of profits. Finally, they were secured by a pledge of Esteroy's stock.

Although the Westway notes were executed and delivered in February 1964, they were dated May 4, 1964. On that date, Westway transferred the Foster Bayou stock to Esteroy.

7. On June 2, 1964, Esteroy liquidated Foster Bayou and entered on its books the 200.17 acres of land in Neighborhoods Eight and Nine at a basis of $3,105,000. At the time that Foster Bayou had acquired that parcel, it had debited its land account in the amount of $1,333,648 and had credited "mortgages payable" in the amount of $1,142,664.

8. Three days later, on June 5, 1964, Esteroy conveyed the 200.17 acres of land that it had received from Foster Bayou to Foster California in exchange for 500 shares ($5,000 par value) of that corporation's stock. The 500 shares represented the remaining one-half of Foster California's authorized stock.

9. Three days later, on June 8, 1964, Esteroy was liquidated by the Foster partnership. At that time, its principal asset was the 500 shares of stock in Foster California. On its final Federal income tax return for the period beginning March 1,

1964, and ending June 7, 1964, it reported no gross income and claimed deductions in the aggregate amount of $465.30, including amortization of organizational costs in the amount of $415.30.

At the time of its liquidation, Esteroy was indebted to Westway in the amount of $3,100,000. On July 24, 1964, the Fosters expressly and unconditionally assumed this indebtedness. At the time that Esteroy had pledged its shares as collateral for the purported purchase of the Foster Bayou stock, it had reserved the right to liquidate and substitute for the pledged shares the personal guarantee of the Fosters.

10. On July 31, 1964, the Foster partnership transferred to Foster California the 500 shares of stock in Foster California which it had acquired on June 8, 1964, by virtue of the liquidation of Esteroy. In exchange for its stock, Foster California transferred to the partnership on August 4, 1964, the 196.638 acres of land in Neighborhoods Two and Three which it had acquired from the partnership on December 3, 1963. This transaction was treated as a taxable exchange, and the partnership reported gain. (See the adjustment in the notice of deficiency which was previously quoted.) Afterwards, Foster California was a solely owned subsidiary of Foster Enterprises.

11. In December 1965, Westway sold to Republic for $952,176 one-half of the $2 million promissory note due August 19, 1966, which Esteroy had executed in 1964 as part of the purported purchase price of the Foster Bayou stock. This left Westway with a remaining receivable of $2,100,000. Westway was subsequently merged into the Howard Corp., which then became the holder of that receivable.

12. By their terms, the Westway notes were due in the months of August 1966, 1967, and 1968. The Fosters were able to successfully negotiate certain renewals. However, by the end of 1968, they had become delinquent in payment. This matter will be discussed later in greater detail.

13. On June 1, 1970, Foster California (whose name had been changed to Foster C Corp.) was merged into its parent, Foster Enterprises. As we shall see, Foster Enterprises had a history of substantial net operating losses. It received the 200.17 acres in Neighborhoods Eight and Nine, less some acreage that had been previously sold, and entered the land on

its books at $3,105,000. That amount represented Foster California's basis for the land and not the basis of the stock canceled.

14. In October 1970, the Fosters withdrew from Foster City as developers. The purchaser, Centex West, Inc. (Centex), agreed to assume liability for the Westway notes. In a collateral agreement, Republic and the Howard Corp. agreed to release the Fosters from personal liability in exchange for the assumption by Centex as well as other consideration which will be described subsequently. As far as the Fosters were concerned, the Westway notes were satisfied at that time.

### C. TAX PLANNING

The principal architect of the Westway transaction was Del Champlin, who had conceived the idea. He was assisted by Roy Lytle, an Oklahoma attorney who represented the Fosters throughout the 1950's and until his retirement in the 1960's. Republic was represented in this matter by James Laney, its attorney, as well as by senior bank officials.

The objective of the Westway transaction from Republic's point of view was to insure that the $3 million bonus was taxed as capital gain rather than as ordinary income. Republic sought to achieve this objective through the purported purchase of Foster Bayou stock in 1962 by Westway for $105,000 and the subsequent sale of that stock by Westway in 1964 for $3,105,000.

The objective of the Westway transaction from the Fosters' point of view was to raise $3 million through tax savings in order to pay the bank its bonus. They sought to achieve this objective by stepping up not only the partnership's basis in the 196.638 acres of land in Neighborhoods Two and Three by $3,105,000, but also Foster California's basis in the 200.17 acres of land in Neighborhoods Eight and Nine by the same amount, for a total step-up in basis of $6,210,000. They also contemplated making Foster California a wholly owned subsidiary of Foster Enterprises. By filing consolidated returns, they hoped that the latter's net operating losses would absorb the income derived by the former from the sale of lots. As events transpired, Foster California was merged into Foster Enterprises in 1970.

The mechanics of the Westway transaction, as described

above, evolved over a period of time. Virtually from the time that the loan and bonus were originally negotiated, there were discussions between the parties concerning the manner in which the transaction should be structured in order to achieve their respective objectives. For example, in early August 1960, Jack Foster asked Roy Lytle to attend a meeting in Dallas with James Laney and bank officials to discuss the transaction. Afterwards Lytle summarized for Foster a proposal which was discussed at that meeting and from which the Westway transaction gradually evolved:

1. Foster will pay $50,000.00 to Howard Corporation for its services in arranging $2,000,000.00 loan from Hoblitzelle Foundation * * *

2. Foundation will lend $2,000,000.00 to T. Jack Foster, with interest at 6%, payable quarterly, due in two years, unsecured * * *

3. There shall be organized a Delaware corporation named "Foster Laguna Corp." (which name will be used unless you pick out another one later on). This corporation shall have an authorized capital of $10,000.00. To this corporation shall be conveyed all of Foster's interest in a tract of land on Brewer's Island covering some 150 to 200 acres of land, it being intended to cover a part of the tract that will be first developed * * * The consideration for this conveyance will be the issuance of all of the stock of the corporation to Foster. * * *

4. Foster will sell all of the stock of Laguna Corp. to Wayside (this is not the exact corporate name, but it is an inactive subsidiary of Howard Corporation which, at the present time, has no assets and no liabilities) for a consideration of either $25,000.00 or $125,000.00 of which $5,000.00 will be paid in cash by Wayside and the remainder of the purchase price will be evidenced by a promissory note of Wayside running in favor of Foster due five years hence and without interest.

5. There shall be incorporated in Delaware, but not necessarily qualified in California, a corporation known as "Foster Bayou Corp." having an authorized capital of $1,000.00. Foster will pay $1,000.00 to the corporation and receive in exchange all of the stock of this corporation.

6. Foster will contribute to Likins-Foster Honolulu Corp. all of the stock of Foster Bayou Corp. so that it is a 100% owned subsidiary of Likins-Foster Honolulu Corp.

7. The stockholders of Wayside will give Bayou Corp. an option to purchase all of the stock of Wayside for $5,000.00 in cash and a note for $2,000,000.00 due five years from the present date, without interest. * * * In some way the note of Wayside to Foster is to be cancelled or we will eliminate any reference to the note of $20,000.00 or $120,000.00, as the case may be, it being intended that the owners of Wayside will get the $5,000.00 in cash to pay to Foster and that the stockholders and Wayside will get back their $5,000.00 in cash and end up with a $2,000,000.00 note * * *

8. If any ad valorem taxes become due against the land owned by Foster

Laguna Corp. while the stock of such corporation is held by Wayside, Foster is to pay those taxes. * * *

9. Foster, individually, joined with his sons and wife, shall guarantee to the stockholders of Wayside Corp. the note of Bayou Corp., limiting the guarantee, however, to 50% of the net profits before taxes made by the guarantors and their corporations on the entire Brewer's Island Project. * * * Just how you will handle the payment of the $2,000,000.00 on your books is up to Del [Champlin] to decide.

10. As soon as you obtain the Wayside stock you will then liquidate Laguna Corp. into Wayside, Wayside into Bayou, and Bayou into Honolulu Corp. In the last liquidation the $2,000,000.00 note of Bayou will not be assumed. Immediately after the liquidation of these corporations, Laguna Corp. will convey to Honolulu Corp. the land owned by it * * *

11. At the same time that all of the other documents are prepared some subsidiary of Howard Corporation, or it may be Howard Corporation, will commit itself, without commitment fee, to make available to you $500,000.00 on August 19, 1961 and $500,000.00 on August 19, 1962, each of which notes would be for a period of one year at 6%, with interest payable quarterly. * * *

12. For these two loans, if you took them, you would be expected to make available $500,000.00 of capital gains. You would form other corporations which would take title to the land involved, the stock would be sold to other subsidiaries of Howard Corporation, a new corporation would issue a note for $500,000.00, which you would guarantee to the extent of one-half of the profits in the Brewer's Island venture, excluding, of course, the first $4,000,000.00 of profit, one-half of which you would be obligated to pay on the first deal.

13. No mention was made at the conference of any obligation on your part to borrow from the Texas lenders either of the $500,000.00 loans which might be necessary to pay off Schilling. So far as any conversation was carried out, you would be free to borrow that where you pleased. I got a great speech on how much the Republic Bank loved you and how much they were sure that you loved the Republic Bank and that if any of the papers prepared didn't work out satisfactorily they could always be shifted and they knew that if you made a tremendous profit on the transaction you would be happy to share it with the Republic Bank group. I think Mr. Florence really believes this, but I would sure hate to see you owe them money that you couldn't pay. *You are also correct in saying that the $2,000,000.00 capital gain carrot was one that the Texas rabbits [i.e., the Republic bankers] wanted very badly and they wanted it as soon as possible* * * * [27] [Emphasis added.]

In April 1962, subsequent to the formation of Foster Bayou but prior to the transfer of its stock to Westway, Jack Foster

---

[27]As will be recalled, the remaining $1 million of the ultimate $3 million "capital gain carrot" did not sprout until Aug. 19, 1961, and Aug. 19, 1962, at which times the partnership borrowed from Republic the $500,000 installments which it owed to the sellers of Brewer's Island.

asked Roy Lytle about the 200.17 acres of land in Neighborhoods Eight and Nine that had been conveyed by the partnership to Foster Bayou:

In reviewing the Republic National Bank's memorandum regarding our transaction out here with the Howard Corporation, we agreed that we would transfer to a corporate entity some 200 or 300 acres, which would be the first lots to be developed and sold. Instead, we transferred to them the 200 acres consisting of the site where the F.A.A. station is located, and that will be one of the later or last areas developed.

*I do not think this actually makes any difference because we plan to buy back all from the corporate entity, giving them a capital gain.* I am sure that Del [Champlin] felt it would give them a greater protection for their capital gain if they took this land that was transferred to them.

Do you recall whether you discussed this with the Bank and cleared this particular point? Mr. Jim Cumby, Senior Vice President of the Bank, will be here on the 10th and I would like to have a clarification on this point before he arrives.

[Emphasis added.]

## Later that month Lytle responded to Foster's inquiry in the following manner:

I have your letter * * * in which you inquired as to my discussions with the Republic National Bank concerning the exact location of the land which was to be conveyed to the corporation which was purchased by a bank subsidiary. * * * At the time that I left you in California you did not know what land would be conveyed to your corporation. We left the acreage in round figures and it was suggested that the land would be among that that was first filled. Later on, because we had no surveys, we took the F.A.A. lease survey. No point has been raised that I know of as to the location of the land owned by Foster Bayou Corp. and, frankly, I doubt if Mr. Laney or Mr. Aston have any recollection of the discussion except by virtue of the memorandum.

Incidentally, when I got the Foster Bayou Corp. deed on record and everything else fixed up I sent the stock certificates and all of the other books and papers pertaining to the Foster Bayou Corp. to Mr. Laney and said, in effect, "Here it is; you can send us the agreed purchase price (which I think was $5,000.00) at your convenience." I heard nothing from him for a month and finally I wrote him and asked him if he got the papers. He immediately answered and acknowledged receipt of them, but that was all. I did not, in sending the papers to Laney, call attention to where the land was located and I doubt if he knows to this date. I am reasonably sure that Mr. Cumby will have no recollection of it because I never met him. *I don't think it actually makes a bit of difference, but should the point be raised, I think you can merely say that that was the only description we had that covered the desired acreage and that it probably doesn't make any difference anyway, because you are going to buy back from The Howard Corporation all of the*

*stock in their subsidiary company [i.e., Westway], which has no assets except the stock in Foster Bayou Corp.*[28] [Emphasis added.]

Subsequent to the transfer of the Foster Bayou stock to Westway in August 1962, the Fosters and Republic continued to discuss the manner in which the transaction should be structured in order to achieve their respective objectives.

In early August 1963, Roy Lytle corresponded with Rex Johnson, a senior vice president of Republic in charge of the Foster account, concerning the renewal of the $2 million note to the Hoblitzelle Foundation which was due later that month:

After I talked with you last week I advised Mr. Foster of your suggestions in regard to the replacement of the Hoblitzelle Foundation $2,000,000.00 note which comes due August 19, 1963. * * * Mr. Foster and his sons have mulled over this matter for about a week, and they say that the terms that you have set forth are impossible to meet because the land will bring in money just so fast and no faster. They have countered with the following suggestions which they said they can and will meet.

     *      *      *      *      *      *      *

4. *On the bonus money he is willing to give the Howard Corporation in exchange for the Bayou Corp. stock, notes aggregating $3,000,000.00.* These notes would be unsecured notes and would provide for payment of $2,000,000.00 on August 19, 1966, $500,000.00 on August 19, 1967, and $500,000.00 on August 19, 1968. These notes would bear no interest until maturity, but would bear interest at 6% after maturity. *He feels that he is making a very substantial concession in giving an unconditional promise to pay, because he is waiving the provision that these notes are payable only out of and from profit.* I think that we all agree that it will be extremely difficult to draw a contract which defines profit.

     *      *      *      *      *      *      *

Jack asked me to emphasize the fact that it will be impossible to give security on Brewer's Island property. As you know, it is subject to a deed of trust in favor of Schilling-Leslie, together with an obligation in favor of Richard H. Grant. He said that any mortgage or deed of trust put on the developed property would make it impossible to sell.

When we were discussing the bonus money arrangements in Mr. Laney's office he wanted the purchase price of Westway, which owns Bayou, to be $2,000,000.00, and he wanted a new corporation formed to hold title to some land which, in turn, would be sold back for $100,000.00. We, of course, are

---

[28]At this point in time, the parties to the Westway transaction contemplated that the Fosters would "purchase" all of Westway's stock in order to reacquire the Foster Bayou stock which the partnership had previously "sold" to Westway. See par. 7 of the Lytle memorandum quoted above in the text; note that Westway is referred to as "Wayside" in that memorandum. As events transpired, the Fosters achieved their objective by simply "purchasing" the Foster Bayou stock from Westway.

willing to do this, but in view of the amendments proposed to regulations under Code Section 61 and 421, I am afraid that you could not get capital gains since the proposed regulations refer to options granted after July 11, 1963. It would be simpler and, in my opinion, much safer if you simply sold the Westway stock for the $3,000,000.00 in notes which are due without interest in 1966, 1967 and 1968, as set forth above.

[Emphasis added.]

During the fall of 1963, the Fosters continued to discuss ways by which to structure the Westway transaction that would not only be acceptable to Republic but compatible with their own interests. Correspondence from Champlin to Lytle in September 1963 reflects the Fosters' objective of financing the 100-percent bonus through tax savings:

One of the essential reasons for concluding the transaction at this time is the fact that the Fosters, in their financial agreements with the bank, took the fact that this transaction would be concluded now into consideration. The financial effect on the Fosters * * * is a substantial reduction in income taxes because of the much higher basis. *This situation affects their ability to carry out their agreements with the bank.* [Emphasis added.]

In January 1964, correspondence commenced concerning the proported sale of the Foster Bayou stock. The initial "offer" came from Westway and was addressed to the Foster partnership:

As you know, Westway Investment Corporation is the sole owner of Foster Bayou Corporation, which owns certain lands located on what was known at the time of their acquisition as Brewer's Island. At the present time, our situation is such that we would consider a sale of this interest.

Therefore, this shall constitute an offer to sell to you 100% of the capital stock of Foster Bayou Corporation for a consideration of $3,105,000.00 to be paid to Westway Investment Corporation. This offer shall remain open until January 31, 1964, and unless accepted prior thereto will automatically terminate on same date.

Ten days later, Esteroy responded as follows:

We have given consideration to your offer to sell 100% of the capital stock of the Foster Bayou Corp. as contained in your letter of January 13, 1964. We would propose to buy this stock on the following terms and conditions:

The sum of $5,000 to be paid in cash upon closing and the sum of $100,000 on August 7, 1967; $2,000,000 on August 19, 1966; $500,000 on August 19, 1967 and $500,000 on August 19, 1968. Notes will be given for the different amounts and said notes will be non-interest bearing prior to maturity. The notes will be secured by pledge of all of the stock of the Esteroy Corporation owned by T. Jack Foster & Sons.

I think we should advise you that we contemplate the liquidation of Foster

Bayou Corp. if Esteroy should acquire that stock. It probably makes no difference to you, but we wanted you to understand what we planned to do.

The Westway notes were delivered in February 1964. Shortly thereafter, a pledge agreement was executed. Under its terms, Esteroy agreed not to permit its own liquidation unless and until the Fosters, individually and unconditionally, agreed to guarantee payment of the Westway notes. However, Esteroy was liquidated in June 1964 and it was not until the following month that the Fosters notified Republic of that fact. At that time, they expressly assumed liability for the Westway notes.

### D. POST-MATURITY DEVELOPMENTS

By their terms, the Westway notes were due as follows:

| Amount | Due | Holder[29] |
|---|---|---|
| $2,000,000 | 8/19/66 | Westway ($1 million); Republic ($1 million) |
| [30]100,000 | 8/ 7/67 | Westway |
| 500,000 | 8/19/67 | Westway |
| 500,000 | 8/19/68 | Westway |
| 3,100,000 | | |

By mid–1966, the Foster partnership was experiencing financial difficulty principally related to cash flow. Although Republic was no longer eager to loan additional amounts, it did agree to renew the $2 million note to August 19, 1967. By that time, however, the partnership's financial position had deteriorated further and Republic was becoming increasingly concerned. Nevertheless, in October 1967, Republic again agreed to renew the $2 million note and the first $500,000 note (originally due Aug. 19, 1967) to October 30, 1968. In exchange, however, it demanded interest at the rate of 1 percent above

---

[29]As will be recalled, Westway was the named payee of all of the notes but transferred $1 million of the $2 million note to Republic in December 1965. Subsequently, it merged into the Howard Corp. For the sake of convenience, however, Westway will be referred to as the holder of the indicated notes.

[30]This note was offset by Westway's $100,000 note which was also due on Aug. 7, 1967. As will be recalled, Westway's note represented all but $5,000 of the stated consideration for its "purchase" of the Foster Bayou stock in 1962. Because of the offset, neither the Fosters nor Republic considered this note as part of the "Westway notes" for purposes of the negotiations which will be described above.

prime, a mortgage on all of the real property in Foster City owned by the partnership and the related Foster corporations, and the Fosters' individual guarantees.

Immediately after the second renewal in October 1967, the Fosters began to seek additional time within which to satisfy the Westway notes. By letter dated October 31, 1967, Jack Foster, Jr., wrote to John Stuart, a vice president of Republic who at that time was responsible for the Foster account:

> For purposes of financial planning with particular emphasis on aiding us in the retiring of our obligations to the Republic National Bank, it is important that we have some idea as to the position of the Republic National Bank regarding the $3,000,000 Westway debt. (I shall refer to this as the Westway debt even though I realize a portion of it is now in the Republic National Bank.)
>
> We will be materially aided in attaining our goals of meeting these obligations, as well as to put our financial house in order, if the Bank will agree to handling this Westway debt as follows:
>
> Subject to the payment of all debt now owing the Republic National Bank by the Foster partnership and all related corporations, except the Westway debt, and
>
> Subject to securing an investor who will provide new capital in the form of a loan or otherwise * * * , and subject to the approval by the Republic National Bank of the financial strength of such partner, then, in that event:
>
> 1. The Westway debt will be amortized over a period of six years at the rate of $500,000 per year, starting 1969;
>
> 2. The Westway debt will be secured by land in Foster City at the ratio of 100% of security to outstanding indebtedness, reserving the right of substitution of other land in Foster City, and;
>
> 3. All collateral except that securing the Westway debt and all guarantees will be returned to Foster.

In preparation for an in-house conference, a report was prepared by Republic in November 1967 concerning the Foster partnership. The last paragraph of that report read as follows:

> 5. The Fosters are being urged by us to bring in an equity partner to give stability, financial respectability and stronger management to the project. It is hoped that *our debt* will be substantially reduced with no more than $3,000,000 having to be carried on a term basis of five to six years. *It should be noted that the latter debt was, in fact, a fee the bank received from Foster in the early years of the project and does not represent any out-of-pocket money by either the bank or Westway, a Howard affiliate.* [Emphasis added.]

In December 1967, John Stuart wrote James Aston a memorandum commenting on the Fosters' proposal. The first and last paragraph of that letter provided as follows:

The Fosters are, as I previously informed you, reportedly trying to get a suitable equity partner for the Foster City project. To assist them in negotiations, Jack Foster, Jr., feels it would be most advantageous to have the indication from us that we would be willing to receive the $3,000,000 of our debt repayable $500,000 a year plus interest. *This is the portion of the overall debt which Mr. Florence received as a fee at the inception of the project.* As it stands now, $1,000,000 of this is owing the bank and $2,000,000 is owing Westway.

I feel that * * * we can prepare such a letter [accepting the Fosters' proposal] which will be very general in context but will be within the spirit of what we hope the Fosters are trying to accomplish and what we need to have done in regard to all our debt. In summary, we would have all of our debt cleaned up with the exception of the fee debt which would be paid back in installments of $500,000. *There are some tax advantages to receiving smaller payments * * * that can be more easily offset by depletion, etc., rather than a lump sum payment since this is ordinary interest to Westway.*
[Emphasis added.]

In 1968, the financial condition of the Foster City project became so precarious that the Fosters consulted their attorneys about the possibility of filing a chapter proceeding under the Bankruptcy Act. Moreover, as the Westway notes approached term, the Fosters had not yet obtained an investor nor had they definitively resolved the situation with Republic.

During the latter half of 1968, there were frequent discussions between Republic and the Fosters concerning the latter's indebtedness to the bank. John Stuart participated in those discussions and prepared memoranda to the file summarizing them. Excerpts from four such memoranda follow.

### (1) Memorandum dated August 2, 1968:

Jack [Foster, Jr.] told us that he thought under the right restructuring of debt they would be able to handle the Leslie-Schilling debt, the $1,500,000 owing Republic, with the balance owing Republic of approximately $4,500,000 being handled on a separate basis. This would entail the $3,000,000 fee debt that came out of Westway being paid at the tail end of the project or some other extended date, with the remaining $1,500,000 continued to be reduced on a monthly basis from cash flow from leases and contracts pledged (this runoff is at the rate of approximately $15,000 to $20,000 a month, including interest).

### (2) Memorandum dated August 27, 1968:

I talked to Dick Foster on 8/25/68 regarding the bank's contemplated work on a creditor's program for the Foster City problem. Dick told me that they are now working on a plan to liquidate select properties to, hopefully, raise enough to pay approximately $3,100,000 to Republic National Bank and $986,000 to Wells Fargo. This would thereby reduce their debt to the

original $3,000,000 that was taken in by Westway (now Howard) in connection with a fee that Mr. Florence worked out with Mr. Foster, Sr. The Fosters then think we should work along with them on this remaining portion due to the origination of the "indebtedness."

### (3) Memorandum dated October 11, 1968:

Mr. Lytle asked if we would take $3,100,000 on their debt and continue to carry the balance on some type of amortized basis. Of course we agreed to this, subject to Mr. Aston's approval since our position would change very little if this were accomplished. This would then repay actual dollars that the bank has invested in the project with the "fee debt" to come at a later date.

To summarize, the Fosters have reached the "moment of truth" and are following anticipated courses of action that we thought they probably would. They appear to feel a strong responsibility to our bank for the actual funds borrowed, but not for the fee money.

### (4) Memorandum dated December 10, 1968:

Before concluding the meeting, Jack [Foster, Jr.] pressed Aston on their obligation to pay the $3,000,000 "fee debt" of which Howard is owed $2,000,000 and RNB $1,000,000. Aston stated that it was an obligation of the Fosters' and we anticipated full payment. Jack questioned the validity of the debt and insisted on playing a tape recording they had of a telephone conversation between Foster, Sr., Aston and Mr. Florence. (It was recorded without the bank's knowledge.)

The Foster position is that the debt was originally to be repaid from a split of profits if any. Aston acknowledged this point, but clearly explained to Jack that subsequent units [sic] and conditions changed this. It is now an obligation owing for which we expect full payment.

In 1969, the Fosters directed their attorneys to review their financial relationship with Republic. They were particularly interested in the possibility of an action against the bank for usury. Although no action was commenced, Republic was aware of their claims.

In October 1970, the Fosters withdrew from Foster City as developers by selling to Centex. At the same time, they entered into an "Agreement of Release" with Republic and the Howard Corp. Under the terms of that agreement, the Fosters were released from personal liability for the Westway notes, which were assumed by Centex. In exchange therefor, the Fosters released Republic and the Howard Corp. from any claim they might have against them for usury. In this regard, the agreement provided as follows:

*Recitals*:

E. Certain of the parties included in the Foster Group are asserting claims against Bank and Howard for payments made or agreed to be made by one or more of the Foster Group to Bank or to Howard, or to their affiliated corporations, arising out of the aforementioned transactions between certain of the Foster Group, on the one hand, and Bank and/or Howard, on the other hand, subsequent to January 1, 1960, allegedly in violation of applicable usury statutes. Bank and Howard deny the validity of any such claim or claims.

      \*      \*      \*      \*      \*      \*      \*

G. The Foster Group, on the one hand, and the Bank and Howard, on the other hand, have agreed to settle and compromise all controversies between and among them and to mutually release each other from any and all claims, demands and liabilities, including without limitation the claim of the Foster Group against Bank and Howard for alleged violation of usury laws as aforesaid.

Now, THEREFORE, in consideration of the mutual covenants and agreements herein contained, IT IS AGREED AS FOLLOWS:

      \*      \*      \*      \*      \*      \*      \*

3. The Foster Group and each of them hereby waive, relinquish, release and discharge Bank and Howard, and each of them, of and from any claims, demands, controversies, actions, causes of action, costs, expenses, attorneys' fees, damages, compensation, obligations and liabilities of any nature whatsoever, whether known or unknown, suspected or claimed, matured or unmatured or whether contingent or noncontingent (including specifically, but without limiting the generality of this release, the claims of the Foster Group referred to in Recital E above), which they and each of them, or their successors in interest, had, now have or may have or claim to have against Bank and Howard, or either of them, by reason of any matter, cause or thing whatsoever in any way arising out of or in connection with acts or transactions prior to this Agreement.

      \*      \*      \*      \*      \*      \*      \*

6. The Foster Group, and each of them, convenants and agrees to indemnify and hold Bank and Howard harmless against all loss, cost, damage and expense, including attorneys' fees, which Bank and Howard, or either thereof, may suffer or incur by reason of the institution or assertion by the Foster Group, their successors in interest (exclusive of Centex West, Inc., its successors and assigns), or any thereof, of any claim, suit, legal action or proceeding against Bank or Howard based upon any claim or demand released or purported to be released by this Agreement.

### E. ULTIMATE FINDINGS OF FACT

The $3 million bonus represented compensation for the use of money.

The Westway notes were executed in consideration of money loaned and not for the purchase of corporate stock.

The Westway notes were not paid during the years in issue.

## V. Facts Related to the Sale of Lots in Neighborhood Four (Issue 3)

Neighborhood Four was the next neighborhood to be developed. It consisted of 311 single-family residential lots, nearly 56 acres of multifamily land, and about 12 acres of commercial land. All together, the neighborhood contained 157 acres.

On August 29, 1966, the Foster partnership conveyed all of the single-family residential lots in Neighborhood Four to Foster Enterprises, a corporation that was owned solely by the Fosters in equal shares. It treated the transfer of the lots as a contribution to its capital.

During 1967, approximately two-thirds of the single-family residential lots in Neighborhood Four were sold to builders. On its 1967 income tax return, Foster Enterprises reported net income from the sale of those lots in the amount of $936,379.01. Respondent determined that such income was overstated by approximately $16,000. In the notice of deficiency, he allocated the revised amount, or $920,462.25, to the Foster partnership. This allocation was made under authority of section 482.

In order to understand the factual predicate of the Neighborhood Four issue, it is necessary to describe the development of Neighborhood Four, the involvement of Foster Enterprises, and the role played by Del Champlin in causing the transfer of the 311 residential lots.

### A. DEVELOPMENT OF NEIGHBORHOOD FOUR

Neighborhood Four was not developed by unit, as were the other neighborhoods, but rather as an integrated whole. The progress of its development can be traced by the following:

In November 1964, Estero awarded a ground preparation contract. In April 1965, the San Mateo County Planning Commission approved the subdivision map. Later that month, Estero entered into an agreement with WH & B for engineering services related to, inter alia, the high school site.

In May 1965, the fill for Neighborhood Four was completed.

In June 1965, Estero awarded a contract for rough grading. That contract was completed ahead of schedule in September 1965. In that month, Estero awarded a contract for the construction of community facilities such as curbs, gutters and

sidewalks, street lights, storm and sewer pipes, and water mains and hydrants. Completion of the contract was scheduled for August 1966. Sixty-five percent of the contract was completed by the end of March 1966.

In November 1965, Estero also entered into an agreement for the construction of community facilities with the Foster partnership and San Mateo County. Later that month, the subdivision map was recorded with the county.

In December 1965, the Foster partnership granted an easement to Estero for the maintenance of the lagoons in Neighborhood Four.

In June 1966, Estero awarded "extension contracts" for the construction of additional improvements such as the paving of roadways.

In September 1966, the Neighborhood Four improvements were completed. By that time, the 311 single-family residential lots had been certified and were ready and available for house construction.

## B. INVOLVEMENT OF FOSTER ENTERPRISES

The Foster partnership conveyed the 311 single-family residential lots to Foster Enterprises on August 29, 1966. At that time, Neighborhood Four was virtually developed. Foster Enterprises did not participate in completing the improvements, nor had it previously played any role in the development of that neighborhood. Rather, Neighborhood Four was completely developed by the partnership, which used Estero as its instrument in the development process.

Although Neighborhood Four was completely developed by September 1966, Foster Enterprises was unable to sell any lots until February 1967. This delay was caused by the weak housing market that existed throughout northern California during most of 1966. In fact, the market was so weak that one major builder withdrew entirely from Foster City, a second went into bankruptcy, and a third stopped purchasing lots because of its large, unsold inventory. Another factor which adversely affected the sale of lots was the Cooper litigation which commenced in December 1966.[31]

---

[31]See note 21 *supra*, and the accompanying text.

During February and March 1967, Foster Enterprises sold 200 of the 311 single-family residential lots in Neighborhood Four to three builders for a total of $1,516,400.[32] Of this amount, $1,186,642 was transferred to the Foster partnership during 1967. These funds were used by the partnership for various purposes, including the payment of its operating expenses and real property taxes, in its ongoing development of Foster City.

### C. ROLE PLAYED BY DEL CHAMPLIN

Foster Enterprises was incorporated in 1960 for the purpose of owning the Foster Tower Hotel on Waikiki Beach in Honolulu, Hawaii. Construction of the hotel began in that year. It opened for business in October 1962, although the commercial space on the first floor was not completed until sometime in 1963. Prior to the sale of lots in Neighborhood Four, Foster Enterprises' business income was derived solely from the operation of Foster Tower.

Foster Enterprises had no payroll from the date of its incorporation until 1967. It paid a management fee for the operation of Foster Tower to Kuhio Beach Hotel, Ltd. (Kuhio). Kuhio was a Hawaiian corporation which was also solely owned by the Fosters in equal shares. It owned the ground lease on the land under the hotel as well as the commercial space on the first floor.

At the same time that Foster Enterprises was incorporated, it was expected that the operation of the Foster Tower Hotel would generate considerable tax deductions through depreciation. From 1962 through 1966, Foster Enterprises never had a profitable year and incurred a cumulative net operating loss of $1,268,835. Most of this loss ($928,825) was generated by accelerated depreciation. The decision to claim accelerated depreciation had previously been made on the advice and recommendation of Del Champlin.

The decision to transfer the 311 residential lots in Neighborhood Four to Foster Enterprises was also made on the advice and recommendation of Del Champlin. The Fosters did not

---

[32]During that same period, an additional 41 lots were sold, subject to certain FHA restrictions, to one of the builders. The restrictions were not removed until 1968, at which time the sale was finalized.

question his recommendation nor did they inquire about his reasons for it. They understood that the transfer was for the purpose of utilizing the net operating loss carryovers of Foster Enterprises. They were very conscious of these carryovers and anxious to insure that they were used to reduce ordinary income. Champlin specifically selected the lots in Neighborhood Four because both he and the Fosters anticipated that they would be the next major source of income in Foster City.

Foster Enterprises derived net income of approximately $920,000 in 1967 from the sale of lots in Neighborhood Four. This income was completely absorbed by a combination of a 1967 net operating loss in excess of $200,000 (exclusive of the aforementioned net income) and the NOL carryovers from prior years.

### D. ULTIMATE FINDINGS OF FACT

The income from the sale of the single-family residential lots in Neighborhood Four was earned by the Foster partnership.

The lots in Neighborhood Four were conveyed to Foster Enterprises so that the income from their sale would be absorbed by that corporation's losses, particularly its net operating loss carryovers.

The lots in Neighborhood Four were conveyed to Foster Enterprises for the purpose of avoiding Federal income taxes.

### VI. FACTS RELATED TO THE GRANT OF THE SWAY EASEMENT (ISSUE 4)

At the time that the Foster partnership acquired Brewer's Island in 1960, the Pacific Gas & Electric Co. (PG & E) owned an easement for a right-of-way across the island. In 1961, PG & E sought to widen that easement in order to construct new, high-voltage electric transmission lines. The Fosters opposed that action because they preferred to have both the contemplated and existing lines rerouted. PG & E refused to accede to this request and commenced an action to condemn an additional easement immediately adjacent to the existing one. In 1964, it succeeded in obtaining the easement and paid the partnership $425,000 for it.

The electric transmission towers which PG & E constructed after condemning the additional easement were in a triple row

and taller than the preexisting ones. They were aesthetically objectionable and negatively affected the value of all of the land in Foster City. Consequently, the partnership characterized the entire $425,000 payment as severance damages and reduced its basis in all of its land by said amount. Respondent never challenged this treatment and in fact adopted it in his land cost schedule in the notice of deficiency.

After the new towers were constructed, the partnership's electrical engineer discovered that the catenary of the power lines was greater than had been anticipated. This meant that under certain wind conditions, the lines would sway outside the easement which PG & E had just condemned. The Fosters, through their attorney, brought this matter to the attention of PG & E, which thereupon undertook to acquire a "sway easement" in order to perfect the right-of-way easement which it had condemned in 1964. A sway easement is an easement which permits powerlines to sway over a portion of the land which is beyond the scope of the existing easement. Because of the sway of the lines, the outer boundary of such an easement defines an arc which can be described by metes and bounds.

The land described by the sway easement was zoned for single-family, multiple-family, and commercial use. The easement precluded the construction of homes or other buildings under the sway area. However, backyards and parking areas could extend under it and trees could be planted, provided they did not interfere with the sway of the powerlines.

PG & E paid $72,000 for the sway easement in 1967. Of this amount, $63,717 was paid to the partnership, and $8,243 to Foster Enterprises as the record title holders. Both the partnership and Foster Enterprises characterized the entire amount received as severance damages and reduced their bases in their respective land holdings by said amount.

In the notice of deficiency, respondent determined that the amount received for the sway easement constituted proceeds from the sale of land in the ordinary course of business and not severance damages. He then determined the amount of the gain and allocated all of it to the Foster partnership.

### ULTIMATE FINDINGS OF FACT

The powerlines and towers which PG & E constructed after condemning the additional easement in 1964 detracted from

the entire Foster City development and decreased the value of all of the land therein.

The $72,000 that PG & E paid for the sway easement in 1967 represented additional consideration for what it had intended to acquire in 1964.

The 1967 sway easement was not independent of and unrelated to the 1964 right-of-way easement but rather was an indispensable part thereof.

## VII. Facts Related to the Transfers of the School and Church Sites (Issue 5)

During 1964 and 1965, the Foster partnership conveyed three parcels of land in Foster City with respect to which it claimed deductions for charitable contributions on its information returns for those years:

1. In 1964, the partnership conveyed 7.4 acres of land in Neighborhood One to the San Mateo City Elementary School District[33] for use as an elementary school site. It valued the land at $40,000 per acre and claimed a deduction for a charitable contribution in the amount of $296,000.

2. In 1964, the partnership sold 2 acres of land for $40,000 ($20,000 per acre) to the United Church of Christ for use as a church site. Because it valued the land at $40,000 per acre, it characterized the transfer as a "bargain sale" and claimed a deduction for a charitable contribution in the amount of $40,000 ($80,000–$40,000).

3. In 1965, the partnership sold 1.844 acres of land for $36,880 ($20,000 per acre) to the United Church of Christ for use as a church site. It also valued this land at $40,000 per acre. Accordingly, it again characterized the transfer as a "bargain sale" and claimed a deduction for a charitable contribution in the amount of $36,880 ($73,760–$36,880).

In the notice of deficiency, respondent disallowed all three deductions in their entirety. The deduction for the transfer of the school site was disallowed because—

(1) the transfer was not made with donative intent but was made to benefit the remaining portions of partnership property and (2) if made with donative

---

[33]Although Foster City was not within the city of San Mateo, it was at that time within that city's elementary school district.

intent, the partnership has not established the fair market value of such property as claimed.

In his land cost schedule, respondent added the cost of this parcel to the partnership's basis in all of its remaining land in Foster City. The deduction for the transfers of the church sites was disallowed because "the partnership has not established the sales price received is less than fair market value of the 2 [or 1.844] acres." No part of the cost of either of these two parcels was capitalized by respondent because their cost was completely recovered in the "bargain sales."

### A. MOTIVATION FOR THE TRANSFERS

Foster City was conceived, designed, and promoted as a totally planned city which would offer its residents a complete array of community facilities and services including schools and churches. Estero's July 1961 bond prospectus described the general plan for the creation of the city as follows:

The firm of Wilsey, Ham and Blair, Consulting Engineers and Planners was employed to prepare a General Plan, comprising the 2,600 acres in the District. The objective for the engagement was to develop a complete plan for a balanced community providing for a proportionate share of the land to be used for industry, business, and residential purposes, and to use the natural characteristics of the land to provide for high amenities for the residents of the community. The Plan was to encompass and provide for all community facilities and services that would be required of a city. The result of the plan represents a logical breakthrough on a scale from shopping centers, industrial parks, and housing projects which have been popular in recent decades and has created an integral union of all these elements. It is the first attempt in the West to create a city "in toto", which will provide various classes of residential areas, completely planned neighborhoods, school sites—all in keeping with practical application of the most recent advancements and techniques of city planning. * * *

The prospectus went on to enumerate specific design criteria and objective goals of the general plan:

2. Since it [Foster City] will be developed as a whole, in accordance with modern planning principles and unity of control, it shall be designed to be relatively more self sufficient than other [San Francisco] Peninsula communities.

3. Since surrounding communities have failed to provide themselves with adequate employment area, Foster City will offer a closer balance between work space and residential area.

4. Full and adequate provision will be made for all community facilities and services required by the resident population, including parks, play-

grounds, clinics and sanitariums, churches, libraries, swimming pools, community center, communications, shopping facilities, exhibits, parking and maintenance and operating facilities.

\*        \*        \*        \*        \*        \*        \*

8. A unique and outstanding Town Center will be developed, comprising a designed composition of stores, offices, public buildings, churches, cultural facilities, recreation and amusement services, hotels, service establishments, banks, restaurants, theater, malls, squares, landscaping, parking structures, and a water front promenade.

9. In order to maximize efficient location and reduce commuting, houses and places of employment will be developed concurrently, so that a newcomer finding a job may also find a vacant and available dwelling at the same time, and so prospective industries can be offered housing for their employees. This is expected to provide added inducement to industrial development, reduce private and public commuting costs, and foster social stability and civic pride.

\*        \*        \*        \*        \*        \*        \*

11. All elementary schools will be located at the center of neighborhoods. With arterial streets generally bounding neighborhoods, and with moderately higher population density, all youngsters will be within 2,000 feet of their school and neighborhood playground and may reach them without crossing major traffic thereby eliminating need for an expensive bus system.

12. The land owner [Jack Foster, on behalf of the Foster partnership] will make all the planned school sites available to the School District at his cost. The Estero District will be reimbursed for all improvement costs of providing for land reclamation and all the community facilities, to relieve the District's tax-payers from paying for improvements on land that will have tax-free usage. Tax payments will therefore be kept in their proper category.

The 1961 prospectus also set forth the general plan's "acreage distribution of land use requirements for a balanced community." In this regard, the plan called for 182 acres of land for schools and 40 acres for churches and institutions.[34] An illustrated layout of Foster City revealed sites for nine elementary schools (one located centrally in each of the nine neighborhoods), two junior high schools, a senior high school, a parochial school and Catholic church, and several other churches.

In language substantially identical to that in its 1961 prospectus, Estero's July 1965 prospectus emphasized Foster

---

[34]In a self-prepared schedule which was attached as an exhibit to his March 1962 deposition (see pages 118 to 119, *infra*), Jack Foster set forth six classes of land use for Foster City. According to this schedule, 352 acres were to be devoted to "Schools, churches, etc."

City's neighborhood school concept. Moreover, it specifically called attention to the fact that the community's first elementary school (the site for which had been conveyed the previous year by the Foster partnership) had been completed and was already in use by the San Mateo Elementary School District.

Estero's 1966 and 1967 prospectuses also highlighted the progress of schools in Foster City. For example, the 1967 prospectus stated that the San Mateo Elementary School District had been operating a 600-pupil elementary school in Neighborhood One since 1965 and that it presently had under construction a 750-pupil elementary school in Neighborhood Two and a 1,000-pupil junior high school in Neighborhood Three.

The Fosters also advertised the planned community concept in newspapers and magazines and in the "Foster City Report," the promotional and public relations newsletter published by the partnership. For example, the August 1963 edition of the "Report" contained a photograph of a 42-square-foot scale model of Foster City complete with the neighborhood schools, churches, and other public facilities. The newsletter reported that similar scale models were on public display in important public places throughout San Mateo County, including at the Fair where "the model attracted more than 100,000 visitors."

In the fall-winter 1965 edition of the "Foster City Report," the headline announced that the San Mateo Union High School District had acquired a 56-acre site in Foster City for the construction of a high school designed to accommodate 3,000 to 3,500 students. The newsletter also reported that the San Mateo Elementary School District was discussing plans for a junior high school in Foster City, and that enrollment in the first elementary school had topped 300 pupils.

In order to provide adequately for schools in Foster City, the Fosters commenced discussions with San Mateo school officials as early as the summer of 1960. There was a great deal of concern on the part of those officials about the impact that Foster City would have on the local school system. That concern grew as development continued and the first residents began moving in. Eventually, the partnership, in order to settle the turmoil that had arisen, offered to donate the site for the first school.

At the time of the partnership's offer, the San Mateo

Elementary School District had been providing bus service to the school children of Foster City. The school district, however, threatened to cancel that service. In addition to alarming the residents, this threat, if carried out, would have made Foster City less attractive to prospective buyers with school-age children. At that point, the Fosters announced that they would withdraw their offer to donate the school site if the bus service were canceled. The district continued the service, whereupon the Fosters conveyed the site.

In order to provide for churches in Foster City, the Fosters developed a "church plan" with the assistance of the California-Nevada Council of Churches. The objective of the plan was to insure that Foster City would offer the proper variety and number of churches. The Council was given the responsibility of designating which churches should be given the first opportunity to purchase sites in Foster City.

The presence of schools and churches in Foster City enhanced the value of all of the land therein.

### B. ULTIMATE FINDING OF FACTS

The Foster partnership's dominant reason for conveying the school and church sites was the expectation of direct economic benefit.

### VIII. FACTS RELATED TO THE $5,000 PAYMENT FOR LEGAL SERVICES (ISSUE 6)

In January 1965, the Foster partnership received a statement for services rendered in the amount of $5,000 from the Oklahoma City law firm of Lytle, Soule & Emery. The statement was sent by Roy Lytle, a partner in that firm and the attorney whom the Fosters had continued to retain notwithstanding their relocation to California. The statement reads as follows:

*T. Jack Foster & Sons—General*

To fee for services rendered in connection with advice on income tax matters (state and federal) relating to Brewer's Island, where the work was in conjunction with Senator Richard J. Dolwig.

The partnership paid the $5,000 in January 1965 and claimed a deduction for legal fees in that amount on its information return for 1965. In the notice of deficiency,

respondent disallowed the deduction in its entirety on the ground that the "services of Senator Dolwig [were] not shown to be for business purposes."

Senator Richard Dolwig was a California State senator. He cosponsored the Estero Municipal Improvement District Act in the California legislature in 1960. Subsequent to the passage of that act, however, he did not engage in any legislative activity on behalf of the partnership.

Senator Dolwig was also a practicing attorney. He performed legal services for the Fosters in connection with the 1961 PG & E condemnation action (discussed *supra* in VI).

It was not the Fosters' practice to make campaign contributions as great as $5,000.

Roy Lytle performed substantial legal services for the Fosters during the 1950's and until his retirement in the 1960's. Unlike Del Champlin, he did not move to California when the Fosters undertook the Foster City project. Like Champlin, however, the Fosters trusted him and reposed great confidence in his professional ability. Accordingly, he was frequently called upon to render legal services from Oklahoma City. For example, he drafted their partnership agreements as well as many of their contracts, agreements, and other legal documents. He was usually the individual responsible for formally incorporating and dissolving their corporations. From 1960 through 1964, he was particularly active on their behalf in the Westway transaction.

### ULTIMATE FINDING OF FACT

The $5,000 payment made by the Foster partnership to Roy Lytle in 1965 was made for legal services and was a business expense.

### IX. FACTS RELATED TO THE PAYMENT OF THE FOSTERS' PERSONAL EXPENSES (ISSUE 7)

This issue involves certain deductions claimed by the Foster partnership which respondent disallowed on the basis that they were personal expenses of the Fosters. It also involves certain expenses paid by Likins-Foster Honolulu Corp. and two

of its subsidiaries which respondent also determined were personal to the Fosters.[35]

## A. NATURE OF THE UNDERLYING ADJUSTMENTS

In the notices of deficiency, respondent disallowed the following amounts claimed by the partnership as business expenses on the basis that they represent "non-deductible personal expenses of the partners":

| 1963 | 1964 | 1965 | 1966 | 1967 |
|------|------|------|------|------|
| $12,863.07 | $8,676.73 | $13,737.12 | $8,504.77 | $5,550 |

Respondent scheduled these amounts as follows in table I on page 115. As the schedule indicates, only the item denominated "travel and entertainment"[36] remains in dispute.

Respondent also determined in the notices of deficiency that the Likins-Foster Honolulu Corp. and certain of its subsidiaries made payments to or for the benefit of each of the Fosters during 1963 through 1967. Respondent denominated these payments as "informal dividends—travel" and determined further that they constituted divided income under sections 301 and 316.[37] In exhibits attached to the notices, he scheduled them as follows in table II on page 116.

The exhibit attached to the deficiency notice issued to Jack Foster, Jr., described the dividends as "personal expenses paid by corporation." This description did not expressly appear in the relevant exhibits attached to the notices issued to Jack Foster and Dick Foster.[38] Nevertheless, it is apparent from the notices as a whole that respondent charged the Fosters with

---

[35]The deductibility of these expenses by the corporations is an issue in *Likins-Foster Honolulu Corp. and Subsidiaries v. Commissioner of Internal Revenue*, docket No. 5361–78, a related but unconsolidated case which is presently pending before this Court.

[36]On its information returns for 1963 through 1967, the partnership claimed deductions for travel and entertainment. Respondent did not disallow those deductions in toto but rather only in part. It is difficult to compare the amounts disallowed with the amounts allowed because it would appear that some travel and entertainment expense was deducted as "advertising."

[37]In Jack Foster's case, respondent determined other constructive dividends in the form of the payment of personal legal fees and the personal use of a company car. These dividends, which aggregate $21,250, have been conceded by petitioners.

[38]As stated in the preceding footnote, the record does not include a complete copy of the notice of deficiency issued to Bob Foster so that we do not know how the relevant exhibit may have described the dividends charged to him.

dividend income because he determined that their corporations paid their personal expenses.

### B. ULTIMATE FINDINGS OF FACT

The Foster partnership paid personal expenses of the Fosters in the amounts of $12,863.07 in 1963, $8,676.73 in 1964, $13,737.12 in 1965, $8,504.77 in 1966, and $5,500 in 1967.

Likins-Foster Honolulu Corp. and certain of its subsidiaries paid personal expenses of the Fosters in the aggregate amounts of $18,057.59 in 1963, $10,726.98 in 1964, $7,072.62 in 1965, $3,631 in 1966, and $845 in 1967.

## X. FACTS RELATED TO THE PAYMENTS MADE TO GLADYS FOSTER (ISSUE 8)

On her 1963 through 1967 joint income tax returns, Gladys Foster, the wife of Jack Foster, described her occupation as that of decorator, and reported the receipt of compensation as follows:

| Year | Amount | Payor |
|------|--------|-------|
| 1963 | $12,000 | Likins-Foster Honolulu Corp. |
| 1964 | 12,000 | Do. |
| 1965 | 12,000 | Do. |
| 1966 | 12,000 | Do. |
| 1966 | 9,000 | Cardiff Homes, Inc. |
| 1967 | [39] 3,000 | Lomita Homes, Inc. |
| | 60,000 | |

Both Cardiff Homes, Inc., and Lomita Homes, Inc., were subsidiaries of Likins-Foster Honolulu Corp.

In the notice of deficiency, respondent determined that Gladys Foster's "compensation" for 1963 through 1967 was actually $70,761.82, allocable as follows:

| 1963 | 1964 | 1965 | 1966 | 1967 |
|------|------|------|------|------|
| $15,380.16 | $14,827.68 | $15,053.60 | $21,794.07 | $3,706.31 |

Respondent also determined that these amounts constitute dividends[40] rather than compensation.

---

[39] The 1967 return indicates that this amount was salary of Jack Foster. The parties, however, appear to agree that it is actually salary of Gladys Foster.

[40] As will be recalled, Jack Foster owned 75 percent of the stock of Likins-Foster Honolulu Corp., and his three sons, the remaining 25 percent in equal shares. Presumably because

TABLE I

| | 1963 | 1964 | 1965 | 1966 | 1967 | Nature of item disallowed |
|---|---|---|---|---|---|---|
| *Unagreed issues:* | | | | | | |
| Travel and entertainment— | | | | | | |
| T. Jack Foster | $6,000.00 | $2,000.00 | $1,950.00 | $892.76 | --- | Personal expenses |
| Advertising | 83.20 | 605.73 | 5,633.55 | 1,526.68 | --- | Personal expenses |
| Total unagreed issues | 6,083.20 | 2,605.73 | 7,583.55 | 2,419.44 | | |
| *Previously agreed issues:* | | | | | | |
| Boat expense | 654.87 | 435.00 | 578.57 | 351.83 | --- | Personal use of boat |
| Richard Foster, personal | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | $2,000 | Personal use of automobile |
| John R. Foster, personal | 1,400.00 | 1,400.00 | 1,400.00 | 1,400.00 | 1,400 | Personal use of automobile |
| T. Jack Foster, Jr. | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000 | Personal use of automobile |
| Telephone—T. Jack Foster | 100.00 | --- | --- | --- | --- | |
| Dues and subscriptions | 625.00 | --- | 175.00 | 333.50 | --- | |
| Charitable contributions | --- | 236.00 | --- | --- | 150 | |
| Total previously agreed issues | 6,779.87 | 6,071.00 | 6,153.57 | 6,085.33 | 5,550 | |
| Total personal expenses disallowed | 12,863.07 | 8,676.73 | 13,737.12 | 8,504.77 | 5,550 | |

TABLE II

| Dick Foster | 1963 | 1964 | 1965 | 1966 | 1967 |
|---|---|---|---|---|---|
| Travel and entertainment: | | | | | |
| Likins-Foster Honolulu Corp. | $122.36 | --- | --- | --- | --- |
| Lomita Homes, Inc. | 2,427.43 | $623.68 | --- | --- | --- |
| T. Jack Foster & Sons, Inc.[1] | --- | 852.83 | $1,546.33 | $200 | $75 |
| Total | 2,549.79 | 1,476.51 | 1,546.33 | 200 | 75 |
| | | | | | |
| Bob Foster | | | | | |
| Informal dividends-travel[2] | 4,332.34 | 894.35 | 850.00 | 200 | 75 |
| | | | | | |
| Jack Foster, Jr. | | | | | |
| Travel and entertainment | | | | | |
| Likins-Foster Honolulu Corp. | 122.37 | --- | --- | --- | --- |
| Lomita Homes, Inc. | 2,218.66 | 408.02 | --- | --- | --- |
| T. Jack Foster & Sons, Inc. | --- | 1,676.45 | 1,119.53 | 300 | 100 |
| Total | 2,341.03 | 2,084.47 | 1,119.53 | 300 | 100 |
| | | | | | |
| Jack Foster | | | | | |
| Travel and entertainment | | | | | |
| Likins-Foster Honolulu Corp.: travel | 1,561.38 | --- | --- | --- | --- |
| Lomita Homes, Inc.: | | | | | |
| Travel and telephone | 7,273.05 | 4,035.86 | --- | --- | --- |
| T. Jack Foster & Sons, Inc.: | | | | | |
| Travel and telephone | --- | 2,235.79 | 3,156.76 | 2,931 | 595 |
| Photos | --- | --- | 400.00 | --- | --- |
| Total | 8,834.43 | 6,271.65 | 3,556.76 | 2,931 | 595 |
| Grand total | 18,057.59 | 10,726.98 | 7,072.62 | 3,631 | 845 |

[1] This corporation should not be confused with the Foster partnership. It was incorporated in June 1964 and performed the check-writing and bookkeeping functions for the Foster City project, functions which had previously been performed by Lomita Homes, Inc.

[2] The record does not include a complete copy of the notice of deficiency issued to Bob Foster so that we do not know how the relevant exhibit allocated these amounts among the payor corporations.

ULTIMATE FINDING OF FACT

During 1963 through 1967, Gladys Foster received payments in the aggregate amount of $70,761.82, allocable to those years as determined by respondent, which are taxable as ordinary income to her and Jack Foster.

OPINION

By this point, it is probably apparent that this case involves some measure of complexity. That complexity is reflected in the sheer magnitude of the record and is exacerbated by the contentiousness of the parties. Not surprisingly, our task of finding the facts has been laborious and frequently frustrating. We have plodded through nearly 2,000 pages of testimony and examined more than 200 exhibits. The record is replete with factual inconsistencies and contradictions which the parties exploit to their own advantage in almost 1,000 pages of briefs. Nevertheless, we have done our best to reconcile the conflicting portions of the record. In all too many instances, however, we have reluctantly concluded that perfect harmony is simply not attainable.

Before turning to the substantive issues involved in this case, we need to address a number of preliminary issues related to certain evidentiary and procedural matters. The most important of these relate to the admissibility of several depositions. We have devoted considerable attention to these issues because of the importance of the content of the depositions to the parties' respective positions.

PRELIMINARY ISSUES RELATED TO
CERTAIN EVIDENTIARY AND PROCEDURAL MATTERS

During the course of this case, four depositions were admitted into evidence. The admissibility of each of those depositions has been challenged. Moreover, a ruling made by

---

Jack and Gladys Foster filed joint returns for 1963 through 1967, respondent did not specifically attribute the dividends to either spouse in the notice of deficiency. On brief, however, he inexplicably attributed them to Gladys Foster despite her lack of stock ownership. If the amounts in question are dividends, they should, of course, be attributed to Jack Foster.

the Court at trial sustaining an objection to a question calling for a conclusion by a witness has been questioned. Finally, an issue concerning the proper locus of the burden of proof in respect of the three major substantive issues has been raised. We shall begin with the depositions and discuss each in the chronological order in which it was taken.

### A. DEPOSITION OF JACK FOSTER

In 1961, the Pacific Gas & Electric Co. (PG & E) commenced an action to condemn an additional easement for a right-of-way across Brewer's Island. The action was brought in the Superior Court of the State of California for the County of San Mateo. Jack Foster was named as one of the parties defendant.

In March 1962, Foster was called to testify as a witness by PG & E at a deposition conducted by its attorney before a notary public and court reporter. At the deposition, Foster was represented by counsel. He was put under oath and examined by PG & E's attorney. His own attorney actively participated in the deposition by objecting to questions and occasionally instructing him not to answer and by briefly examining him. The examination included a history of the Fosters' involvement in Brewer's Island, a discussion of public and private financing for the project, and a review of the first 2 years of operation.

The deposition transcript was not executed by Foster. However, it was stipulated that if he did not sign it prior to trial, it could be used at that time with the same force and effect as though he had signed it.[41] The transcript was apparently filed by the parties with the State court. However, the record does not disclose whether the condemnation action was ultimately resolved by trial or settlement, and, hence, whether the transcript was ever formally admitted into evidence in that action.

Jack Foster died in March 1968.

Pursuant to respondent's motion and over what was essentially petitioners' general hearsay objection, the Court admit-

---

[41]It was also stipulated that all objections to questions, except those related to form, were reserved by the parties.

ted Foster's deposition into evidence, subject to petitioners' relevancy objection.

### 1. *Petitioners' General Hearsay Objection*

Rule 801(c) of the Federal Rules of Evidence[42] defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Statements made at a deposition and offered later at trial to prove the truth of the matter asserted would seem to fall within that definition. If so, such statements are inadmissible under Fed. R. Evid. 802 unless an exception to the hearsay rule is applicable. See Fed. R. Evid. 803 and 804. However, Fed. R. Evid. 801(d)(2)(A) provides that a statement is not hearsay if it constitutes an admission by a party-opponent, i.e., "the statement is offered against a party and is his own statement, in either his individual or a representative capacity."

The rationale for excluding admissions from the definition of hearsay is set forth in the Advisory Committee's Note to Fed. R. Evid. 801:

Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule. No guarantee of trustworthiness is required in the case of an admission. The freedom which admissions have enjoyed from technical demands of searching for an assurance of trustworthiness in some against-interest circumstance, and from the restrictive influences of the opinion rule and the rule requiring firsthand knowledge, when taken with the apparently prevalent satisfaction with the results, calls for generous treatment of this avenue to admissibility. [Citations omitted.]

See also 4 J. Wigmore, Evidence, sec. 1048 (J. Chadbourn rev. 1972); D. McCormick, Evidence, sec. 262 (2d ed. 1972). As Wigmore explains:

The theory of the hearsay rule is that an extrajudicial assertion is excluded unless there has been sufficient opportunity to test the grounds of assertion and the credit of the witness, by cross-examination by the party against whom it is offered * * * ; e.g., if Jones had said out of court, "The party-opponent Smith borrowed this fifty dollars," Smith is entitled to cross-examine Jones upon that assertion. But if it is Smith himself who said out of

---

[42]This Court is, of course, bound by the Federal Rules of Evidence. Sec. 7453; Rule 143(a); Fed. R. Evid. 101, 1101(a).

court, "I borrowed this fifty dollars," certainly Smith cannot complain of lack of opportunity to cross-examine himself before his assertion is admitted against him. Such a request would be absurd. Hence the objection of the hearsay rule falls away, because the very basis of the rule is lacking, viz., the need and prudence of affording an opportunity of cross-examination. [4 J. Wigmore, *supra* at sec. 1048, pp. 4–5.]

An admission by a party-opponent is thus admissible as substantive evidence of the fact stated. 4 J. Weinstein & M. Berger, Weinstein's Evidence, par. 801(d) (2) [01] (1981). Jack Foster's deposition constitutes a series of admissions (see 2 B. Jones, Evidence, sec. 13:54 (6th ed. 1972)), which are admissible as such.[43] Petitioners' objection that they were not afforded an opportunity to cross-examine Foster at the deposition is without merit.[44]

## 2. *Petitioners' Relevancy Objection*

Petitioners also raise a relevancy objection. We agree that an admission must be relevant to be admissible. Fed. R. Evid. 402; see Fed. R. Evid. 403. However, to the extent that their objection speaks to the deposition as a whole, it is without merit because Foster's examination touched on a number of matters which are relevant to many of the issues before us. To the extent that their objection relates to specific passages, suffice it to say that in finding the facts we were mindful of the definition of "relevant evidence" set forth in Fed. R. Evid. 401,[45] although we would be less than candid not to admit that we are inclined to treat relevancy objections as going more to weight than to admissibility.

### B. DEPOSITION OF DEL CHAMPLIN

In June 1969, A. O. "Del" Champlin terminated his relationship with the Fosters. His rapport with the three sons had

---

[43]In the present proceeding, the party-opponent is technically the Estate of Jack Foster and not Jack Foster, individually. However, the relationship between the two is such that Foster's statements constitute admissions. 4 J. Wigmore, Evidence, sec. 1081.

[44]Moreover, their objection is without factual foundation because Foster's attorney did, in fact, question him after he was examined by PG & E's counsel.

[45]"Relevant evidence" is defined by that rule as—

"evidence having *any tendency* to make the existence of *any fact* that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. [Emphasis added.]"

gradually deteriorated, particularly after Jack Foster's death in 1968. In July 1969, Champlin commenced an action against Jack Foster, Jr., Dick Foster, and Bob Foster in the Superior Court of the State of California for the County of San Mateo. The complaint was styled as one "for wrongful interference with advantageous relationship, compensatory and punitive damages." It alleged that they caused the dissolution of Champlin's accounting firm by inducing his partners to continue rendering accounting services notwithstanding the termination of his relationship with the Fosters.

Shortly thereafter, Champlin also sued the three Foster sons for breach of contract in a separate action. His complaint alleged three causes of action, namely, that the Fosters failed to (1) fully compensate him for services related to his agreement to (a) relocate to California and (b) "perform and provide for defendant's ordinary day to day advisory services and certified public accountant services in matters of finances, taxes and business advice during the planned eight (8) year development by defendants of Foster City;" (2) compensate him for "extraordinary tax consultation services" related to, inter alia, Foster Bayou Corp., Esteroy Corp., Foster Enterprises, Ltd., and Foster California Corp.; and (3) reimburse him for certain expenses incurred in respect of the foregoing. Judgment in the amount of $1,500,000 was prayed for on the first two causes of action.

In the breach of contract action, the Fosters counterclaimed, alleging malpractice on Champlin's part and damage "by reason of tax deficiencies, and by reason of tax deductions lost to defendants which substantially increased the income taxes paid by defendants in excess of those otherwise payable." Judgment in the amount of $2 million (plus interest and penalties), was prayed for in the counterclaim. In answers to interrogatories served by Champlin, the Fosters outlined the grounds for their malpractice counterclaim, including the following:

I. *Failure to recommend or cause incorporation of Foster City development project.*

The pending audit by the Internal Revenue Service of the Foster tax returns for the period 1959–1967 discloses proposed assessments of tax deficiencies based on attribution of additional taxable income to the partners of the partnership known as T. Jack Foster & Sons in an amount in excess of

$5.9 million. If the claims of the Service are sustained, the resulting taxes will be imposed on the individual members of the partnership at rates which exceed corporate tax rates by an average of 50%. At corporate tax rates, the proposed assessment would result in tax deficiencies of approximately $2.95 million (applying an average corporate tax rate of approximately 50%). At individual tax rates, however, the proposed assessment could result in imposition of taxes on the individual partners aggregating approximately $4 million, or approximately $1.1 million more than would have been the case if the Foster City development project had been placed in a corporate structure at the outset.

Plaintiff was or should have been aware that it is the custom and practice in the development industry to perform land development under a corporate form of organization, particularly where, as in the instant case, sales projections (in the making of which plaintiff participated) showed prospects of very large profits and the retaining and reinvesting in the project of very large sums for continued development.

If the proposed deficiency is sustained, the amount of deficiency will bear interest at the rate of 6% per year; based on an average projected period of 7 years, the aggregate loss resulting solely from this one item is approximately $1.5 million ($1.1 million, plus 6% interest for 7 years).

II. *Creation of and failure to use losses generated in Foster Enterprises, Ltd.*

Foster Enterprises, Ltd. was a corporation which owned the Foster Towers apartment-hotel building in Honolulu. From the completion of the structure, plaintiff elected to take accelerated depreciation for tax purposes, rather than taking depreciation on a straight line basis. The result was to increase substantially operating losses generated by Foster Enterprises, Ltd.

Plaintiff utterly failed to do anything about the substantial losses that were being generated in Enterprises until 1966, at which time some of the earlier loss carryforwards would have expired. In 1966, plaintiff recommended and caused the transfer to Enterprises of a substantial amount of real property located in Neighborhood 4 in the Foster City project in San Mateo County, which property was owned by the partnership of T. Jack Foster & Sons. The said property was sold shortly after such transfer, and the losses of Enterprises were set off against the profits on the sales. It is the position of the Internal Revenue Service that the property at the time of transfer was fully developed and ready for sale; that the transfer of the property to Enterprises was sham, and that the profit on the sales should properly be charged to the partnership. If the Internal Revenue Service is sustained in its position, approximately $980,000 in taxable income will be attributed to the partners for the year 1967, which will result in tax liabilities of approximately $650,000, plus interest at 6% per year. In addition, the bulk of the losses generated in Enterprises as aforesaid will be of no use to any taxpayer, the time for such use having expired. The effect of the use of accelerated depreciation has been to decrease the basis of the hotel building by approximately $530,000 and the taxable gain on sale will be increased by an equivalent amount. Assuming that the building is sold by a corporation (sales negotiations are currently pending), the result will be an unnecessary

increased tax liability of approximately $265,000 on the sale resulting from the use of accelerated depreciation.

Plaintiff was negligent in connection with the foregoing transactions in the following particulars:

(a) Plaintiff elected to take accelerated depreciation on the hotel building, and failed to discontinue the same when it was apparent that Enterprises would not, of itself, generate profits, and plaintiff neither formulated nor executed reasonable plans for use of the operating losses of Enterprises.

(b) Plaintiff failed to cause the property transferred to Enterprises to be transferred at a timely date, i.e., failed to cause such transfer to occur when the property was clearly undeveloped and not ready for sale.

III. *Creation of, and transfer of properties to, the "Alphabet Corporations".*

(a) *Failure to effect timely transfer.*

As land in Neighborhood 1 of the Foster City project was being developed, plaintiff caused the formation of 4 separate "alphabet" corporations; namely, Foster T, Foster J, Foster B, and Foster D Corporations, each of which was wholly owned by one of the partners of T. Jack Foster & Sons, the then owner of the land. Neighborhood 1 land was transferred to the 4 corporations as tenants in common in or about 1963. The bulk of the land was then sold during the period 1963–1965 at a substantial profit, most of such profit being realized in 1963 and 1964.

It is the position of the Internal Revenue Service that the formation of the alphabet corporations, and the transfer of land to them, had no business purpose other than the avoidance of taxes; that the land transferred was fully developed and ready for sale at the time of transfer; and that the entire series of transactions was therefore a sham which should be disregarded, with all profit on the sales of land by the alphabet corporations in Neighborhood 1 to be attributed to the partnership, T. Jack Foster & Sons. The total profit proposed to be attributed by the Internal Revenue Service to the partnership on the said land sales is $1,225,238.56. Because the partners' tax brackets were substantially higher than those of the corporations, the effect of the attribution will be to increase taxes payable by the individuals to the Federal Government by more than $750,000.

\*          \*          \*          \*          \*          \*          \*

Plaintiff was negligent and unprofessional in his conduct and advice in connection with the foregoing transactions as follows:

(a) Plaintiff failed to cause the property transferred to the alphabet corporations to be transferred at a timely date, i.e., failed to cause such transfer to occur when the property was clearly undeveloped and not ready for sale;

\*          \*          \*          \*          \*          \*          \*

VII. *Negligence in preparing tax returns in relation to personal, as opposed to business, expenses.*

Plaintiff had primary responsibility for preparation of the tax returns of the Fosters. The Internal Revenue Service has taken the position that the returns covered by its pending audit were so far overreaching in their claims

of business expense deductions for items which the Service regards as personal that a 5% negligence penalty is proposed on the income of the taxpayers involved for the years covered by the returns. It is not possible at this time to state the amount of such penalty if it is imposed, other than to state that it would not be less than $50,000 and could be substantially greater than that amount. If the Internal Revenue Service is sustained in its position, it will be because of plaintiff's negligence in preparing the returns in question.

\* \* \* \* \* \* \*

IX. *General and Miscellaneous Items.*

\* \* \* \* \* \* \*

Further, and throughout the periods covered in these interrogatories, plaintiff purported to act as tax counsellor and consultant to defendants. In the course of so doing, plaintiff gave legal advice, prepared instruments beyond his professional competence, and engaged in the practice of law without a license.

All of these answers to interrogatories were verified by Bob Foster under penalties of perjury.

In October and November 1969, Del Champlin was called to testify as a witness by the Fosters in a deposition conducted by their attorney before a notary public and court reporter. At the deposition, Champlin was represented by counsel. He was put under oath and examined by the Fosters' attorney over a 5-day period. His own attorney participated in the deposition only to a limited extent. The examination included Champlin's background, his association with the Fosters, and his involvement in the Foster City project.

The deposition transcript was not executed by Champlin. However, he reviewed it and a number of corrections were made. The parties stipulated that it could be used at trial.[46] The transcript was apparently filed with the State court. However, the underlying actions were ultimately settled prior to trial.

Del Champlin died prior to the trial of the present case.

Over petitioners' general hearsay objection, the Court granted respondent's motion to admit specified parts of the Champlin deposition into evidence, subject to petitioners' relevancy, opinion, and double hearsay objections. Petitioners then moved to admit portions of the balance of the deposition

---

[46]It was also stipulated that all objections to questions, except those related to form, were reserved by the parties.

for the limited purpose of establishing alleged "bias or untruthfulness or inconsistencies" on Champlin's part. Respondent offered no objection and their motion was granted.

1. *Petitioners' General Hearsay Objection*

There is no question that Champlin's deposition constitutes hearsay as defined in Fed. R. Evid. 801(c). It is therefore inadmissable under Fed. R. Evid. 802 unless an exception to the hearsay rule is available. We think Fed. R. Evid. 804(b)(1) provides such an exception. That rule states as follows:

(b) *Hearsay exceptions.*—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) *Former testimony.*—Testimony given as a witness * * * in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered * * * had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

Champlin, as the declarant, is "unavailable as a witness" within the meaning of that phrase as defined in Fed. R. Evid. 804(a)(4). Petitioners concede that his deposition was "taken in compliance with law" and that they had the opportunity to develop his testimony by direct examination. They contend, however, that they did not have a "similar motive" to develop his testimony because it was taken in the context of a discovery deposition. In this regard, they maintain that their motive "was not to tie Mr. Champlin down to a consistent and truthful statement of facts" that would be admissible in court but rather to achieve "wide-range" discovery objectives, principally including the production of "raw information" and the identification of the "outer limits" of their adversary's position.

We recognize that the focus of a party's examination of a witness at trial will generally be narrower than in a discovery deposition. However, we reject any suggestion that we adopt a rule of law that a party's motive in examining the witness is not similar in the two proceedings. See 4 J. Weinstein & M. Berger, *supra* at par. 804(b)(1)[02], pp. 804–61/62, 804–62 ("Rule 804(b)(1) should not be interpreted as requiring a blanket exclusion of all depositions taken for purposes of discovery"). Rather, we think the question of similarity of motive is factual and is best resolved by comparing "the

similarity of the issues and the context in which the opportunity for examination previously arose." S. Saltzburg & K. Redden, Fed. R. Evid. Manual 652 (3d ed. 1982). See 4 J. Weinstein & M. Berger, *supra* at par. 804(b)(1)[04].

Champlin's action against the Fosters for breach of contract, and their counterclaim against him for malpractice, involved services which he rendered in his capacity as their tax counselor during the development of Foster City. The tax consequences of those services give rise to the issues presently before us. It is readily apparent from a perusal of the Fosters' answers to Champlin's interrogatories that the tax consequences of those services were also at issue in the State court action. For example, they faulted him for failing to recommend or cause the incorporation of the Foster City project, and for failure to effect a timely transfer of land to the Alphabet Corporations. As we shall see, these matters relate to the Neighborhood One issue, discussed *infra* in Issue 1. They also faulted him for creating, and then failing to use, losses generated by Foster Enterprises. As we shall also see, this matter relates to the Neighborhood Four issue, discussed *infra* in Issue. 3. Moreover, they alleged in their answers that Champlin had "primary responsibility" for not only preparing their tax returns but also establishing their books of account and those of their corporations.[47]

Furthermore, in another deposition (discussed *infra* in C.), Jack Foster, Jr., described Del Champlin as the "steward" of the Fosters' taxes. Champlin was unquestionably the architect of their tax strategy. The soundness of that strategy was a major issue before the Superior Court and the central issue before this Court. Similarly, the extent to which Champlin may have played a role other than that of tax consultant was, and continues to be insofar as the parties are concerned, an important related issue. The Fosters probed these issues over a 5-day period in 1969. Their efforts are reflected in a transcript which runs 435 pages. For these reasons, we are satisfied that petitioners had a similar motive to develop Champlin's testimony, and hence that his deposition is admissible in this

---

[47]The latter responsibility is alleged in a portion of their answers which was not reproduced above.

proceeding under the "former testimony" exception to the hearsay rule.

## 2. *Petitioners' Remaining Objections*

We turn now to petitioners' relevancy, opinion, and double hearsay objections.

We agree that petitioners are entitled to raise relevancy objections at this time. See D. McCormick, *supra* at sec. 259. However, if the objection is to the Champlin deposition as a whole, it is without merit. Even given the most hurried and superficial reading, the relevance of that deposition is readily apparent. On the other hand, if the objection is to isolated passages, we refer to our comments set forth above in A.2., which are equally applicable here.

It is less certain whether petitioners are entitled to raise opinion objections at this time. See D. McCormick, *supra* at sec. 259. However, we need not decide that issue because the trial court has considerable latitude under Fed. R. Evid. 701 in admitting opinion testimony by lay witnesses. See 3 J. Weinstein & M. Berger, *supra* at par. 701[02]. 4 J. Weinstein & M. Berger, *supra* at par 801(d)(2)(A)[01], p. 801–140 n. 7. That rule, which rejects a rigid and liberal application of the opinion rule, provides as follows:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

We find little, if indeed anything, objectionable in Champlin's testimony under this rule. His testimony is certainly helpful in determining many of the facts in issue. We also think it rests on a firm foundation. After all, Champlin had a long history with the Fosters. He began by performing accounting services for them during the Likins-Foster era and continued to do so after Likins and Foster terminated their business relationship in 1955. At their request, he moved to San Mateo in January 1961. From that time until June 1969, the Fosters were virtually his only clients and he devoted most of his time to their affairs. He even shared their offices and was never excluded from one of their meetings regardless of the subject matter. As their tax adviser they trusted him implicitly and reposed great confidence in his professional

ability. And, most importantly, he played a central role in arranging the transactions challenged here by respondent. However, we agree with petitioners that Champlin's comments concerning the management ability and integrity of each of the Fosters, as well as similar expressions of opinion, are objectionable, but on grounds of relevance and not opinion. Thus, we have disregarded those comments.

Finally, we agree that petitioners are entitled to raise double hearsay objections at this time. However, their objections are generally not well founded for several reasons. First, Fed. R. Evid. 805 does not exclude hearsay within hearsay "if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Second, as previously discussed (see A.1., *supra*), a party's admissions do not constitute hearsay and are admissible as substantive evidence of the fact stated. See Fed. R. Evid. 801(d)(2)(A). Most of petitioners' specific objections to Champlin's testimony involve admissions by the Fosters. Thus, double hearsay is not even present. Third, to be objectionable, hearsay must be evident in the testimony, itself. We will not sustain an objection premised on a party's inference drawn from other parts of the record that the deponent's testimony must have been hearsay because he could not possibly have had firsthand knowledge of the underlying facts.

## 3. *Petitioners' Complaint of Bias, etc.*

Petitioners urge that we reject the Champlin deposition in its entirety because the deponent was allegedly biased, inconsistent, and not truthful in his testimony. In our view, this complaint does not affect the *admissibility* of the deposition but rather the *weight* to which it is entitled. See Fed. R. Evid. 607 and 608; see generally D. McCormick, *supra* at sec. 40; cf. Fed. R. Evid. 403. No protracted analysis is therefore necessary. We shall simply state that Champlin was not a disinterested witness, just as the Fosters were not at the trial of this case, and that we considered that fact in evaluating his testimony.

### C. DEPOSITION OF JACK FOSTER, JR.

In March 1971, Jack Foster, Jr., was called to testify as a witness by Del Champlin at a deposition conducted by Champ-

lin's attorney before a notary public and court reporter. The deposition was part of Champlin's action against the Fosters for breach of contract and their counterclaim against him for malpractice. (See B., *supra*.) At the deposition, Foster was represented by counsel. He was put under oath and examined by Champlin's attorney over a 4-day period. His own attorney participated in the deposition only to a limited extent. The examination revolved around the development of Foster City as well as Champlin's relationship to the Fosters and his involvement in the project.

The deposition transcript was reviewed, corrected, and executed by Jack Foster, Jr., and was apparently filed with the State court.[48] However, as stated previously, the underlying actions were ultimately settled prior to trial.

Jack Foster, Jr., was alive at the time of the trial of the present case and testified extensively.

Pursuant to respondent's motion and over petitioners' general hearsay objection, the Court admitted Foster's deposition into evidence, subject to petitioners' relevancy, opinion, and "double hearsay"[49] objections.

Petitioners' hearsay and relevancy objections are without merit for the reasons previously discussed. See A., *supra*. This leaves for consideration their opinion and "double hearsay" objections.

Contrary to petitioners' contention, an admission is not objectionable merely because it is not based on personal knowledge or is in the form of an opinion. 4 J. Weinstein & M. Berger, *supra* at par. 801(d)(2)[01], p. 801–136, and par. 801(d)(2)(A)[01], p. 801–140; 4 J. Wigmore, *supra* at sec. 1053; D. McCormick, *supra* at secs. 263 and 264; see *Owens v. Atchison, Topeka & Santa Fe Railway Co.*, 393 F.2d 77, 79 (5th Cir. 1968) ("it is well settled that the opinion rule does not apply to a party's admissions"); cf. Fed. R. Evid. 602; S. Saltzburg & K. Redden, *supra* at 305–306. Such an admission may be entitled

---

[48]It appears that the parties to that proceeding stipulated that the transcript could be used at trial. They also stipulated that all objections to questions, except those related to form, were reserved by the parties.

[49]In the context of this issue, the phrase "double hearsay," or "hearsay within hearsay," is technically a misnomer because admissions do not constitute hearsay under Fed. R. Evid. 801(d)(2).

to less weight, but it is clearly not inadmissible. We might also add that, as previously discussed, Fed. R. Evid. 701 eschews a rigid and literal application of the opinion rule in favor of a liberal formulation which gives the trial court considerable latitude in admitting opinion testimony by lay witnesses. See B.2., *supra*. In any event, we fail to see much potential for opinion testimony on the part of Jack Foster, Jr. After all, Foster was not a "sidewalk superintendent" idly gazing into the construction pit and casually observing the development of Foster City. Rather, from November 1960 until 1970, he was the project's general manager, a position that consumed virtually all of his time. Moreover, he was an equal partner in the Foster family partnership and a shareholder and officer in most of the Foster-dominated corporations.

We turn now to petitioners' "double hearsay" objection. Although Fed. R. Evid. 805 does not technically apply because admissions do not constitute hearsay statements under Fed. R. Evid. 801(d)(2) (see S. Saltzburg & K. Redden, *supra* at 686), we agree that hearsay within an admission is subject to objection, unless, of course, an exception to the hearsay rule applies. See *Cedeck v. Hamiltonian Fed. Sav. & L. Ass'n*, 551 F.2d 1136 (8th Cir. 1977); S. Saltzburg & K. Redden, *supra* at 686. However, we think their specific hearsay objections are without merit because petitioners have confused hearsay with lack of personal knowledge. In other words, there is a difference between offering as an admission a party's out-of-court statement that "A said that x is a fact" for the purpose of proving that x is a fact, and offering as an admission a party's out-of-court statement that "x is a fact" for that same purpose. As stated above, a party's lack of personal knowledge that x is a fact does not render inadmissible his statement to that effect. Returning to our example, even though a party's out-of-court statement that "x is a fact" is based on A's having told him that fact rather than on his personal knowledge, the statement is still admissible as an admission. Of course, a party is entitled to try to lessen the *weight* of an admission by introducing evidence that it was not based on personal knowledge. D. McCormick, *supra* at sec. 263. *Admissibility* of the admission, however, is a completely different matter.

### D. DEPOSITION OF REX D. JOHNSON[50]

In December 1977, immediately prior to the issuance of the first of the four notices of deficiency involved in this case, petitioners filed with this Court an "Application to Take Deposition to Perpetuate Testimony of Rex D. Johnson Before Commencement of Case." See Rules 82, 80(a). Attached to their application was a copy of a letter dated August 12, 1974, from Johnson to their present counsel which purported to outline "the various steps taken or initiated in 1966 to improve the credit support or security which the Republic National Bank had for the various loans it had made to the Foster interests." Petitioners stated that they desired to perpetuate Johnson's testimony concerning the content of his letter, indicating that it related to the Neighborhood Four issue. (See Issue 3, *infra*.)

Respondent filed a notice of objection to petitioners' application and a hearing was held in San Francisco in January 1978. After considering the arguments of counsel, the Court granted the application. The last paragraph of our order stated that if the applicants should file a petition in this Court, the deposition could only be used in accordance with Rule 81(i).

In February 1978, Rex Johnson was called to testify as a witness by petitioners in a deposition conducted by their counsel before a notary public and court reporter. Johnson was not represented by counsel at the deposition. He was put under oath and examined by petitioners' counsel and then cross-examined by respondent's counsel. Petitioners' counsel objected to, and the witness declined to answer, questions propounded by respondent's counsel which they thought went beyond the scope of the August 1974 letter, and, hence, the direct examination, particularly questions addressed to the Westway transaction. (See Issue 2, *infra*.)

The deposition transcript was reviewed, corrected, and executed by the witness.

Rex Johnson was not present at the trial of this case. At that time he was alive and well and living in Dallas.

Pursuant to petitioners' motion and over respondent's

---

[50]As will be recalled, Rex D. Johnson was at one time a senior vice president of the Republic National Bank with responsibility for the Foster account.

general objections, the Court admitted the Johnson deposition into evidence (see Rule 143(c)), subject to a number of specific objections by respondent.

### 1. *Respondent's General Objections*

Respondent objects to the Johnson deposition in its entirety on two grounds. First, he contends that the deposition does not satisfy any of the conditions for its use at trial set forth in Rule 81(i). Second, he contends that he was denied the right of cross-examination at the deposition. We think both contentions lack merit.

Rule 82 governs depositions to perpetuate evidence taken in anticipation of commencing a case in this Court. The last sentence of that rule provides that if such a deposition is taken and a case is thereafter commenced, the deposition may only be used in conformity with Rule 81(i). That Rule provides in part as follows:

At the trial * * * any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition * * * in accordance with any of the following provisions:

       \*       \*       \*       \*       \*       \*       \*

(3) The deposition may be used for any purpose if the Court finds: * * * (E) that such exceptional circumstances exist, in regard to the absence of the witness at the trial, as to make it desirable in the interests of justice, to allow the deposition to be used.

We think that such exceptional circumstances exist that the interests of justice allow the use of the Johnson deposition and did not demand that the witness be present at trial. Respondent is not prejudiced. He had reasonable notice of the deposition and was represented by counsel of his choice. He had the opportunity to, and did, in fact, cross-examine the witness. Moreover, use of the deposition at trial conserved time, helped to shorten an already protracted proceeding, and minimized expense and inconvenience. See Rule 1(b). Finally, the witness is not a party and resides a considerable distance from where the trial was held. The deposition was conducted in Dallas at the Republic National Bank where he was given the opportunity to review bank records in an effort to refresh

his recollection about events which occurred during the mid–1960's.

Respondent's other general objection involves his complaint that he was denied the opportunity to cross-examine Johnson at the deposition. However, the deposition transcript indicates to the contrary. The witness only declined to answer questions when respondent sought to examine him on matters unrelated to his August 1974 letter. Petitioners' original application clearly stated that they desired to depose Johnson only with respect to the content of that letter, indicating that it related to the Neighborhood Four issue. At the deposition, the witness repeatedly stated his understanding that his examination was to be so limited and explained that he prepared himself accordingly. He indicated that because of the passage of time, he was reluctant to testify further, for fear of being inaccurate and unfair, without first refreshing his recollection by reviewing pertinent bank records. As he stated: "the only way I can be fair in these matters is to be accurate. And I just cannot expound on items that old without some opportunity to prepare myself."

We are satisfied that respondent was not denied the opportunity to cross-examine Rex Johnson at the deposition. If his testimony on the Westway transaction was sufficiently important, respondent had the opportunity to subpoena him at trial (see Rule 147), or to take his deposition (see Rules 74, 81). His failure to do either reinforces our view that his contention is without merit.[51]

## 2. *Respondent's Specific Objections*

Respondent also objects to parts of the Johnson deposition. Certain of his objections were raised at the deposition while others were raised at trial. See Rule 85(c); cf. Rule 81(f)(2).

Respondent objects to a substantial part (and arguably all) of the Johnson deposition on the ground of relevancy. He contends that as a matter of law, petitioners cannot frustrate his application of section 482 by claiming that the Neighbor-

---

[51]In his reply brief, for the first time, respondent objects to the admissibility of the Johnson deposition on the specific ground that the deponent was not "unavailable as a witness" within the meaning of Fed. R. Evid. 804(b)(1). See also Fed. R. Evid. 804(a). However, we think the objection on this particular ground comes too late. See Rule 85(c); Fed. R. Evid. 103(a)(1).

hood Four lots were transferred for a business purpose, and that, for that reason, Johnson's testimony is largely irrelevant. The objection, therefore, goes to the heart of the substantive issue. Accordingly, it would be inappropriate to consider it at this time. See instead Issue 3, *infra*.

Respondent also objects, on hearsay and "best evidence" grounds, that the records which Johnson reviewed in preparing to testify at the deposition were not made available to him for inspection. The deposition transcript, however, suggests the contrary. For example, it refers to the presence of two cardboard boxes allegedly containing the records which Johnson reviewed. Nothing in the transcript indicates that respondent's counsel was precluded from inspecting the contents of those boxes or that he even requested to do so. Moreover, we simply cannot comprehend a hearsay basis for this objection. Respondent's additional reliance on the best evidence rule is likewise ill founded. That rule requires the production of the original in order to prove the contents of a writing. Fed. R. Evid. 1002; see D. McCormick, *supra* at sec. 230. However,

If the contents are not sought to be proved, this particular Rule need not be complied with. The fact that a writing is made to describe or record an event or a condition does not prevent testimony by knowledgeable witnesses as to the same event or condition. [S. Saltzburg & K. Redden, *supra* at 732.]

Johnson's testimony concerning Republic's interest in the transfer of the Neighborhood Four lots is thus outside the scope of the best evidence rule.

Contending that they constitute more than mere corrections, respondent also objects to changes made by Johnson to the deposition transcript before he executed it. However, Rule 81(h)(1) provides that "Any changes in form *or substance*, which the witness desires to make, shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them." (Emphasis added.) Although Rule 81 governs depositions in a pending case, we can see no reason why the quoted provision should not also apply to depositions under Rule 82. Cf. Rule 143(c).

Finally, respondent objects on hearsay grounds to three exhibits introduced by petitioners at the deposition. One of the exhibits is the August 1974 letter from Rex Johnson to petitioners' present counsel which was written in anticipation

of this litigation. It is a classic hearsay statement (see Fed. R. Evid. 801(c)), and is inadmissible under Fed. R. Evid. 802.[52] The two remaining exhibits are bank records. One is admissible, if for no other reason, because respondent stipulated to it and failed to reserve any hearsay objection in the stipulation of facts. The other is admissible under the business-records exception to the hearsay rule. See Fed. R. Evid. 803(6).

E. THE "BUSINESS PURPOSE" OBJECTION

At his deposition in March 1971, Jack Foster, Jr., testified as follows:

Q. At the time Neighborhood 4 was transferred into Foster Enterprises, did you actually have some sales pending for those lots, or not?
A. I would say—let's see. The transfer was in '66?
Q. Yes.
A. Well, no, I don't think we did have any sales for those lots in '66.
Q. Was this transfer made, Neighborhood 4 to Foster Enterprises, solely on the advice and recommendation of Mr. Champlin?
A. Yes.
Q. And no one questioned that recommendation?
A. No.
Q. Did anyone ask him why he was recommending that it be done?
A. No.
Q. Did he say it was for the purpose of taking advantage of a tax loss in Foster Enterprises?
A. Yes.
Q. Was there any *business purpose* in this transfer at all? [Emphasis added.]
A. I don't know.
Q. You don't know of any? Is that what you're saying?
A. Well, no.

At trial, Foster was again questioned about the transfer of the Neighborhood Four lots to Foster Enterprises. On direct examination he testified as follows:

Q. * * * Have you had the opportunity of reviewing the deposition of Rex Johnson?
A. Yes.

----

[52]We find petitioners' contention that this letter is not hearsay but that if it is, it constitutes "recorded recollection" and hence is admissible under an exception to the hearsay rule, i.e., Fed. R. Evid. 803(5), to be so disingenuous as not to warrant further comment.

Q. And have you looked at the exhibits which are attached to that deposition?

A. Yes.

Q. With that information, would you say there was—would you now state whether or not there was a *business purpose* to that transfer? [Emphasis added.]

At this point, respondent objected on the grounds that the question "calls for a conclusion on the witness * * * And it was an observation made precisely for the trial." The Court sustained the objection but reserved judgment on petitioners' motion to strike the same question in Foster's deposition.

### 1. *Objection to Question Calling for a Conclusion*

On brief, petitioners invite us to reverse our ruling on respondent's objection at trial, an invitation which we decline. Assuming that their business purpose question is relevant, it is clear that the abolition of the ultimate issue rule in Fed. R. Evid. 704[53] does not render admissible every expression of opinion; rather, opinion testimony must still be "helpful" under Fed. R. Evid. 701. See the Advisory Committee's Note to Fed. R. Evid. 704; 3 J. Weinstein & M. Berger, *supra* at par. 704[02], pp. 704–9/10; S. Saltzburg & K. Redden, *supra* at 478. In our judgment, Foster's opinion would not have satisfied this standard. It would have been based solely on his reading of the Johnson deposition, formulated only for purposes of the present case, and expressed nearly 15 years after the transfer in question. We have previously ruled that the Johnson deposition is admissible. See D., *supra*. If we determine that business purpose is relevant to the Neighborhood Four issue (see Issue 3, *infra*), we will therefore have available for our consideration the exact same raw information upon which Foster would have based his opinion. Under these circumstances, we fail to see how his expression of opinion would have been helpful.

### 2. *Motion To Strike*

We turn now to petitioners' motion to strike. We think that motion must be denied because the business purpose question

---

[53]The rule provides as follows:

"Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

asked at the deposition elicited an admission of a party-opponent which is admissible under Fed. R. Evid. 801(d)(2)(A). See A.1. and C., *supra*. As D. McCormick states:

> this [opinion] rule, designed to promote the concreteness of answers on the stand, is grotesquely misapplied to out-of-court statements, such as admissions, where the declarant's statements are made without thought of the form of courtroom testimony and where it can only be applied by excluding the statement, whereas in the courtroom if the opinion objection is sustained, counsel may reframe his question in the preferred form. [D. McCormick, *supra* at sec. 264, p. 632.]

Although not necessary to support either our ruling at trial or our disposition of petitioners' motion to strike, we think Foster's answer to the business-purpose question at the deposition was given under circumstances which would make it far more trustworthy than an answer to that question at trial. The deposition was conducted in 1971, ten years before the trial of the present case. Moreover, Foster's incentive to respond at trial in a self-serving manner would obviously have been greater than at his deposition.

### F. BURDEN OF PROOF

Petitioners begin their brief with a lengthy discussion of the "bursting bubble" theory of presumptions. They maintain that the presumption of correctness enjoyed by respondent does not constitute evidence and disappears from the case when contrary evidence is introduced. They then attempt to relate that discussion to the manner in which the burden of proof should be allocated. They also invoke the burden-shifting principles of *Helvering v. Taylor*, 293 U.S. 507 (1935), and *Weimerskirch v. Commissioner*, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977). Although the issues which they raise are intriguing (see *Llorente v. Commissioner*, 74 T.C. 260, 272–280 (1980) (Tannenwald, J., concurring), revd. in part 649 F.2d 152 (2d Cir. 1981)), we think they are largely academic here because the requisite factual foundation is lacking. Nevertheless, we shall briefly address them so that there is no question about our approach to the three major substantive issues involved in this case.[54]

---

[54]We have confined our comments to this context because petitioners have generally focused on just those substantive issues.

(See Issues 1 and 3, *infra*.) We shall also address them further, later in this opinion, as the need arises.

Petitioners' preoccupation with the question of whether a presumption, particularly the presumption of correctness, constitutes evidence would be more understandable if respondent had simply sat back and passively relied on that presumption with respect to his determinations. That, however, was not what happened. Rather, respondent played a very active role in the trial of this case. He subpoenaed and examined witnesses. He offered depositions. He introduced exhibits. He stipulated facts and documents in support of his determinations. In fact, respondent may have even introduced a greater quantum of evidence than petitioners. In any event, what we have done to decide the issues is evaluate the quality of the evidence introduced by petitioners and the quality of the evidence introduced by respondent. We have then weighed the evidence, keeping in mind the general rule that it is petitioners who bear the ultimate burden of proof. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). We hasten to emphasize that in weighing the evidence we have assigned not even a gram to the presumption of correctness.

From what we have just said, it should be readily apparent that petitioners' reliance on *Weimerskirch v. Commissioner*, 596 F.2d 358 (9th Cir. 1979), is ill founded. In that case the Commissioner determined that the taxpayer had unreported income from the sale of narcotics. At trial, however, he called no witnesses and introduced no evidence in support of his determination. In reversing our decision, the Court of Appeals held that the Commissioner was not entitled to rely exclusively on the presumption of correctness in an unreported income case, particularly where he alleges that the taxpayer is engaged in an illegal income-producing activity. In the present case, however, we have placed upon the evidentiary scales, not the presumption of correctness, but rather only the proof adduced by respondent in support of his determinations. *Weimerskirch*, therefore, is inapposite. See *Basic Bible Church v. Commissioner*, 74 T.C. 846, 854 (1980); *Perrett v. Commissioner*, 74 T.C. 111, 135–136 (1980), affd. without published opinion 679 F.2d 900 (9th Cir. 1982); *Karme v. Commissioner*, 73 T.C. 1163, 1195–1196 (1980), affd. 673 F.2d 1062 (9th Cir. 1982).

Petitioners' reliance on *Helvering v. Taylor*, 293 U.S. 507 (1935), is also misplaced. Contrary to their assertion, respondent's determinations are simply not arbitrary. The basis for this conclusion will become apparent when we address the merits of the first three issues. Suffice it to say for the present, that we think respondent's determinations rest on a rational foundation.[55]

## *Issues 1 and 3*

### REALLOCATIONS OF INCOME UNDER SECTION 482

Two of the three major substantive issues in this case involve reallocations of income made by respondent under the authority of section 482. That section provides as follows:

SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

The genesis of the first section 482 issue lies in the October 1962 transfer by the Foster partnership of undivided 25-percent interests in 127 acres of land in Neighborhood One to each of the four Alphabet Corporations. In the notice of deficiency, respondent allocated to the partnership the net income[56] reported by the Alphabets from the sale of lots in that parcel. Petitioners contend, inter alia, that the issue is

---

[55]We defer, for now, consideration of petitioners' additional argument that the doctrine of laches is incorporated into the burden-shifting principles set forth in *Helvering v. Taylor*, 293 U.S. 507 (1935), and *Weimerskirch v. Commissioner*, 596 F.2d 358 (9th Cir. 1979). See instead Issue 7, *infra*.

[56]Although sec. 482 authorizes the Commissioner to allocate "gross income," it is generally recognized that he may also allocate "net income." *Hamburgers York Road, Inc. v. Commissioner*, 41 T.C. 821, 834 (1964); see B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 15.06, at 15–17 (4th ed. 1979); Fuller, "Section 482 Revisited," 31 Tax L. Rev. 475, 517 n. 176 (1976).

governed by the nonrecognition and basis provisions of sections 351, 1032, and 362, rather than by section 482.

The genesis of the second 482 issue lies in the August 1966 transfer by the Foster partnership of 311 single-family residential lots in Neighborhood Four to Foster Enterprises. In the notice of deficiency, respondent allocated to the partnership the corrected net income reported by that corporation from the sale of those lots. Again, petitioners contend, inter alia, that the issue is governed by the nonrecognition and basis provisions of sections 118 and 362, rather than by section 482.

Before delving into the complexities of section 482, we need to resolve two preliminary issues raised by petitioners involving that section. First, they question the constitutionality of section 482. Second, they also question the heretofore acknowledged standard for review of the Commissioner's determinations under that section. We will deal with the constitutional issue first because of its obvious threshold importance.

### A. CONSTITUTIONALITY OF SECTION 482

Section 482 is directly derived from section 45 of the Revenue Act of 1928, ch. 852, 45 Stat. 791, 806. It can be traced, however, to the consolidated return provisions of section 240(d) of the Revenue Act of 1921, ch. 136, 42 Stat. 227, 260, and ultimately to articles 77 and 78 of Regulations 41, which were promulgated under the War Revenue Act of 1917, ch. 63, 40 Stat. 300. Despite this long history, section 482 has rarely been the subject of constitutional challenge. In fact, the only previous constitutional challenge we are aware of was raised in *Asiatic Petroleum Co. v. Commissioner*, 79 F.2d 234 (2d Cir. 1935), affg. 31 B.T.A. 1152 (1935). There, the taxpayer argued that section 45 of the Revenue Act of 1928[57] was unconstitutional because it taxed one person on the income of another, thereby depriving that person of property without

---

[57]SEC. 45. ALLOCATION OF INCOME AND DEDUCTIONS.

In any case of two or more trades or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income or deductions between or among such trades or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such trades or businesses.

due process of law. The Court of Appeals rejected this contention and stated that the section—

does not measure the tax of one person by the income of another * * * ; rather, it looks through form to reality * * * . Even without such a statute as section 45, many cases have gone very far in disregarding formal transfers introduced into corporate transactions for the purpose of escaping taxation. If anticipatory arrangements intended to circumvent taxes may be disregarded by the courts without the aid of statutory authority, a statute authorizing the Commissioner to disregard them under similar circumstances cannot be unconstitutional. It is true, as the Supreme Court recently stated in *Gregory v. Helvering* * * * that a taxpayer is privileged "to decrease the amount of what would otherwise be his taxes, or altogether avoid them, by means which the law permits." But there is no suggestion in that opinion, or in the authorities upon which it relies, that a statute would be unconstitutional which took away this privilege. At least under the conditions specified in section 45 we are satisfied that it may be taken away. [79 F.2d at 238; citations omitted.]

Presumably, petitioners do not quarrel with *Asiatic Petroleum Co.* because they attack the constitutionality of section 482 on other than due process grounds. Rather, they invoke the nondelegation doctrine and, of course, the two stalwarts of that doctrine, *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), and *Schechter Corp. v. United States*, 295 U.S. 495 (1935).

In its pristine form, the nondelegation doctrine held that Congress could not lawfully delegate its legislative power to an administrative agency. See *United States v. Shreveport Grain & El. Co.*, 287 U.S. 77, 85 (1932) ("That the legislative power of Congress cannot be delegated is, of course, clear"). The doctrine was later narrowed to hold that legislation which does not provide a meaningful standard to guide the exercise of an agency's discretion constitutes an unlawful delegation of legislative power. *Panama Refining Co. v. Ryan, supra; Schechter Corp. v. United States, supra*. Petitioners contend that section 482 is unconstitutional because it purports to vest in the Commissioner the discretion to disregard the statutory structure established by Congress for the taxation of corporations without setting forth a meaningful standard to guide him in the exercise of that discretion. We disagree. We think petitioners' contention is infirm for at least two reasons.

First, contrary to petitioners' apparent belief, section 482 does not delegate authority to respondent to reallocate income

at his whim. Rather, he may do so only if he first determines that such reallocation is "necessary in order to prevent evasion of taxes or clearly to reflect the income" of two or more commonly owned or commonly controlled organizations, trades, or businesses. We think this is a meaningful standard. Moreover, respondent's exercise of his authority under section 482 is judicially reviewable.[58]

Second, the very doctrine on which petitioners rely has been described by Justice Marshall as "moribund." *National Cable Television Assn. v. United States*, 415 U.S. 336, 353 (1974) (dissenting opinion). Professor Davis is even more direct: "Since 1935 the nondelegation doctrine has had no reality in the holdings, although remnants of the doctrine persist in judicial verbiage." 1 K. Davis, Administrative Law Treatise, sec. 3:1, at 150 (2d ed. 1978). His comments on *Panama Refining Co. v. Ryan, supra*, and *Schechter Corp. v. United States, supra*, the only two cases in which the Supreme Court has ever held congressional delegations to governmental authorities to be invalid, deserve to be quoted:

Despite the futility, counsel often cite the two cases in briefs, but the courts uniformly uphold the delegations. E.g., *United States v. Davis*, 564 F.2d 840, 844 (9th Cir. 1977), cert. denied 434 U.S. 1015 (1978); *United States Postal Service v. Brennan*, 574 F.2d 712, 716 (2d Cir. 1978), cert. denied 439 U.S. 1115 (1979). Such briefs waste the client's money and waste the courts' time. The current law is not in the Panama and Schecter opinions, the attitude of those cases "has been virtually abandoned by the Court for all practical purposes." *National Cable Television Ass'n v. United States*, 415 U.S. 336, 352–53 (1974). [K. Davis, *supra* at sec. 3:8 (Supp. 1982).]

In view of the foregoing, we hold that section 482 is not unconstitutional as an invalid delegation of legislative power.

### B. STANDARD FOR REVIEW AND BURDEN OF PROOF

The Commissioner enjoys broad discretion under section 482. *Spicer Theatre, Inc. v. Commissioner*, 346 F.2d 704, 706 (6th Cir. 1965), affg. 44 T.C. 198 (1964); *Edwards v. Commissioner*, 67 T.C. 224, 230 (1976); *E. I. du Pont de Nemours & Co.*

[58]In *Schechter Corp. v. United States*, 295 U.S. 495, 532–533 (1935), the Supreme Court was influenced in its decision to invalidate sec. 3 of the National Industrial Recovery Act, ch. 90, 48 Stat. 195, 196–197, by the fact that judicial review was not to be provided for in "codes of fair competition" approved or prescribed by the President pursuant to that section.

*v. United States*, 221 Ct. Cl. 333, 608 F.2d 445, 455 (1979). In applying that section, his determinations must be sustained absent an abuse of discretion. We may reverse only where the taxpayer proves that those determinations are unreasonable, arbitrary, or capricious.[59] *Ach v. Commissioner*, 42 T.C. 114, 125–126 (1964), affd. 358 F.2d 342 (6th Cir. 1966); *Philipp Bros. Chemicals, Inc. (N.Y.) v. Commissioner*, 435 F.2d 53, 57 (2d Cir. 1970), affg. *Philipp Bros. Chemicals, Inc. (Md.) v. Commissioner*, 52 T.C. 240 (1969); *Charles Town, Inc. v. Commissioner*, 372 F.2d 415, 422 (4th Cir. 1967), affg. a Memorandum Opinion of this Court.[60] It is precisely because of the "heavier than normal burden of proving arbitrariness" that taxpayers are entitled to notice that the Commissioner intends to rely on section 482 in support of his determination. *Young & Rubicam, Inc. v. United States*, 187 Ct. Cl. 635, 410 F.2d 1233, 1245 (1969); see *Commissioner v. Transport Mfg. & Equip. Co.*, 478 F.2d 731, 734–736 (8th Cir. 1973), affg. *Riss v. Commissioner*, 56 T.C. 388 (1971), and 57 T.C. 469 (1971) (supplemental opinion); *Achiro v. Commissioner*, 77 T.C. 881, 890–891 (1981).

In the present case, petitioners do not contend that they were unaware that respondent reallocated income under authority of section 482. The notice of deficiency expressly so provides. Rather, they contend that in *Commissioner v. First Security Bank of Utah*, 405 U.S. 394 (1972), the Supreme Court announced a new, and presumably less strict, standard for review. In this regard, they seize upon the penultimate sentence of that Court's opinion: "The Commissioner's exercise of his §482 authority was therefore *unwarranted* in this case." 405 U.S. at 407; emphasis added. In their view, the use of the word "unwarranted" constitutes an implied rejection of the "unreasonable, arbitrary, or capricious" standard. We disagree.

A careful reading of *First Security Bank* reveals that the Supreme Court did not have before it any issue involving the

---

[59]The fact that some cases express this standard in the conjunctive rather than the disjunctive (see, e.g., *Pacella v. Commissioner*, 78 T.C. 604, 618 (1982)), is of no consequence because the terms utilized by the standard are synonymous. *Wilson v. United States*, 530 F.2d 772, 779 n.1 (8th Cir. 1976) (concurring opinion).

[60]T.C. Memo. 1966–15.

appropriate standard for review of the Commissioner's determinations under section 482. That no such issue was presented is also apparent from the fact that it was the Commissioner who petitioned for certiorari (405 U.S. at 395), after losing in the Tenth Circuit. The Court of Appeals, whose judgment was affirmed by the Supreme Court, stated as follows:

> We recognize the established rules that substance prevails over form, that the Commissioner has a wide discretion which we may not upset unless it is used *arbitrarily or capriciously*, and that the burden of persuasion lies on the taxpayers. These do not change the result. * * * We believe that the § 482 allocations made by the Commissioner are *arbitrary and capricious* and inconsonant with the basic concepts of federal income taxation. [*First Security Bank of Utah, N.A. v. Commissioner*, 436 F.2d 1192, 1198 (10th Cir. 1971); emphasis added.]

The absence of any discussion of the established standard in *First Security Bank* confirms our opinion that the Supreme Court did not intend the use of the word "unwarranted" to signal any departure from, or dilution of, that standard. We also note that since 1972, this Court and the various Courts of Appeals, have continued to apply the unreasonable, arbitrary, or capricious standard in reviewing the Commissioner's determinations under section 482. See, e.g., *Erickson v. Commissioner*, 598 F.2d 525, 528 (9th Cir. 1979), revg. on other grounds a Memorandum Opinion of this Court;[61] *Wilson v. United States*, 530 F.2d 772, 776 (8th Cir. 1976); *Pacella v. Commissioner*, 78 T.C. 604, 618 (1982); *Keller v. Commissioner*, 77 T.C. 1014, 1021–1022 (1981), on appeal (10th Cir., Apr. 2, 1982).

For these reasons, we therefore hold that the Commissioner's determinations under section 482 must be sustained unless proven unreasonable, arbitrary, or capricious.

### C. APPLICATION OF SECTION 482
### TO TAXABLE DISPOSITIONS OF PROPERTY
### PREVIOUSLY ACQUIRED IN NONRECOGNITION TRANSACTIONS

Petitioners contend that the Commissioner may not reallocate income derived from the taxable disposition of property previously acquired in a nonrecognition transaction. The nonrecognition transactions which petitioners contemplate

---

[61] T.C. Memo. 1976–147.

include an exchange of property for stock under section 351 and a contribution of capital. We shall begin by briefly analyzing the statutory framework for their argument.

Under section 351,[62] a transferor does not recognize gain or loss when property is transferred to a corporation solely in exchange for its stock or securities if immediately after the exchange the transferor controls the corporation. Similarly, under section 1032,[63] a corporation does not recognize gain or loss when property is transferred to it in exchange for its stock. One important consequence of this nonrecognition exchange is that under section 362(a)(1)[64] the transferor's basis in the transferred property is carried over and becomes the transferee's basis in that property.[65] The transferee therefore inherits the potential gain or loss which is inherent in the property at the time of its transfer. When that property is subsequently sold or otherwise disposed of in a taxable transaction, a form of income-shifting can occur, which in turn can cause some measure of distortion in both the transferor's and transferee's taxable income. Such income-shifting and distortion are unquestionably contemplated by the nonrecognition and basis provisions discussed above. The issue which

---

[62]SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.

(a) GENERAL RULE.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.

An amendment made to this section by sec. 203(a), Pub. L. 89–809, 80 Stat. 1539, 1577, in 1966 is not relevant to the issue before us and is not reflected above.

[63]SEC. 1032. EXCHANGE OF STOCK FOR PROPERTY.

(a) NONRECOGNITION OF GAIN OR LOSS.—No gain or loss shall be recognized to a corporation on the receipt of money or other property in exchange for stock (including treasury stock) of such corporation.

[64]SEC. 362. BASIS TO CORPORATIONS.

(a) PROPERTY ACQUIRED BY ISSUANCE OF STOCK OR AS PAID-IN SURPLUS.—If property was acquired on or after June 22, 1954, by a corporation—

(1) in connection with a transaction to which section 351 (relating to transfer of property to corporation controlled by transferor) applies, or

(2) as paid-in surplus or as a contribution to capital,

then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer.

See sec. 1.362–1(a), Income Tax Regs.; see also sec. 1032(b).

[65]From the transferor's point of view, his basis in the transferred property is substituted as the basis of the stock received. Sec. 358(a)(1); sec. 1.358–1(a), Income Tax Regs.

petitioners raise is whether the Commissioner can reallocate the income to the transferor under authority of section 482.

A similar analysis applies when a shareholder merely contributes capital to a corporation. The shareholder obviously does not recognize gain or loss because income is not even realized when capital is contributed to a corporation. Similarly, under section 118[66] the corporation does not recognize gain or loss. Under section 362(a)(2) (see note 64, *supra*) the shareholder's basis in the contributed property is preserved, and the corporation inherits the potential gain or loss. As in the case of a section 351 exchange, income-shifting and some distortion occur when the property is subsequently sold in a taxable transaction. Once again, petitioners question whether the Commissioner can reverse the contemplated income-shifting and distortion by invoking section 482.

As a preliminary matter, we must decide whether petitioners have accurately characterized the transfers in question. In this regard, they characterize the October 1962 transfer by the Foster partnership of undivided 25-percent interests in 127 acres of land in Neighborhood One to each of the four Alphabet Corporations as four separate section 351 transactions. They characterize the August 1966 transfer by the partnership of 311 single-family residential lots in Neighborhood Four to Foster Enterprises as a contribution to the capital of that corporation. Respondent disputes only the former characterization, arguing that the transfers to the Alphabet Corporations were not made "in exchange for stock," and, even if they were, the partnership was not "in control" immediately after the exchange.

Although the record is not as neat and tidy as we might like, we are satisfied that the 127 acres were transferred in exchange for stock in the Alphabets. Those corporations were formed in 1962 at the behest of Del Champlin for the purpose of holding title to land in Neighborhood One. While the actual transfer of land may not have been simultaneous with the formation of the Alphabets, it was clearly part of a preconceived plan. We also think the "control" requirement was

[66]SEC. 118. CONTRIBUTIONS TO THE CAPITAL OF A CORPORATION.

(a) GENERAL RULE.—In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer.

satisfied. The transaction can be viewed as one consisting of two steps: a distribution by the partnership of the 127 acres of land to the Fosters, followed by the transfer of their undivided interests therein to the Alphabets. In any event, this particular matter is actually moot because if that transaction is not a section 351 exchange, it would have to be viewed as a capital contribution, and the same basic analysis would apply. We shall proceed, therefore, as if it were such an exchange. We shall also focus exclusively on that transaction. The conclusions which we reach necessarily apply to the capital contribution of the residential lots in Neighborhood Four to Foster Enterprises.

Before we begin our discussion of the relationship of section 482 to the nonrecognition and basis provisions of sections 351 and 362, we should mention that those provisions do not bar the application of either section 446(b) (see *Palmer v. Commissioner*, 267 F.2d 434 (9th Cir. 1959), affg. 29 T.C. 154 (1957)), or such basic judicial doctrines like assignment of income (see *Commissioner v. Fender Sales, Inc.*, 338 F.2d 924 (9th Cir. 1964), revg. a Memorandum Opinion of this Court),[67] step transaction (substance over form) (see *Hallowell v. Commissioner*, 56 T.C. 600 (1971)), and tax benefit (see *Hutton v. Commissioner*, 53 T.C. 37 (1969), remanded 434 F.2d 1313 (6th Cir. 1971)), to taxable dispositions of property previously acquired in nonrecognition transactions. See generally Miller, "The Application of IRC Section 482 to Transfers Under Section 351: The *National Securities* Risk," 1976 Ariz. St. L.J. 227, 235 n. 58 (1976); Berger, Gilman & Stapleton, "Section 482 and the Nonrecognition Provisions: An Analysis of the Boundary Lines," 26 Tax Law. 523, 527 n. 17 (1973). Thus, for example, section 446(b) authorizes the Commissioner to compute taxable income by a different method of accounting if he determines that the taxpayer's method does not clearly reflect income. In *Palmer v. Commissioner, supra*, the Commissioner determined that the percentage-of-completion, rather than the completed-contract, method of accounting more clearly reflected the income of a partnership from a construction business for work largely completed prior to the section 351 exchange.

---

[67] T.C. Memo. 1963–119.

The Ninth Circuit affirmed our decision sustaining his determination, concluding that the method chosen by the Commissioner was "fair and equitable." 267 F.2d at 439. Cf. *Standard Paving Co. v. Commissioner*, 190 F.2d 330 (10th Cir. 1951), affg. 13 T.C. 425 (1949); *United States v. Lynch*, 192 F.2d 718 (9th Cir. 1951).

1. *Section 1.482–1(b)(1), Income Tax Regs., and the Arm's-Length Bargaining Standard*

As previously stated, petitioners contend that the Commissioner may not reallocate income derived from the taxable disposition of property previously acquired in a nonrecognition transaction. Respondent, of course, contends to the contrary. The parties cite different provisions of the regulations in support of their respective positions. Petitioners rely on section 1.482–1(b)(1), Income Tax Regs. That section provides as follows:

(b) *Scope and purpose.* (1) The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits, or allowances, or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each controlled taxpayer. The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

See also secs. 1.482–1(a)(6) and 1.482–1(c), Income Tax Regs. On the other hand, respondent cites section 1.482–1(d)(5), Income Tax Regs. That section provides as follows:

(5) Section 482 may, when necessary to prevent the avoidance of taxes or to clearly reflect income, be applied in circumstances described in sections of the Code (such as section 351) providing for nonrecognition of gain or loss. See, for example, *National Securities Corporation v. Commissioner of*

*Internal Revenue,* 137 F.2d 600 (3rd Cir. 1943), cert. denied 320 U.S. 794 (1943).[68]

Petitioners argue that the arm's-length bargaining standard adopted by section 1.482–1(b)(1), Income Tax Regs., cannot be applied to a section 351 exchange because such a transaction cannot by definition occur between unrelated parties. From this they conclude that the Commissioner may not invoke section 482 to reallocate income derived from the taxable disposition of property previously acquired in a nonrecognition transaction. However, in *Northwestern Nat. Bank of Minneapolis v. United States,* 556 F.2d 889 (8th Cir. 1977), the Eighth Circuit rejected a similar contention. In that case, a wholly owned subsidiary transferred 10,000 shares of stock in a third corporation as a dividend to the taxpayer, its parent corporation. Shortly thereafter, the taxpayer donated the shares to a foundation and claimed the contribution as a charitable deduction. Acting pursuant to section 482, the Commissioner reallocated the deduction to the subsidiary. In a refund action, the taxpayer argued that section 482 does not apply to a transaction which originates as a dividend distribution because such a distribution would not occur between uncontrolled taxpayers. The Court of Appeals characterized this argument as "without merit" and stated as follows:

There is nothing in the language of section 482 or its corresponding regulations that is inconsistent with applying section 482 to transactions between subsidiary corporations that might not occur in similar form between unrelated taxpayers. The purpose behind the dividend distribution was to obtain a tax advantage not available in an arm's length transaction. The transaction was made possible solely on the basis of [the taxpayer's] relationship with and control of [its subsidiary], and the end result was a distortion of the respective net incomes of both parent and subsidiary corporations. Section 482 was designed specifically to correct such distortions.

It should be noted that the distortion was not caused by the upstream dividend alone; intercorporate dividends do not automatically trigger section 482 reallocation. The dividend was simply the vehicle by which assets were moved to the parent corporation, which was in a better position to enjoy the deduction that would accrue from the previously planned contribution. *Since*

---

[68]This section was not adopted until April 1968. Assuming its validity, an issue which we shall shortly address, there is no question that it applies to all of the years before us. Sec. 7805(b); T.D. 6952, 1968–1 C.B. 218; *Cayuga Service, Inc. v. Commissioner,* T.C. Memo. 1975–4; see Rev. Proc. 66–33, 1966–2 C.B. 1231.

*such a strategy would be unavailable to an uncontrolled taxpayer, the Commissioner did not abuse his discretion in reallocating the deduction back to the subsidiary, the true donor under the standard of an uncontrolled taxpayer. See* Treas. Reg. §1.482–1(b)(1). [556 F.2d at 891–892; emphasis added; fn. refs. and citations, generally, omitted.]

We think this reasoning is sound and applies equally to the present case because the tax strategy attendant upon a section 351 exchange would be similarly unavailable to an uncontrolled taxpayer.[69]

Petitioners ascribe controlling significance to *Commissioner v. First Security Bank of Utah,* 405 U.S. 394 (1972). In that case, the Commissioner reallocated under the authority of section 482, credit life reinsurance premiums from one wholly owned subsidiary, a company licensed to engage in the insurance business, to another wholly owned subsidiary, a national bank. The bank was not licensed to sell insurance; it was legally prohibited from receiving insurance-related income and, in fact, never received any such income. Nevertheless, the Commissioner allocated 40 percent of the other subsidiary's premium income to it as compensation for originating and processing the credit life insurance on its customers. The Supreme Court held that the parent holding company did not have "complete power," within the meaning of section 1.482–1(b)(1), Income Tax Regs., to shift the premium between its subsidiaries because it would have been illegal for the bank to receive that income: "The 'complete power' referred to in the regulations hardly includes the power to force a subsidiary to violate the law." 405 U.S. at 405. Because the holding company was thus barred from utilizing its control over its subsidiaries to distort their true taxable incomes, the Commissioner's determination was not sustained.

Petitioners argue that *First Security Bank* is significant to cases in which the events in question could only occur between commonly controlled taxpayers because the Supreme Court rested its decision disapproving the Commissioner's realloca-

---

[69]See also Berger, Gilman & Stapleton, "Section 482 and the Nonrecognition Provisions: An Analysis of the Boundary Lines," 26 Tax Law. 523, 531 (1973), who maintain that the arm's-length bargaining standard "is not the *test* of whether or not section 482 will override an applicable nonrecognition provision [but] merely the *remedy* to be applied if * * * section 482 is held to override nonrecognition principles." (Emphasis in original.)

tion on that basis. We disagree. We think that case is inapposite to the issue before us.

In his dissenting opinion, Justice Blackmun observed that the majority's decision in *First Security Bank* "may not be too important, for it affects only a few taxpayers." 405 U.S. at 426. It is clear to us that petitioners are not among those few because they do not even suggest that it would have been illegal for the Foster partnership to receive the income which respondent seeks to reallocate from the Alphabet Corporations and Foster Enterprises. In our view, it was the fact that the receipt of insurance-related income would have been illegal that was determinative in *First Security Bank*. That case is also inapposite because it did not involve a section 351 exchange or other nonrecognition transaction.

In view of the foregoing, we think petitioners' reliance on section 1.482–1(b)(1), Income Tax Regs., is ill founded.

2. *Validity of Section 1.482–1(d)(5), Income Tax Regs.*

Petitioners counterattack by denying the validity of section 1.482–1(d)(5), Income Tax Regs., presumably on the basis that it is out of sync with such nonrecognition provisions as sections 351 and 362. We disagree. While our preceding discussion may perhaps be dispositive of the matter, its obvious importance demands that we address it more fully.

Section 1.482–1(d)(5), Income Tax Regs., is built upon a solid line of cases that extends back 40 years. The three leading cases in that line are *National Securities Corp. v. Commissioner*, 137 F.2d 600 (3d Cir. 1943), affg. 46 B.T.A. 562 (1942); *Central Cuba Sugar Co. v. Commissioner*, 198 F.2d 214 (2d Cir. 1952), revg. 16 T.C. 882 (1951); and *Rooney v. United States*, 305 F.2d 681 (9th Cir. 1962). See also *Estate of Walling v. Commissioner*, 373 F.2d 190, 193–194 (3d Cir. 1967), revg. 45 T.C. 111 (1965); but see *Ruddick Corp. v. United States*, 226 Ct. Cl. 426, 643 F.2d 747 (1981). We will discuss each of the leading cases in turn.

The seminal case is *National Securities Corp. v. Commissioner*, 137 F.2d 600 (3d Cir. 1943). There, a parent corporation acquired shares of stock in an unrelated corporation (Standard) as an investment at a cost of approximately $140,000. After the market value of that stock had declined to about $8,500, the parent transferred it to the taxpayer, its wholly

owned subsidiary, in exchange for 800 additional shares in the taxpayer, with a stated value of $8,000 and a market value of approximately $75,000. This transaction qualified as a section 351 exchange. Later that same year, the taxpayer sold the Standard stock for $7,175, and, on its income tax return, claimed a loss equal to the difference between the amount realized and its parent's cost (the taxpayer's carryover basis under section 362). Acting pursuant to section 482, the Commissioner determined that the loss[70] should be reallocated from the taxpayer to its parent. The parent, however, was unable to use the loss because it had already claimed the maximum capital loss deduction permitted for the year in issue.

The Commissioner's determination raised two issues: Whether the nonrecognition and basis provisions of sections 351 and 362 override the Commissioner's authority under section 482[71] to allocate; and, if not, whether the allocation in question should be sustained. Like the Board of Tax Appeals, the Court of Appeals resolved the first issue in favor of the Commissioner. It described the relationship of section 482 to sections 351 and 362 as follows:

> Section [482] is directed to the correction of particular situations in which the strict application of the other provisions of the act will result in a distortion of the income of affiliated organizations. In every case in which the section is applied its application will necessarily result in an apparent conflict with the literal requirements of some other provision of the act. If this were not so Section [482] would be wholly superfluous. We accordingly conclude that the application of Section [482] may not be denied because it appears to run afoul of the literal provisions of Sections [351 and 362] if the Commissioner's action in allocating under the provisions of Section [482] the loss involved in this case was a proper exercise of the discretion conferred upon him by the section. [137 F.2d at 602.]

The Court of Appeals went on to sustain the Board's decision that the Commissioner's action in allocating the loss was neither arbitrary nor capricious. 137 F.2d at 603.

---

[70]The Commissioner later conceded that a small part of the loss, equal to the decline in value of the stock between the dates of the exchange and the subsequent sale, was deductible by the taxpayer.

[71]The sections involved were actually the predecessors of those cited, i.e., secs. 112(b)(5), 113(a)(8), and 45, respectively, of the Revenue Act of 1936, ch. 690, 49 Stat. 1648, 1679, 1683, 1667–1668.

In *Central Cuba Sugar Co. v. Commissioner*, 198 F.2d 214 (2d Cir. 1952), a decision which this Court implicitly accepted in *Simon J. Murphy Co. v. Commissioner*, 22 T.C. 1341, 1343 (1954), revd. on other grounds 231 F.2d 639 (6th Cir. 1956), the taxpayer, a New York corporation, had been engaged for many years in the business of cultivating, processing, and selling sugar in Cuba. Except for its statutory office in New York, its land and sugar mills were located in Cuba, and its controlling shareholders were Cuban. A provision of the Cuban constitution, then only recently in force, restricted the foreign ownership of land. Fearful of expropriation, the taxpayer transferred all of its assets to a Cuban corporation pursuant to a tax-free plan of reorganization under the predecessor of section 368 in exchange for the transferee's capital stock (which was then distributed to the taxpayer's shareholders) and the assumption of its liabilities. The taxpayer had obtained an advance ruling which concluded that the transfer was not "in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes."

The taxpayer transferred its assets, including its current unharvested and unsold sugar crop, at a time when it had incurred substantial expenses in connection with that crop but had not yet realized any income from it. On its income tax return for the reorganization year it deducted those expenses, causing it to sustain a net operating loss which it sought to carry back to a prior year. Acting under authority of the predecessor of section 482, the Commissioner reallocated the expenses to the Cuban corporation. However, we did not sustain his determination, and held, instead, that "where a sound reason not primarily related to tax saving was the motivating force of the transaction in question, the [Commissioner] should not be permitted, under the guise of section [482], to allocate certain of the expenses of the [taxpayer] to the Cuban corporation." 16 T.C. at 892–893.

On appeal, the Second Circuit reversed our decision, holding that "The Tax Court's assumption of the necessity of finding some ulterior motivation—traditionally a thankless task in tax cases and one to be avoided if possible—was error." 198 F.2d at 215–216. It then sustained the Commissioner's determination, observing that the purpose of section 482 is "to deny

the power to shift income or deductions arbitrarily among controlled corporations." 198 F.2d at 216.

In *Rooney v. United States*, 305 F.2d 681 (9th Cir. 1962), the taxpayers, husband and wife, were hop farmers. During the middle of the year, they transferred their current unharvested, but previously contracted for crop, as well as their other farm assets, to a corporation in exchange for all of its stock. On their individual income tax returns, they claimed the expenses incurred in growing the crop prior to the date of the section 351 exchange. The corporation deducted the expenses incurred after that date and reported all of the income from the sale of the crop. As a result, the taxpayers sustained a net operating loss, which they sought to carry back to prior years. However, under authority of section 482, the Commissioner reallocated the expenses of growing the crop to the corporation.

The Ninth Circuit spared few words in disposing of the taxpayer's argument that section 482 is inapplicable in the face of section 351. It briefly quoted from *National Securities Corp. v. Commissioner, supra*, and then concluded that "section 482 * * * will control when it conflicts with section 351 * * * as long as the discretion of the Commissioner in reallocating is not abused." 305 F.2d at 686. Citing *Central Cuba Sugar Co. v. Commissioner, supra*, it then held that there was no abuse by the Commissioner in the case before it.

We fail to see how the validity of section 1.482-1(d)(5), Income Tax Regs., can be seriously questioned in light of the above cases. The regulation is neither unreasonable nor inconsistent with the statute (see *Bingler v. Johnson*, 394 U.S. 741, 749-751 (1969)), reflecting as it does a judicial interpretation of section 482 that has stood the test of 40 years. Moreover, as we shall now show, it harmonizes with the statute's "origin and purpose." See *United States v. Vogel Fertilizer Co.*, 455 U.S. 16 (1982); *National Muffler Dealers Ass'n, Inc. v. United States*, 440 U.S. 472, 476-477 (1979).

Reference to the legislative history of section 482 sheds light on its origin and purpose. As previously stated, the section can be traced to the consolidated return provisions of section 240(d) of the Revenue Act of 1921, ch. 136, 42 Stat. 227, 260. The Senate Finance Committee report reflects congressional concern about the arbitrary shifting of profits among related businesses:

A new subdivision is added to this section giving the Commissioner power to consolidate the accounts of related trades or businesses owned or controlled by the same interests, for the purpose only of making a correct distribution of gains, profits, income, deductions, or capital, among the related trades or businesses. This is necessary to prevent the arbitrary shifting of profits among related businesses * * * . [S. Rept. 275, 67th Cong., 1st Sess. (1921), 1939–1 C.B. (Part 2) 181, 195.]

This same concern is evident in the House Ways and Means Committee report which accompanied section 45 of the Revenue Act of 1928, ch. 852, 45 Stat. 791, 806, from which section 482 is directly derived:

The section of the new bill provides that the Commissioner may, in the case of two or more trades or businesses owned or controlled by the same interests, apportion, allocate, or distribute the income or deductions between or among them, as may be necessary in order to prevent evasion (by the shifting of profits, the making of fictitious sales, and other methods frequently adopted for the purpose of "milking"), and in order clearly to reflect their true tax liability. [H. Rept. 2, 70th Cong., 1st Sess. (1927), 1939–1 C.B. (Part 2) 384, 395.]

See also S. Rept. 960, 70th Cong., 1st Sess. (1928), 1939–1 C.B. (Part 2) 409, 426. Perhaps the best and most succinct statement of the purpose of section 482 is provided by Bittker & Eustice:

The major thrust of §482 is the prevention of artificial shifting, milking, or distorting of the true net incomes of commonly controlled enterprises. The regulations also warn that distortions of income may invoke application of this section even though the taxpayers act in good faith and with an absence of tax-avoidance motives. In effect, then, §482 seems to be an amalgam of several important themes and policies of the tax law: tax-avoidance principles, assignment-of-income notions, general deduction theories, and clear reflection of income under the parties' accounting methods. [B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 15.06, at 15–15/16 (4th ed. 1979); fn. ref. omitted.]

In our view, section 1.482–1(d)(5), Income Tax Regs., is compatible with the purpose of section 482 as expressed above and in its legislative history. It takes little imagination to envision a taxable disposition of property previously acquired in a nonrecognition transaction, such as a section 351 exchange, which results in "the artificial shifting, milking, or distorting of the true net incomes of commonly controlled enterprises." One need only recall the facts in *National Securities Corp. v. Commissioner, supra.*

Finally, we find nothing in the origin and purpose of section

351 that would lead us to question the validity of section 1.482–1(d)(5), Income Tax Regs. Section 351 is derived from section 202(c)(3) of the Revenue Act of 1921, ch. 136, 42 Stat. 227, 230, and is designed to facilitate changes in the form of a business by permitting an owner to incorporate without fear of adverse tax consequences. See S. Rept. 275, 67th Cong., 1st Sess. (1921), 1939–1 C.B. (Part 2) 181, 188–189; H. Rept. 350, 67th Cong., 1st Sess. (1921), 1939–1 C.B. (Part 2) 168, 175–176. As the First Circuit observed in *Portland Oil Co. v. Commissioner*, 109 F.2d 479, 488 (1st Cir. 1940), affg. 38 B.T.A. 757 (1938), Congress determined that it would be inappropriate to recognize gain or loss "where in a popular and economic sense there has been a mere change in the form of ownership and the taxpayer has not really 'cashed in' on the theoretical gain, or closed out a losing venture."

By creating an exception to the general rule that an exchange of property is a taxable event, section 351 in effect repealed the "incorporation tax," the burden on business readjustments which Congress sought to eliminate by the enactment of that section. Neither section 482 nor section 1.482–1(d)(5), Income Tax Regs., reinstates that tax because those sections do not apply to the nonrecognition transaction itself. Rather, they apply to the subsequent, taxable disposition of property previously acquired in the nonrecognition transaction. They do not interfere with business readjustments and thus do not violate the policy inherent in section 351. The Third Circuit reached basically this same conclusion in *National Securities Corp. v. Commissioner, supra.* In distinguishing the function of sections 351 and 362 from that of section 482, it stated as follows:

We think, however, that the petitioner misconceives the distinct functions of these provisions of the statute. Sections 112 [of the Revenue Act of 1936, subsec. (b)(5) of which was the predecessor of sec. 351] and 113 [subsec. (a)(8) of which was the predecessor of sec. 362] were intended to regulate the time when certain gains or losses are to be recognized for tax purposes and the cost bases to be used in determining the amounts of such gains or losses. It is true that they likewise lay down a general rule to determine which taxpayer shall take such gains or losses into account. These sections were followed in the present case by the Commissioner when he determined that no loss should be recognized upon the transfer of the Standard shares by the parent to the taxpayer and that the loss sustained by the taxpayer upon the later sale of these shares should be measured by their original cost to the parent.

Section [482] on the other hand is addressed to the wholly different

problem of providing a more appropriate manner of allocating income and deductions when the application of the general rules of the statute will not clearly reflect the true income. [137 F.2d at 602.]

In view of the foregoing, we sustain the validity of section 1.482–1(d)(5), Income Tax Regs.

3. *Section 1.482–1(d)(5), Income Tax Regs., and the Avoidance of Taxes*

Having sustained the validity of section 1.482–1(d)(5), Income Tax Regs., we must now determine under what circumstances the Commissioner may reallocate income derived from a taxable disposition of property previously acquired in a nonrecognition transaction. Petitioners contend that section 482 does not authorize the Commissioner to reallocate income between commonly controlled enterprises "merely because the taxpayers' employment of nonrecognition provisions has given rise to avoidance or minimization of income tax." We disagree. Rather, we think nonrecognition provisions such as sections 351 and 362 do not bar the reallocation of income under section 482 and section 1.482–1(d)(5), Income Tax Regs., *if such reallocation is necessary to prevent the avoidance of taxes.*

We start with the statute. Under section 482, the Commissioner is not authorized to reallocate income unless such action "is necessary *in order to prevent evasion of taxes* or clearly to reflect the income" of commonly controlled taxpayers. (Emphasis added.) The statute thus contemplates alternative and independent bases for its application. *Central Cuba Sugar Co. v. Commissioner*, 198 F.2d at 215; *Eli Lilly & Co. v. United States*, 178 Ct. Cl. 666, 372 F.2d 990, 998–999 (1967); B. Bittker & J. Eustice, *supra* at par. 15.06, pp. 15–24. By its terms, section 1.482–1(d)(5), Income Tax Regs., only applies "when necessary to prevent the avoidance of taxes *or* to clearly reflect income." (Emphasis added.) Like the statute, it similarly contemplates alternative and independent bases for its application. In view of our findings of fact (see III. and V., *supra*), we shall address only the first ground, i.e., "to prevent the avoidance of taxes."

At first blush, the use of the term "avoidance" by the regulation may appear to be inconsistent with the use of the term "evasion" by the statute. Indeed, petitioners contend that there is a critical distinction between the terms, a proposition

with which we cannot quarrel if criminally punishable conduct is one's focus. See sec. 7201. However, for purposes of section 482, a nonpunitive section, the terms are interchangeable. Petitioners' contention to the contrary was rejected nearly 50 years ago:

It is argued that "avoidance" connotes escape from taxation by avoidance of the receipt of income, while "evasion" connotes an effort to escape taxation by one who has received taxable income, and is conduct criminally punishable * * * . By selling to Bataafsche at cost what it might have sold to Shell Union at a profit, Asiatic avoided the receipt of income; hence, it is urged, it did not evade any tax, and section 45 is inapplicable on the basis of tax evasion. We cannot accept so narrow a construction. * * * The phrase "evasion of taxes" is broad enough to include the avoidance of the realization for taxation of such a profit * * * . That such was the meaning ascribed to it during the progress of the bill through Congress is evident from the committee reports which explain that evasion may be attempted "by the shifting of profits, the making of fictitious sales, and other methods frequently adopted for the purpose of 'milking'." [*Asiatic Petroleum Co. v. Commissioner*, 79 F.2d 234, 236 (2d Cir. 1935).]

The synonymity of the terms for purposes of section 482 is reflected in section 1.482–1(c), Income Tax Regs.:

Transactions between one controlled taxpayer and another will be subjected to special scrutiny to ascertain whether the common control is being used to reduce, avoid, or escape taxes. In determining the true taxable income of a controlled taxpayer, the district director is not restricted * * * to the case of a fraudulent * * * transaction * * *

Finally, if any doubt remains, we note that synonymity is supported by both the text writers and the commentators. See B. Bittker & J. Eustice, *supra* at par. 15.06, pp. 15–24; Rothman, "Transfers to Controlled Corporations: Related Problems," 348 BNA Tax Mgmt. A–16/17 (1979); Miller, "The Application of IRC Section 482 to Transfers Under Section 351: The *National Securities* Risk," 1976 Ariz. St. L.J. 227, 232, 249–250; Adess, "The Role of Section 482 in Nonrecognition Transactions—The Outer Edges of Its Application," 57 Taxes 946, 958, 966 (1979); Berger, Gilman & Stapleton, "Section 482 and the Nonrecognition Provisions: An Analysis of the Boundary Lines," 26 Tax Law. 523, 530–531 (1973).

Petitioners rely heavily on *Ruddick Corp. v. United States*, 226 Ct. Cl. 426, 643 F.2d 747 (1981).[72] In that case the Court of Claims held, in its majority opinion, that absent the taint of tax avoidance, the Commissioner is not authorized to reallocate income on the ground of clear reflection of income in the face of a specific nonrecognition provision. In effect, the Court rejected that ground in the limited context of a nonrecognition transaction as an alternative and independent basis for the application of section 482; rather, it determined that any distortion arising from the sale or other disposition of property acquired in such a transaction is permissible: "Having contemplated and authorized that possible distortion, Congress is not to be frustrated by use within the Service of the general provisions of Section 482." 643 F.2d at 752.

*Ruddick Corp.* did not involve a section 351 exchange but rather the distribution as a dividend of highly appreciated stock in a third corporation by a profitable subsidiary to its parent who had a large net operating loss carryforward. This distribution was in effect a nonrecognition transaction as to both parties by virtue of sections 243 and 311; and under section 301, the subsidiary's basis in the stock was carried over to the parent. The Court decided the issue on the Government's motion for summary judgment, which it denied. In deciding the issue, it repeatedly cautioned that it was hypothesizing the absence of tax evasion or avoidance and the presence of a business reason (the parent's need to satisfy the net capital requirements of the SEC and the Midwest Stock Exchange) for the distribution. Because these facts were actually in dispute, the Court also denied the taxpayer's cross-motion for summary judgment and remanded the case to the Trial Division for a determination of the factual issues.

We need not express an opinion whether *Ruddick Corp.* was correctly decided. In our view, it is inapposite because the taint of tax avoidance is not absent in the case before us.

Based on all of the above, we hold that in order to prevent the avoidance of taxes, section 482 and section 1.482–1(d)(5), Income Tax Regs., may be applied to a taxable disposition of property previously acquired in a nonrecognition transaction.

---

[72]For recent commentary on this case, see Note, *"Ruddick Corp. v. United States*: Section 482 and the Nonrecognition Provisions," 2 Va. Tax Rev. 143 (1982).

### D. NEIGHBORHOOD ONE REALLOCATION

Having concluded that section 482 may be applied to a taxable disposition of property acquired in a nonrecognition transaction in order to prevent the evasion or avoidance of taxes, we must now decide whether the reallocation of income from the sale of lots in Neighborhood One was unreasonable, arbitrary, or capricious. See *Rooney v. United States*, 305 F.2d 681, 686 (9th Cir. 1962); *National Securities Corp. v. Commissioner*, 137 F.2d 600, 602 (3d Cir. 1943), affg. 46 B.T.A. 562 (1942). Our determination whether the Commissioner abused his discretion turns on questions of fact. *Ballentine Motor Co. v. Commissioner*, 321 F.2d 796, 800 (4th Cir. 1963), affg. 39 T.C. 348 (1962).

As will be recalled, the present issue arises because of the transfer by the Foster partnership of undivided 25-percent interests in 127 acres of land in Neighborhood One to each of the four Alphabet Corporations as tenants in common. This transfer occurred on October 3, 1962. The sale of lots in Neighborhood One began in June 1963 and continued for the next several years. Income derived from the 127 acres was reported by the Alphabets. Respondent, however, allocated all of the sales income to the partnership under section 482 on the theory that it was the partnership which earned it. In this regard, he contends that the partnership, acting largely through the Estero Municipal Improvement District (Estero), was solely responsible for the development of Neighborhood One and that the Alphabets were merely "corporate shells" which did nothing to improve the acreage or to sell it. He also contends that the October 1962 transfer was designed to avoid Federal income taxes. Petitioners, on the other hand, contend that respondent's section 482 allocation is erroneous in its entirety. Although they readily acknowledge the important role played by Estero in the development of Foster City, they emphasize its legitimacy and its status as a separate legal entity and maintain that it acted independently of the Fosters. They also maintain that the Alphabets had substance and actively participated in the development process. Finally, they maintain that the transfer of the 127 acres of land in Neighborhood One was business motivated rather than tax motivated.

Based on our review of the record and for the reasons which

we will discuss, we think there is substantial support for respondent's position. Accordingly, we cannot say that his section 482 allocation is unreasonable, arbitrary, or capricious.

―――――――

By October 3, 1962, the date on which the Foster partnership conveyed the 127 acres of land to the Alphabet Corporations, Neighborhood One had been substantially reclaimed, i.e., filled and compacted, but not completely developed.[73] A part of the income derived from the sale of lots in that neighborhood can therefore be viewed as having been earned *prior* to that date. That the transfer of the 127 acres shifted that part of the income from one commonly controlled enterprise to another is apparent from the fact that the partnership had been orchestrating the development of Foster City from the inception of the project, whereas the Alphabets did not even exist until the time of the transfer.[74]

Petitioners argue that Congress has given its blessing to such income shifting when it occurs in the context of an exchange to which section 351 is applicable. We have already addressed that argument at quite some length (see C., *supra*) and have concluded that section 482 may be applied to a taxable disposition of property previously acquired in a nonrecognition transaction (such as a section 351 exchange) in order to prevent the avoidance of taxes. Accordingly, there is no reason to consider petitioners' argument any further; however, we will address the question of tax avoidance at a later time.

Because Neighborhood One was not completely developed on October 3, 1962, a part of the income derived from the sale of lots in that neighborhood can be viewed as having been earned *subsequent* to that date. The question we must decide is whether the Foster partnership or the Alphabet Corporations

―――――――

[73]The record does not enable us to state with any degree of certainty the percent to which Neighborhood One had been completed by Oct. 3, 1962. However, it was sufficiently well along so that negotiations for the sale of lots in that neighborhood began in 1962. Moreover, by Nov. 1962 the Fosters were projecting income by January 1963.

[74]Estero's role in the development of Foster City and its relationship to the Foster partnership will be discussed in the context of our analysis of that part of the income which was earned subsequent to Oct. 3, 1962.

earned that part of the income. The answer to this question depends primarily on one's view of Estero. In this regard, respondent maintains that Estero was the partnership's hand-maiden; petitioners, by contrast, maintain that the district was an independent third party. If we accept respondent's premise, then the value added by Estero after October 1962 to the 127 acres of land which was subsequently realized upon the sale of lots is allocable to the partnership as the true earner of the income. See sec. 1.482–1(d)(1), Income Tax Regs.[75] On the other hand, if we accept petitioners' premise, then the value added by Estero after that date was properly reported by the Alphabets as the record owners of the benefited acreage. In our opinion, Estero was controlled and dominated by the Foster partnership which used the district as its instrument for the development of Foster City. Accordingly, Estero's efforts must be viewed as the work of the partnership.

We begin with the fact that it was the Foster partnership which was responsible for the creation of Estero. In this regard, it will be recalled that in late 1959 or early 1960, the partnership retained a San Mateo law firm specializing in municipal finance to draft proposed legislation to create a municipal improvement district. The partnership also retained a firm of civil engineers and land planners to assist in the drafting of that legislation by specifying the powers that such a district would need in order to successfully undertake the contemplated development. The Estero Municipal Improvement District Bill was subsequently introduced into the California legislature by the local State senator (who was also the Fosters' personal attorney) and State assemblyman. The bill was endorsed by San Mateo County in March 1960; thereafter it was passed by the legislature and approved by the Governor in May 1960. The record gives no reason to question that the Fosters lobbied actively for the bill throughout the legislative process.

---

[75]That section provides in part as follows:

"The method of allocating, apportioning, or distributing income * * * shall be determined with reference to the *substance* of the particular transactions or arrangements which result in the avoidance of taxes or the failure to clearly reflect income. [Emphasis added.]"

Although sec. 1.482–1(d)(1), Income Tax Regs., was not adopted until April 1968, it applies to all of the years before us. See note 68, *supra.*

The Foster partnership secured enabling legislation for Estero because it needed a vehicle to finance the development of Brewer's Island. Jack Foster originally estimated that the project would require $55,500,000 and would take many years to complete. Given the partnership's limited resources, outside financing on a long-term basis was a necessity. The Fosters flatly rejected the possibility of obtaining equity capital because they did not want to surrender any control over the project or share any of the anticipated profits. Although they had a long-established and cordial relationship with the Republic National Bank, a major lending institution, the amount needed was in excess of that bank's legal lending limit. It was determined, however, that the improvements to Brewer's Island could be financed through municipal bonds issued by a municipal improvement district. Because such bonds are tax exempt, they offered the added advantage of a lower rate of interest to be paid by the landowner.

The critical importance of Estero as the partnership's financing vehicle is readily apparent from the testimony of Jack Foster, Jr., at his deposition in 1971:

Q. Now, was this particular event—the passage of this bill [i.e., the Estero bill] into law—was that a condition before the family would go ahead with Foster City?

A. Well, it was not a formal condition written into the option [to purchase Brewer's Island], or anything like that; but I think that, had the bill not passed, then we would have been—we would have faced the decision to proceed or to stop and lose our $200,000 option money. I think we would probably have forfeited the option money.

Q. I take it, to finance a project such as Foster City was contemplated to be was a tremendous outlay of money; isn't that right?

A. It's even a lot of money to finance a small project.

Q. I appreciate that.

A. But tremendous there, yes.

Q. And it's of such magnitude that, without some kind of a municipal district such as Estero, it would probably not be practical and you would have abandoned it? Is that what you're saying?

A. I think that's probably true.

Estero's importance to the partnership is also apparent from the testimony of Jack Foster at his deposition in 1962:

Q. Did you feel that the creation of the Estero Municipal Improvement District was a benefit to your project for developing Brewer Island into Foster City?

A. I definitely felt that it was a benefit.

Q. Can you tell me in what way you felt it would benefit the land and the project?
A. Well, to assist in the financing was the principal—
Q. The main reason?
A. Yes.
Q. How would the district assist in the financing of the project?
A. It enabled us to sell general obligation tax-exempt bonds, tax exempt both federal and state.

So that it could serve as a financing vehicle, the Estero Act specifically authorized the district to issue both general obligation and revenue bonds, as well as other types of securities.[76]

The Fosters regarded Estero as more than the partnership's financing vehicle, however. They also regarded it as the vehicle by which the partnership would transform a 2,600-acre undeveloped and uninhabited tract of land into a completely planned and self-contained city of 35,000 people. This is why the partnership retained a firm of civil engineers and land planners to assist its attorneys in drafting legislation for a municipal improvement district. It was imperative that such a district possess all the powers needed to successfully accomplish the contemplated transformation. Accordingly, the Estero Act vested the district with a broad spectrum of general governmental powers, specifically including the power to reclaim and improve land, to enter into contracts, to employ all needed personnel, and to make and enforce such regulations as were necessary and proper to the exercise of its various powers.[77]

The role to be played by Estero in the development of Brewer's Island was too important to the ultimate success of the project for the Foster partnership not to control the district. After all, it was the partnership which was the prospective owner of Brewer's Island and which stood to benefit if the project were a financial success. Accordingly, Estero was designed to be subservient. This was accomplished by restricting the right to vote only to landowners.[78] Each

---

[76]See the sections of the Estero Act quoted above in note 14.

[77]See sec. 94 of the Estero Act quoted above in note 11 and the other sections of the act quoted in note 12.

[78]Sec. 215(f) of the Estero Act provided in part as follows:

"The land in the district is not owned by residents. The owners are the ones primarily

landowner was entitled to one vote for each dollar in assessed valuation of land owned by him. The landowners exercised control by electing the three members of the board of directors, the governing body of the district.[79] They also exercised control by authorizing the issuance of bonds needed to finance the contemplated development. The Foster partnership, of course, was originally the only landowner; during the years in issue it was the principal landowner.

The partnership's control over Estero is reflected in the composition of the district's board of directors. Richard Grant was the individual who first interested the Fosters in developing Brewer's Island and whom they arranged to retain at a substantial fee for his help and assistance if the project were undertaken. When Grant resigned in 1961 he was replaced by C. W. Olmo, who served as director through the years in issue. Although he came to be the public member of Estero's board,[80] he was sufficiently close to the Fosters that they retained him as one of their subcontractors when they built a major commercial building in Foster City in 1965. William Innes, one of the original directors who served through the years in issue, was a trusted executive within the Foster organization and on their payroll. George Shannon, the other original director who served through the years in issue, was affirmatively sought out by the Fosters to be on the board. Petitioners' assertion that Shannon was independent is belied by the fact that he regularly attended the Fosters' weekly planning sessions and was on the payroll of Likins-Foster Honolulu Corp. during Estero's formative period.[81]

The partnership's control over Estero is also evidenced by the fact that Innes and Shannon, the directors whom the Fosters elected, were appointed by the board to important

concerned with the district and the ones who will be supporting the district. The owners should therefore hold the voting power."

See also the sections of the act quoted above in note 10.

[79]In June 1963, the Estero Act was amended to require that one of the three directors of the board be a public member designated and appointed by the Board of Supervisors of San Mateo County. The landowners still controlled the board, however. Two board members constituted a quorum for the transaction of business; the same number was required to pass an ordinance, resolution, motion, or contract.

[80]See the preceding footnote.

[81]We might also mention that Shannon's name was printed on the Fosters' internal routing slips along with the names of the principals in the Foster organization.

offices. Innes was appointed Estero's finance officer and assistant secretary. Shannon was appointed district secretary, tax assessor, and tax collector. In 1962, he was appointed general manager, a position which consolidated his other offices and made him the chief executive officer and head of the administrative branch of the district government. If Shannon was independent of the Fosters, as petitioners allege, we wonder why he was terminated as general manager immediately after the residents of Foster City gained control of the board in 1969 and why he was reemployed by the Fosters shortly thereafter.

Other facts also point to the partnership's control over Estero. For example, the district reimbursed the partnership for expenses related to the Foster City project which it incurred both before and after the district was established. Also, the major engineering obstacle facing the project involved the dredging and landfill operation. Estero originally entered into a multimillion dollar contract with a Foster-controlled corporation to perform this task. The contract was later canceled only after the State attorney general questioned the arrangement as a possible conflict of interest.

Another fact relevant to the issue of control deserves to be mentioned. The district capitalized interest on its bonds in a manner designed to shift much of the tax burden from the Fosters to the future residents of Foster City. (See pp. 64–66, *supra.*) When the homeowners sought to discuss their concerns about such bond practices with Estero's board of directors, the board referred them to the Fosters. Later, after the Estero Act was amended to democratize election to the board, the district's objectionable bond practices were stopped. Other fundamental changes related to finance and development were also instituted. These changes reflected community pressure to make the district responsive to the needs of the residents rather than the desires of the Fosters. (See pp. 62 and 66 to 67, *supra.*)

That the Estero Act gave total control of the district to the landowners has been recognized by the California Supreme Court on at least two occasions. In *Cooper v. Leslie Salt Co.*, 70 Cal. 2d 627, 451 P.2d 406, 75 Cal. Rptr. 766 (1969), that court described the act as follows:

The statute includes elaborate financial provisions, including authorization for the directors to issue general obligation bonds * * * and other types of securities to raise money for development of the raw land included within the district so that the owners thereof, *who absolutely control the operations of the district*, can cause the various improvements to be made which are necessary to make the land fit for marketing as a residential tract. [451 P.2d at 409; emphasis added; fn. ref. omitted.]

Even the dissent agreed with this assessment, stating that "the effective political and economic power rests not with the residents of the district, but with a regency." 451 P.2d at 413.

In *Burrey v. Embarcadero Municipal Improvement Dist.*, 5 Cal. 3d 671, 488 P.2d 395, 97 Cal. Rptr. 203 (1971), the California Supreme Court had before it a question involving the statute establishing Estero's sister district. The court stated that both districts "were established by virtually identical statutes at the instance of land developers to enable them, through the use of the districts' bonding power, to raise the necessary risk capital to develop the properties as subdivisions." 488 P.2d at 396. The Court also described the voting system of the Embarcadero District, a description which applies equally to Estero in view of the "virtually identical" statutes involved:

In order to promote the development of the land, the Legislature created a system for selecting the governing board of the district which vests long-term and virtually total control of the district in the hands of the developing landowner. [488 P.2d at 397.]

The California legislature has also expressly recognized that the Estero Act gave control of the district to the landowners. In a report prepared in 1962, the Assembly Committee on Municipal and County Government described the use of a quasi-municipal type of district as a financing vehicle for the land developer.

It provides a source of public financing for streets, utilities, and other improvements, which are essential to the success of the subdivision. It does so, moreover, without tying up the developer's own capital or credit.

Speaking specifically of Estero and Embarcadero, the committee stated that "By design, the districts were planned to coordinate closely with the activities of the land developers and to be responsive to their wishes." It specifically found that "The organizational requirements of these districts placed each of them under the direct control of the developers."

In an article written in 1965,[82] Thomas Willoughby, consultant to the Committee on Municipal and County Government of the California Assembly and principal draftsman of the committee report referred to in the preceding paragraph, described the use of special districts as financing vehicles for land developers:

> The continuing quest of all land speculators has been the search for new sources of capital to finance their ventures. The California speculator has recently discovered that he can employ special districts and other public agencies to provide him with a significant credit subsidy. With boundary lines artfully drawn to include only the promoter's land, a special district becomes a tightly controlled operating division of the promoter's organization—an operating division which can use its bonding powers to raise risk capital independent of the subscriber's own credit resources or capital reserve.

> \*   \*   \*   \*   \*   \*   \*

> The current trend to subsidize development with publicly raised funds began in 1960 with the introduction of special legislation to subsidize two specific development projects. Having obtained an option to purchase 2600 acres of San Francisco Bay tidelands, one large developer [Jack Foster] had a northern California bond counsel draft special legislation to establish the Estero Municipal Improvement District. Supported actively in the Legislature by the same bond counsel, the measure passed without difficulty. The resulting district was contiguous with the developer's land holdings, *was controlled by him* and was authorized to issue general obligation, revenue and special assessment bonds *at his discretion.* \* \* \* [38 So. Cal. L. Rev. at 72, 73; emphasis added; fn. refs. omitted.]

Petitioners maintain that the legitimacy of Estero was upheld by the California Supreme Court in *Cooper v. Leslie Salt Co., supra.* See also *Cooper v. Estero Municipal Improvement District,* 70 Cal. 2d 645, 451 P.2d 417, 75 Cal. Rptr. 777 (1969). They also maintain that after scrutiny, Estero's conduct, unlike Embarcadero's, was not censured by either the State attorney general or the Assembly Committee on Municipal and County Government. From this they conclude that "there does not appear to us to be anything for this Court to consider."

We agree that Estero's legitimacy is not an issue in this case.

---

[82]"The Quiet Alliance," 38 So. Cal. L. Rev. 72 (1965). This article was cited by the California Supreme Court in *Cooper v. Leslie Salt Co.,* 70 Cal. 2d 627, 451 P.2d 406, 409, and *Burrey v. Embarcadero Municipal Improvement Dist.,* 5 Cal. 3d 671, 488 P.2d 395, 396. Its author testified at the trial in this case.

Nor is the question whether the Foster partnership abused its control of Estero one for us to decide. However, we disagree with petitioners' conclusion that there is therefore nothing for us to consider. It is the question of the partnership's control over Estero which is relevant to our inquiry whether income derived from the sale of lots in Neighborhood One should be reallocated. Not only has the fact of such control been established, but the wide recognition of this fact within the California legal community has also been demonstrated.

Petitioners cite *Birch Ranch & Oil Co. v. Commissioner*, 13 T.C. 930 (1949), affd. 192 F.2d 924 (9th Cir. 1951), for the proposition that reclamation and improvement districts are legal entities separate and distinct from their bondholders and landowners. In that case, the taxpayer owned substantially all of the land in a California reclamation district. It also owned (along with certain related parties) substantially all of the district's bonds. In order to pay interest on the bonds, the district made assessment calls which the taxpayer paid and subsequently deducted as "taxes." The Commissioner disallowed the deduction on the basis (inter alia) that the payor and payee of the bonds were economically identical. In a Court-reviewed opinion we upheld the deduction and on appeal were affirmed.

We find *Birch Ranch & Oil Co.* inapposite to the issue before us. Our conclusion that the partnership controlled Estero does not conflict with the district's status as a juristic entity. As we have already observed, the California Supreme Court sustained the legitimacy of Estero while at the same time recognizing that its operations were absolutely controlled by the landowners. *Cooper v. Leslie Salt Co., supra.* There is no question that Estero added value to Brewer's Island. However, it never realized that value because it did not own the land or receive the proceeds from its sale. All we are deciding here is whether the value added by Estero is allocable to the Foster partnership because of the legislatively conferred control that the partnership exercised over the district. To answer that question in the affirmative does not require that we ignore Estero's legal identity as a public agency.

Before we move on we might note that petitioners do not contend that the Alphabet Corporations (rather than the Foster partnership) controlled Estero or used the district as

*their* instrument for the development of the 127 acres of land in Neighborhood One. The record, however, would not permit petitioners to make such a contention. After all, such a contention would ignore the fact that it was the partnership which solved the formidable engineering and financial problems which would otherwise have precluded the Foster City project from even being undertaken. It would ignore the fact that it was the partnership which actually purchased Brewer's Island and commenced to develop it. It would ignore the fact that development of Neighborhood One was well under way before the Alphabets were even incorporated. It would ignore the fact that many of the specific improvements that were completed after their incorporation were begun before that event.[83] And, as we shall see, it would ignore the passive role played by the Alphabets in the development of Neighborhood One.

We began this discussion by focusing on that part of the income derived from the sale of lots in Neighborhood One which can be viewed as having been earned subsequent to October 3, 1962, the date on which the Foster partnership transferred the 127 acres of land to the Alphabet Corporations. We asked whether the partnership or the Alphabets earned that part of the income and stated that the answer depended *primarily* on one's view of Estero. We have determined that the partnership controlled Estero and used the district as its instrument for the development of Foster City and that Estero's efforts must therefore be viewed as the work of the partnership. However, our inquiry is not complete until we consider the roles played by the partnership and the Alphabets independent of Estero in the development of Neighborhood One.

The role played by the Foster partnership in the development of Neighborhood One has already been described in detail (see pp. 74–77, *supra*) and need not be repeated here. Suffice it to say that its role was an active one. The role played by the Alphabets stands in sharp contrast. Most, if not all, of what they did was occasioned merely because they were the record owners of the 127 acres of land. It is of no consequence,

---

[83]A few examples which come to mind include the Hillsdale-Marina Lagoon Bridge, the water supply line, the sewage disposal plant, and the sewer outfall line.

therefore, that they executed deeds to builders and easements to Estero. The contracts entered into by the Alphabets appear to have been executed for this same reason. Moreover, the Alphabets did not act independently of the Foster partnership but rather in concert with it. Thus, for example, they were joined by the partnership as a contracting party whenever they entered into agreements with third parties. And although the Alphabets collected $2,023,900 from the sale of lots in Neighborhood One from July 1963 through December 1965, during that same period, they transferred $2,052,500 in stated loans to the partnership for its use in the further development of Foster City.

We disagree with respondent that the Alphabets were merely "corporate shells." After all, they leased waterfront lots to builders and undertook to construct an apartment complex in 1965. These activities, however, do not serve to define the Alphabets' involvement in the development of the 127 acres of land in Neighborhood One. It is only the income derived from the sale of lots in that parcel which is the subject of the section 482 allocation. We must therefore agree with respondent that the Alphabets did not earn any part of that income. The record in this case simply does not permit us to make a partial allocation. Furthermore, petitioners have never even contended in the alternative that such an allocation would be appropriate here. See *Marc's Big Boy-Prospect, Inc. v. Commissioner*, 52 T.C. 1073, 1105–1106 (1969), affd. sub nom. *Wisconsin Big Boy Corp. v. Commissioner*, 452 F.2d 137 (7th Cir. 1971).

At this point, we can readily dispose of petitioners' remaining contentions. First, they argue that respondent's section 482 allocation denies them the right to do business in corporate form. That section, however, does no such thing. Rather, it merely serves to tax income to the true earner, thereby preventing related enterprises from shifting income by legal or accounting legerdemain. Second, petitioners argue that the section 482 allocation serves to tax the Fosters, rather than the Alphabets, on the appreciation which occurred after the transfer of the 127 acres to those corporations. They fail to recognize, however, that Neighborhood One appreciated in value because of the efforts made by the partnership, rather than the Alphabets, in developing it. Finally, petitioners argue

that the Fosters acted not as partners but as employees of two corporations, Lomita Homes, Inc., and T. Jack Foster & Sons, Inc., both of which were subsidiaries of Likins-Foster Honolulu Corp.[84] Those corporations, however, merely performed the check-writing and bookkeeping functions for the Foster City project and did not earn any of the income derived from the sale of lots in Neighborhood One.

---

We turn now to the question of whether the transfer of the 127 acres of land in Neighborhood One was tax motivated. We must decide that question because income may only be allocated under section 482 if such allocation is necessary to prevent the avoidance of taxes *or* clearly reflect the income of commonly controlled or commonly owned enterprises. We have previously stated that these are alternative bases for the application of the section. We have also previously concluded that section 482 may be applied to a taxable disposition of property previously acquired in a nonrecognition transaction in order to prevent the avoidance of taxes. Accordingly, we will focus exclusively on the question of tax avoidance. For the reasons which we will discuss, we think the 127 acres of land were conveyed in order to avoid Federal income taxes.

Petitioners begin by arguing that the transfer of the land could not have been motivated by a desire to avoid taxes because on the basis of the "tax facts" then known, the transfer was bound to increase taxes. In this regard, they maintain that the income derived from the sale of lots was reported by the Alphabets and not offset by any losses,[85] whereas if that income had been reported by the partnership, it would have been offset by the operating losses which the partnership claimed on its returns. We find this argument to be without merit. Petitioners conveniently overlook the aggregate theory of partnerships which predominates when it comes

---

[84]T. Jack Foster & Sons, Inc., was incorporated in June 1964; Lomita Homes, Inc., built homes in San Diego during the early 1950's.

[85]Petitioners claim that the carryback of operating losses subsequently incurred by the Alphabets because of the construction of the Commodore Apartments could not have been foreseen in 1962.

to the taxation of partnership income to the partners, see 1 W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, par. 1.02 (1977), and the implications of the rate differential which exists between individuals and corporations, see B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, pars. 1.01–1.03 (4th ed. 1979). In other words, the tax savings to an individual realized by preserving a partnership loss may very well exceed the tax cost to his corporation incurred by reporting the income.

Next, petitioners argue that the Alphabets were incorporated and the land conveyed "because the Fosters had always, up to that time, used the corporate form for operating businesses." That statement, however, is not entirely accurate. During the Likins-Foster era, Jack Foster and V. B. Likins did business in both corporate and partnership form. When they terminated their business relationship in 1955, Foster entered into a partnership agreement with his sons. The purpose of the partnership, as defined by its agreement, was to actively transact business:

the purpose of this partnership shall be to own and to acquire land or interests in land, construct houses or other buildings; to rent or sell such real property or leasehold estates either in an improved or unimproved condition; to own stocks, bonds, debentures, or other evidences of indebtedness in any corporation; to buy, own, develop and operate oil and gas leasehold estates, or mineral rights or royalties; and to generally engage in the business of buying or owning property, real, personal or mixed; to act as contractors or principals or agents in any business transaction; to borrow or to lend money with or without security; to act as guarantors on the contracts of others; and generally to engage in any business which the partners may agree upon among themselves.

Moreover, the Fosters amended their partnership agreement in January 1959 to provide for their equal participation in the profits and losses resulting from the operation of the partnership and to authorize the payment of salaries to all of the partners rather than to just Jack Foster. The amendments were made shortly after the graduation from college and entry into the family business of Bob Foster, the youngest son, and at a time when the partnership was actively assessing the feasibility of developing Brewer's Island. In our opinion, the amendments evidence an intention to proceed as a partnership if the project were undertaken.

The most potent fact, however, is that it was the partnership

which actually committed itself to the Foster City project by solving the major engineering problem related to the reclamation of the land, by solving the major financial problem related to obtaining both long-term and short-term debt capital, by exercising the option to purchase Brewer's Island in August 1960, and thereafter by working day in and day out to effect the transformation of the land. It was not until September or October 1962, that the Alphabets were even incorporated. By that time, the partnership had succeeded in substantially reclaiming Neighborhood One.

When the Alphabets appeared on the scene, the partnership did not bow out but rather continued to act as the developer not only of Neighborhood One but also of the other neighborhoods. Petitioners describe the Foster City project as a "single unitary business." It is clear that that business was at all times conducted under the aegis, direction, and control of the partnership. Moreover, its role was no closely guarded secret. After all, the partnership held itself out and was regarded as the developer of Foster City.

We find it particularly significant that Jack Foster, Jr., the general manager of the Foster City project, was unable to say whether any business purpose was served by the incorporation of the Alphabets and the transfer of the 127 acres of land. At his deposition in 1971, he testified as follows:

Q. * * * Let me ask you the direct question: Was there any business purpose in setting up the four alphabet corporations, first, other than for purposes of tax planning?
A. Well, I don't recall.

And again:

Q. Do you know of any business purpose for the setting up of the Alphabets, or was this strictly again a tax matter set up by Mr. Champlin?
A. I don't know what the business purpose was, because Mr. Champlin set it up. But I hope Mr. Champlin had some business purpose other than tax savings.

And once again:

Q. As you sit there now, do you recall any business purpose for setting up the Alphabets other than for tax reasons?
A. I don't recall what it was.

The basic organizational structure within which the Fosters

undertook to develop Brewer's Island was dictated by the recommendations of Del Champlin. Jack Foster, Jr., described Champlin as "the steward of our taxes." He also testified that "Mr. Champlin was in charge of our income tax, and just whatever he said went, really. I don't recall that it was ever questioned."

Champlin determined that it would be advantageous from a tax standpoint for the Fosters to begin in partnership form. Losses incurred during the early years could be utilized by the partners to reduce income on their individual returns; later, as land was developed, acreage could be transferred to corporations in an effort to shift income and split it among taxpayers subject to a lower rate of tax. At his deposition, Foster acknowledged Champlin's grand plan:

Q.  * * * Now, do I understand from what you said that Mr. Champlin said, "We'll start out with this partnership form of entity; and as time goes along, I'll set up corporations or whatever entity I think is needed and put the income into that entity at the right time," or words to that effect? Is that what he said he was going to do?

A.  Yes, this is the way he intended to operate it.

Jack Foster, Jr., admitted that Champlin's plan concerned him because it exposed the Fosters to personal liability through use of the partnership. He did not question the plan, however. His failure to do so is most telling:

Q.  Do you recall ever being concerned about personal liability because of the use of that form of ownership?

A.  Yes.

Q.  And when was it that you had these concerns, if there was more than one occasion?

A.  Oh, I think I had these concerns for quite some time.

Q.  Dating back how far?

A.  Maybe even back to the outset.

Q.  But, again, to repeat, you never specifically brought it up to Mr. Champlin?

A.  I don't recall. My impression was—if I could elaborate on this—

Q.  Sure.

A.  —because it's coming out sounding rather foolish to be concerned about it without asking questions. I was concerned—I don't recall that I asked questions. The impression that I was given was that the tax planning was so advantageous and so outstanding that that was just the chance we took in order to get this great tax saving.

Q.  Now, this great tax advantage: this was Mr. Champlin speaking, I take it?

A.  It was his—yes; right.

Q. He said there was such a great tax advantage that it overrode all other considerations? Is that what you're saying?
A. Yes.

The tax motivation for the incorporation of the Alphabets and the transfer of the 127 acres of land is further evidenced in the testimony of Jack Foster, Jr., describing the Fosters' disinterest in the particulars of those events, a disinterest which we find to be absolutely antithetical to business motivation:

Q. * * * Well, before the [Alphabet] corporations were set up, was there any discussion amongst the family and/or Mr. Champlin that this was going to be done?
A. I think he told us about it.
Q. Well, what did he say?
A. Well, he said that we needed these corporations to put these particular lands in. I don't recall that he gave the reasons.
Q. Well, did anyone ask him why?
A. Well, no, because we trusted him implicitly. If he said to do it, we did it. He didn't have to tell us because we knew that it was done for the purpose of conserving on income taxes.
Q. Okay. Well, I take it he said, "As time goes on, we're going to form different entities," and you assumed, now, he was forming the entities he talked about? Is that what you're saying?
A. Well, yes, okay.
Q. And it was all part of—as far as you were concerned—tax planning; is that right?
A. Yes.

        *       *       *       *       *       *       *

Q. As to the selection of what properties were put into these corporations, who participated in that?
A. Mr. Champlin.
Q. All by himself; is that right?
A. Yes; right.
Q. Okay. He said, let's transfer in this block and that block, and everyone said, okay; is that right?
A. Right.
Q. Without any discussion? If there was, tell me. I wasn't there.
A. No. I'm sorry,—I don't—You know, as was our practice, he would make these decisions and we followed them. We did it.

The Fosters' slavish deference to their tax adviser is again evidenced in the testimony of Jack Foster, Jr.:

Q. Now, when Mr. Champlin said, let's set up these corporations and transfer some property into it, how much time elapsed from the time he made that suggestion until that was carried out, if you recall?
A. Oh, usually when he came forth with these decisions, he had the

timetable right with him. If he wanted it right then and there, it was done right then and there.

It was no accident that land in Neighborhood One was transferred to the Alphabets rather than land in some other neighborhood. Neighborhood One was the first neighborhood to be developed. The Fosters originally anticipated that it would begin to produce income in 1962. However, sales were delayed, primarily because the filling operation took longer than had been anticipated. Negotiations for the sale of lots in Neighborhood One did begin in 1962, and by November 1962, the Fosters were projecting income for the following January. Del Champlin was aware of these facts when he arranged for the incorporation of the Alphabets and the transfer of the 127 acres of land on October 3, 1962.

The Fosters' preoccupation with income taxes was attributable to a combination of two factors. First, the partnership needed to retain as much cash as possible for the development of Foster City. Second, the value of money on hand to the Fosters far exceeded any interest that might eventually have to be paid on a tax deficiency, particularly when the rate of interest charged by the Government was less than that charged by commercial banks. Champlin was therefore expected to minimize taxes to the extent possible and to postpone the payment of those taxes which could not be avoided. A particular tax strategy was not necessarily rejected merely because it might result in litigation or even ultimately fail. The more important criterion was the extent to which that strategy would promote the immediate availability of cash for the partnership's use. As Champlin testified at his deposition in 1969:

Mr. Foster's viewpoint was that the value of the money on hand far exceeded any interest that might be involved, and besides the interest could be deducted for income tax purposes anyway.

\* \* \* \* \* \* \*

Mr. Foster felt that the availability of the cash was of very great financial benefit to him. Even if the method that was used would ultimately fail, he could make far more than any 6 percent interest by having the money.

In view of the foregoing, we are convinced that the 127 acres of land in Neighborhood One were conveyed to the Alphabet Corporations in order to avoid Federal income taxes. We therefore sustain respondent's section 482 allocation.

### E. NEIGHBORHOOD FOUR REALLOCATION

We turn now to the question whether the reallocation of income from the sale of lots in Neighborhood Four was unreasonable, arbitrary, or capricious. See *Rooney v. United States*, 305 F.2d 681, 686 (9th Cir. 1962); *National Securities Corp. v. Commissioner*, 137 F.2d 600, 602 (3d Cir. 1943), affg. 46 B.T.A. 562 (1942). As before, our determination whether the Commissioner abused his discretion turns on questions of fact. *Ballentine Motor Co. v. Commissioner*, 321 F.2d 796, 800 (4th Cir. 1963), affg. 39 T.C. 348 (1962).

There is no question that the transfer by the Foster partnership of the 311 single-family residential lots in Neighborhood Four to Foster Enterprises shifted income from one commonly controlled entity to another. At the time of the transfer, the neighborhood had been virtually developed by the partnership. In this regard, it should be kept in mind that the lots were conveyed on August 29, 1966; in September, the land improvements were completed. By that time, the lots had been certified and were ready and available for the construction of houses. The fact that the first sale of lots did not occur until the following February was a direct consequence of the weak housing market that existed throughout northern California during most of 1966 and had nothing to do with the status of the land improvements at the time of the transfer. It should also be kept in mind that Foster Enterprises did not undertake to complete the negligible development left to be accomplished as of the date of the transfer; that task remained the responsibility of the partnership. There is nothing in the record to indicate that Foster Enterprises even attempted to market the lots; to the contrary, it apparently relied on the partnership to advertise and sell them. Moreover, the corporation had not previously played any role in the development of Neighborhood Four. It is clear, therefore, that the income from the sale of lots in that neighborhood was not earned by Foster Enterprises but rather was completely earned by the Foster partnership. See *Philipp Bros. Chemicals, Inc. (N.Y.) v. Commissioner*, 435 F.2d 53 (2d Cir. 1970), affg. *Philipp Bros. Chemicals, Inc. (Md.) v. Commissioner*, 52 T.C. 240 (1969), where the failure to actually earn the income in question was the basis for the reallocation under section 482.

There is similarly no question that the transfer of the lots in

Neighborhood Four distorted the incomes of the Foster partnership and Foster Enterprises. First, only highly appreciated inventory pregnant with income was conveyed. Second, Foster Enterprises had no business operations in Foster City and had not played any role in its development. Third, the partnership, and not Foster Enterprises, was solely responsible for the development of Neighborhood Four.

Petitioners seek to justify the transfer on the basis that the 311 residential lots were conveyed for a business reason. In this regard, they argue that Rex Johnson, a senior vice president of the Republic National Bank who at the time was in charge of monitoring the Fosters' account, insisted that the lots be conveyed in order to improve the balance sheet of Foster Enterprises. Although there is indeed testimony in the record to that effect, we have not found it to be convincing. Rather, we think the lots were conveyed in order to avoid taxes.

In order to understand Johnson's testimony, and appreciate our skepticism, we need to briefly describe the credit relationships that existed, particularly in August 1966, among and between various Foster-controlled entities and the Republic National Bank. We start with the fact that Foster Enterprises was not indebted to Republic at any time material to this issue. However, it had borrowed money from Likins-Foster Honolulu Corp. In addition, it had borrowed from Roy Turner Associates, Ltd. (Turner Associates), a subsidiary of Likins-Foster. Turner Associates was in turn indebted to Likins-Foster. Both Likins-Foster and the Foster partnership were indebted to Republic. The balance owed by Likins-Foster in mid-August 1966 was approximately $1,100,000. This amount was secured by an assignment of sales contracts and sublease ground rentals with respect to property unrelated to Foster City, and payment was personally guaranteed by the Fosters. The balance owed by the partnership in mid-August 1966 was also approximately $1,100,000, exclusive of the Westway notes. This amount was secured, inter alia, by the Fosters' pledge of their stock in Likins-Foster.

According to Johnson, he insisted on the transfer of the lots in Neighborhood Four in order to improve the liquidity of Foster Enterprises and thereby (1) enhance the collectibility of the indebtedness of Likins-Foster to Republic, (2) improve the

bank's security in the Likins-Foster stock, and (3) insulate the bank from the fortunes of the Foster partnership.

With regard to the first objective, Johnson testified that Likins-Foster was slow in making payment and its prospects for the future were uncertain. However, in a special audit report prepared by the bank in August 1966 concerning (inter alia) Likins-Foster Honolulu Corp., the final paragraph concluded that "The performance of the collateral [the sales contracts and sublease ground rentals], in our opinion, is good and the loans are liquidating according to arrangements approved by the bank." In any event, if Johnson was concerned about the ability of Likins-Foster to repay its loan, it would have made more sense to transfer the lots in Neighborhood Four directly to that corporation rather than to an entity that was not even indebted to Republic. Moreover, Foster Enterprises was not under any obligation to dispose of the proceeds from the sale of the lots in a manner consistent with the bank's interest in its receivable from Likins-Foster. In fact, it was understood by the parties that the sales proceeds would be used by the Foster partnership to further develop Foster City rather than by Foster Enterprise to liquidate its debts to Likins-Foster and Turner Associates. Johnson's statement that the repayment of the sales proceeds by the partnership to Foster Enterprises "would be enforceable by Enterprises as a creditor in the event should there be a bankruptcy of the Foster family partnership" may very well be true. However, we fail to comprehend how a banker avowedly concerned about his debtor's ability to repay could be so sanguine about such a daisy chain of receivables ultimately based upon a claim in bankruptcy. All of this might be more understandable if Republic had required Foster Enterprises to maintain a trust account in order to protect the bank's interest in the proceeds from the sale of lots, but this was not the case.

In contrast to the first objective, the second and third objectives relate to the partnership's indebtedness to Republic. Johnson testified that he was concerned about the financial future of the partnership, particularly because of its cash flow problem. However, the transfer of the lots obviously weakened its ability to repay its loan and certainly exacerbated its cash flow problem. Presumably, therefore, the transfer was designed to enhance the bank's position by insulating assets from

the partnership's general creditors by placing them in corporate solution.

In our view, Republic's security in the Likins-Foster stock was only indirectly and very marginally improved by the transfer of the lots to Foster Enterprises. The stock would have provided sounder security if the transfer had been made directly to Likins-Foster. After all, it was that corporation's stock, not that of Foster Enterprises, that had been pledged as security. However, if this were not feasible,[86] Foster Enterprises could have provided security to Republic, but did not.

We also fail to see how the transfer helped to insulate Republic from the fortunes of the Foster partnership. In 1967, Foster Enterprises sold 200 lots in Neighborhood Four for $1,516,400. During that year, it transferred approximately $1,200,000 of that amount to the partnership, which used the funds to pay its (i.e., the partnership's) operating expenses, real property taxes, and other obligations related to its ongoing development of Foster City. Although Foster Enterprises still had an asset, it was now an unsecured receivable from the partnership. Collectibility was therefore dependent upon the partnership's overall success in developing and selling land in Foster City. But this was precisely the risk against which Johnson ostensibly wanted to protect.[87]

Johnson characterized Foster Enterprises as a "key corporation" insofar as intercorporate debt was concerned and professed concern about its inadequate finances. It is remarkable, therefore, that Foster Enterprises was not even mentioned in the previously mentioned special audit report involving Likins-Foster Honolulu Corp.

One should not infer from the foregoing that we think the credit relationship between the Fosters and the Republic National Bank was without any tension. To the contrary,

---

[86]Petitioners argue that it would have been awkward for them to transfer the lots to Likins-Foster because their stock ownership in that corporation, unlike Foster Enterprises, was unequal among themselves. However, that fact would not have been of consequence to Republic and was not even mentioned by Johnson in his testimony. In addition, the Fosters pledged their stock in Likins-Foster as security for the partnership notwithstanding their equal interests therein.

[87]Republic's practice of requiring the Fosters to personally guarantee the indebtedness of their various entities also exposed the bank to the vicissitudes of their business fortune and demonstrates that it regarded them as the ultimate source of collection.

there is no question that as the years passed the Foster partnership did develop a serious cash flow problem which caused Republic such increasing concern that in 1967 it demanded, and for the first time obtained, a secured interest in the land in Foster City owned by the partnership and the related Foster corporations. Nevertheless, and unlike petitioners, we do not think Johnson was a disinterested witness whose testimony must be accepted at face value. Republic officials, including Johnson, collaborated with the Fosters in structuring the Westway transaction for their mutual benefit.[88] Quite frankly, we think it more probable than not that Johnson applauded the transfer of the lots in Neighborhood Four as a means of improving cash flow by reducing Federal income taxes.

In view of the foregoing, as well as the curious paucity of documents surrounding the Neighborhood Four transfer, we are inclined to regard Johnson's testimony as an exercise in postmortem tax planning.

Finally, we cannot ignore the testimony of Jack Foster, Jr., given at his deposition in 1971. Foster's testimony is particularly significant because it was given at a time relatively close to the event in question and under circumstances where the consequence of his response was not so obvious as to be an incentive to reply in a self-serving manner. Moreover, as general manager of the Foster City project, Foster was in a position to know the particulars surrounding the Neighborhood Four transfer. This was especially true after his father's health began to decline in the mid–1960's, and he increasingly assumed even greater responsibilities.

In no uncertain terms, Foster testified that he was unaware of any business reason for the transfer of the lots and that they were conveyed solely on the advice and recommendation of Del Champlin:

Q. Was this transfer made, Neighborhood 4 to Foster Enterprises, solely on the advice and recommendation of Mr. Champlin?
A. Yes.

---

[88] We might add at this point that we are equally skeptical of Johnson's testimony that he also insisted on the December 1963 transfer by the Foster partnership of 500 shares of stock in Foster California Corp. to Foster Enterprises in order to improve the liquidity of the latter corporation. This particular transfer was, of course, part of the Westway transaction. See Issue 2, *infra*.

Q. And no one questioned that recommendation?
A. No.
Q. Did anyone ask him why he was recommending that it be done?
A. No.
Q. Did he say it was for the purpose of taking advantage of a tax loss in Foster Enterprises?
A. Yes.
Q. Was there any business purpose in this transfer at all?
A. I don't know.
Q. You don't know of any? Is that what you're saying?
A. Well, no.

It is apparent that the Fosters understood that the purpose of the Neighborhood Four transfer was to utilize the operating losses of Foster Enterprises. They were conscious of those losses and very anxious that they be used to reduce ordinary income. In view of its history of unprofitable operations, there was little likelihood of ever utilizing the accumulated net operating losses of that corporation without shifting income from another entity to it. The reason for specifically transferring the lots in Neighborhood Four, as opposed to lots in any other neighborhood, is clearly evident from Foster's testimony:

Q. Did he [Champlin] give any reason why he was selecting Neighborhood 4 rather than any other area in Foster City to make this particular transfer?
A. Well, he saw it as the next anticipated income.
Q. And you agreed with that?
A. Oh, yes.
Q. Was there any other Neighborhood ready for sale at that time, or would be ready within the next year?
A. I think we had 50 lots remaining in Neighborhood 3, but I don't believe we saw any other block of lots of the single family variety that might be sold within the immediate future.
Q. By that you mean within the next year?
A. Right.

That the Fosters acted on Champlin's recommendation, and not at Johnson's direction, is also apparent from Foster's testimony:

Q. Now assuming that Mr. Champlin had not recommended this transfer of this particular Neighborhood 4 into Foster Enterprises, what was the plan? That you would just sell Neighborhood 4 as land then owned by the partnership, I take it?
A. Well, I would presume that Mr. Champlin would—if that was a decision that he would make, that's what we would do. That was our pattern all along.

Q. Are you suggesting that when land was ready or getting ready to be sold, that Mr. Champlin made the determination as to which entity would sell it? Is that what you're saying?

A. No, I'm not saying that. I have tried to say all along that this was an ongoing relationship, and he was in our office every day. He knew the status of all the land, and at any time he deemed it appropriate, for whatever tax reason he had in mind, that's when we acted.

Maybe it was years before development that he would suggest that a piece of land might be transferred to a corporation. Maybe it was at the stage where it was in the process of development. I don't know. Whenever he said, "Do it," we did it.

Based on the foregoing, we hold that the lots in Neighborhood Four were transferred in order to avoid Federal income taxes and that respondent did not abuse his discretion under section 482 in reallocating the income derived from their sale to the Foster partnership.[89]

### F. STATUS OF THE FOSTER PARTNERSHIP

In the alternative, petitioners contend that the Foster partnership was an "association" within the meaning of section 7701(a)(3) and section 301.7701–2, Proced. & Admin. Regs., and hence taxable as a corporation.[90] They recognize, however, that—

once corporate status is found, * * * all the consequences of operating in corporate form will flow from this determination; that is, the full panoply of

---

[89]In their reply brief, petitioners appear to raise an issue concerning the *amount* of the income to be reallocated, presumably because in July 1966 the partnership reduced the asking price of nonwaterfront lots in Neighborhood Four from $7,800 per lot to $6,800 per lot, whereas the average sales price of the 200 lots sold in February and March 1967 was $7,582 per lot. Contrary to petitioners' contention, "this Court may allocate income under the statute [sec. 482] in a manner the evidence before us demonstrates to be correct and * * * respondent's allocation need not be approved or disapproved *in toto.*" *Nat Harrison Associates, Inc. v. Commissioner,* 42 T.C. 601, 617–618 (1964). See *Ach v. Commissioner,* 42 T.C. 114, 126–127 (1964), affd. 358 F.2d 342 (6th Cir. 1966); *Bell v. Commissioner,* T.C. Memo. 1982–660, slip opinion at 41–43. However, even if we were to disregard the motivation for the transfer, the obvious shifting of income, and the partnership's status as its true earner, petitioners have not convincingly demonstrated that some lesser amount should be reallocated. The fair market value of the nonwaterfront lots on the date of their transfer has not been established by appraisal or other competent evidence. Moreover, the record is silent concerning the market value of the waterfront lots. Finally, the fact that the housing market was weak in 1966, combined with the fact that the Cooper litigation, which commenced in December 1966, adversely affected the sale of lots, leads us to think that there was little, if any, potential for appreciation from August 1966 to February/March 1967.

[90]Petitioners do not contend that the Foster partnership ever elected under sec. 1361 to be taxed as a domestic corporation.

tax rules relating to the treatment of corporations and shareholders will govern the organization, operation, liquidation, and reorganization of the enterprise, and the taxability of distributions to its associates. [B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 2.01, at 2–3 (4th ed. 1979); emphasis in original.]

Accordingly, they also contend that during the years in issue, the partnership made no distributions which could be regarded as taxable dividends. Finally, they contend that under section 6501(a) the 3-year period within which a deficiency against the partnership (viewed as an association) could be assessed has expired.[91] Petitioners conclude that neither they nor their partnership (again viewed as an association) is liable for any deficiency based on the three major adjustments set forth in respondent's notice of deficiency.

In our view, the major premise of petitioners' argument is faulty. In other words, we do not think the Foster partnership was an association; rather, we think it was a partnership within the meaning of section 7701(a)(2) and section 301.7701–3, Proced. & Admin. Regs. See also section 761(a) and section 1.761–1(a), Income Tax Regs. Accordingly, we do not find it necessary to address petitioners' subsidiary contentions.

At the outset, we should emphasize that for purposes of State law, the Foster partnership was exactly what it purported to be, i.e., a general partnership. For example, the written agreement entered into by the Fosters in 1955 was denominated "Partnership Agreement" and provided in part as follows:

THIS PARTNERSHIP AGREEMENT * * * WITNESSETH,

That, Whereas, the parties hereto have agreed among themselves to form a partnership for the transaction of their business, Now THEREFORE,

In consideration of the following convenants and agreements, IT IS STIPULATED by and between the parties, as follows:

1. The parties hereto do hereby form a partnership to be known as T. Jack Foster & Sons, in which partnership all of the partners are general partners;

Therefore, the only issue before us is the status of the partnership for tax purposes.

Section 7701(a)(2) defines a partnership to include "a syndicate, group, pool, joint venture, or other unincorporated

---

[91]Petitioners appear to have overlooked the possible application of the mitigation provisions of secs. 1311 through 1314. See B. Bittker & J. Eustice, *supra* at par. 2.01, pp. 2–4—2–5.

organization, through or by means of which any business, financial operation, or venture is carried on, and which is not * * * a corporation." Section 7701(a)(3) defines a corporation to include an "association." Drawing from *Morrissey v. Commissioner*, 296 U.S. 344 (1935), section 301.7701–2(a)(1), Proced. & Admin. Regs., enumerates six major corporate characteristics: (1) Associates, (2) an objective to carry on business and divide the gains therefrom, (3) continuity of life, (4) centralization of management, (5) liability for corporate debts limited to corporate property, and (6) free transferability of interests. The regulation further provides that an unincorporated enterprise will be treated as an association if it more nearly resembles a corporation than, for example, a partnership, i.e. if it has more corporate characteristics than noncorporate characteristics. Secs. 301.7701–2(a)(1) and 301.7701–2(a)(3), Proced. & Admin. Regs. However, in determining the tax status of a particular enterprise, the characteristics common to the possible types of enterprises are not considered. Thus, for example, if the choice is between association or partnership status, as is the case here, the first two characteristics enumerated above are ignored because they are common to both types of enterprises, and the determination is based on the later four.[92] Secs. 301.7701–2(a)(2) and 301.7701–2(a)(3), Proced. & Admin. Regs. Each characteristic is accorded equal weight, and the determination is thus mechanical in approach. *Larson v. Commissioner*, 66 T.C. 159, 172, 185 (1976). In the absence of additional characteristics (see the previous footnote), an unincorporated enterprise such as a partnership which lacks *two or more* of the four determinative corporate characteristics will not be classified as an association but rather as a partnership. Sec. 301.7701–2(a)(3), Proced. & Admin. Regs.; *Larson v. Commissioner*, supra at 185; *Zuckman v. United States*, 207 Ct. Cl. 712, 524 F.2d 729, 744 (1975). This reflects the regulation's objective of limiting the ability of a partnership to qualify as a corporation for tax purposes. *Larson v. Commissioner*, supra at 187 (Dawson, Chief Judge, concurring).

---

[92]Characteristics other than those specifically enumerated in the regulation may be considered if helpful in resolving the classification issue. Sec. 301.7701–2(a)(1), Proced. & Admin. Regs. However, petitioners have not identified any such additional characteristics.

We turn now to the characteristics of continuity of life, centralization of management, limited liability, and free transferability of interests. Although these characteristics, or standards, are prescribed under authority of the Internal Revenue Code, local law, in this case California law, governs in determining "whether the legal relationships which have been established in the formation of an organization are such that the standards are met." Sec. 301.7701–1(c), Proced. & Admin. Regs.

(1) *Continuity of life.*—Section 301.7701–2(b)(1), Proced. & Admin. Regs., provides that "if the death, insanity, bankruptcy, retirement, resignation, or expulsion of any member will cause a dissolution of the organization, continuity of life does not exist." The regulation goes on to conclude that a general partnership subject to a statute corresponding to the Uniform Partnership Act lacks continuity of life. Sec. 301.7701–2(b)(3), Proced. & Admin. Regs. The State of California adopted the Uniform Partnership Act in 1949. Cal. Corp. Code secs. 15001–15045 (West 1977) (hereinafter cited as the California UPA). See 6 U.L.A. 1 (Supp. 1982); *Baker Commodities, Inc. v. Commissioner*, 415 F.2d 519, 525 n. 4 (9th Cir. 1969), affg. 48 T.C. 374 (1967). Petitioners do not dispute the fact that the Foster partnership was subject to that act. Thus, it would appear that the partnership lacked the corporate characteristic of continuity of life.

Petitioners contend, however, that the partnership agreement provided that the partnership should continue in the event of the death or withdrawal of a partner,[93] and that such provision is sufficient to impart continuity of life to it. We disagree. Section 15031(5) of the California UPA provides that a partnership is dissolved by the bankruptcy of a partner. Moreover, section 301.7701–2(b)(3), Proced. & Admin. Regs., provides that notwithstanding an agreement that an enterprise is to continue for a stated period or until the completion

---

[93]In this regard the agreement, as restated in August 1963, provided as follows:

"9. This partnership shall continue for a term of twenty (20) years from the date hereof and from year to year thereafter, provided that until August 7, 1983 no partner may retire without the consent of all other partners * * *

"11. In the event any partner shall die, either within the primary term of the partnership, or thereafter, said partnership shall, for all purposes, continue despite the death of one or more of said partners * * * * "

of a stated transaction, the enterprise lacks continuity of life if any member has the *power* under local law to dissolve it. Section 15031(2) of the California UPA provides that a partnership is dissolved "In contravention of the agreement between the partners, where the circumstances do not permit a dissolution under any other provision of this section, *by the express will of any partner at any time.*" (Emphasis added.) Although a partner who wrongfully dissolves a partnership may be answerable in damages and may forfeit his right to wind up the partnership's affairs (see secs. 15037 and 15038(2), Cal. UPA), the fact remains that such a partner has the power to dissolve the partnership. And it is the power, not the right, to dissolve which is the touchstone of the regulation. *Zuckman v. United States*, 524 F.2d at 737; see sec. 301.7701-2(g), examples (2) and (7), Proced. & Admin. Regs. Accordingly, we think the Foster partnership lacked the corporate characteristic of continuity of life.

(2) *Centralization of management.*—Section 301.7701-2(c)(1), Proced. & Admin. Regs., provides that an enterprise has centralized management if—

any person (or any group of persons which does not include all the members) has continuing exclusive authority to make the management decisions necessary to the conduct of the business for which the organization was formed. Thus, the persons who are vested with such management authority resemble in powers and functions the directors of a statutory corporation.

The regulation goes on to provide that a general partnership subject to a statute corresponding to the Uniform Partnership Act lacks centralized management because of the mutual agency relationship between members of a general partnership. Sec. 301.7701-2(c)(4), Proced. & Admin. Regs. We have already observed that the State of California has adopted the Uniform Partnership Act and that the Foster partnership was subject to it. Section 15009(1) of the California UPA defines the mutual agency relationship as follows:

Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.

Although petitioners recognize the absolute language of the regulation, they nevertheless argue that the Foster partnership had a form of centralized management because of the following two paragraphs of the partnership agreement:

T. JACK FOSTER shall be the managing partner and shall be authorized to make all routine decisions for the partnership; provided, however, that any matters of policy shall be discussed and determined by all of the partners.

Any two (2) general partners are hereby authorized to bind the partnership by any deed, conveyance, contract or other written document within the general scope of the partnership.

However, the proviso of the first paragraph negates petitioners' contention. In any event, section 301.7701–2(c)(4), Proced. & Admin. Regs., provides that the partners' agreement to vest a selected few with exclusive management authority does not negate the mutual agency relationship between members of a general partnership if the agreement is ineffective as against an outsider with no notice of it. See sec. 15009(1), Cal. UPA, quoted above, and sec. 301.7701–2(g), examples (2) and (3), Proced. & Admin. Regs. Similarly, the second paragraph does not defeat the mutual agency relationship established by section 15009(1) of the California UPA. The fact that the Fosters agreed among themselves that *any* two could bind the partnership is not the equivalent of concentrating management authority in a *particular* person or *particular* group. Accordingly, we think the Foster partnership lacked the corporate characteristic of centralization of management.

At this point, it is apparent that the Foster partnership lacked two of the four determinative corporate characteristics and thus cannot be classified as an association. Sec. 301.7701–2(a)(3), Proced. & Admin. Regs.; *Larson v. Commissioner*, 66 T.C. at 185; *Zuckman v. United States*, 524 F.2d at 744. We could, therefore, conclude our analysis and move on. However, we think it advisable to briefly consider the remaining two corporate characteristics.

(3) *Limited liability.*—Section 301.7701–2(d)(1), Proced. & Admin. Regs., provides that limited liability exists "if under local law there is no member who is personally liable for the debts of or claims against the organization." That section further provides that personal liability exists with respect to each general partner in the case of a general partnership

subject to a statute corresponding to the Uniform Partnership Act. In this regard, see sec. 15015, Cal. UPA; *Young v. Riddell*, 283 F.2d 909, 910 (9th Cir. 1960). Thus, there can be no question that the Foster partnership lacked the corporate characteristic of limited liability. Petitioners do not contend to the contrary.

(4) *Free transferability of interests.*—Section 301.7702-(e)(1), Proced. & Admin. Regs., equates free transferability with the power of substitution. And, "In order for this power of substitution to exist in the corporate sense, the member must be able, *without the consent of other members*, to confer upon his substitute *all* the attributes of his interest in the organization." (Emphasis added.) Although a partner can unilaterally transfer his interest in partnership profits and surplus, he cannot confer on his assignee the other attributes of membership, such as the right to participate in the management and conduct of the partnership business, without the consent of all of the partners. Secs. 15018 (c) and (g), 15026, and 15027, Cal. UPA. Accordingly, the Foster partnership lacked the corporate characteristic of free transferability of interests. Petitioners admit as much.

———

Our review of the four major corporate characteristics relevant to the determination of an organization's tax status indicates that the Foster partnership possessed only noncorporate characteristics and thus cannot be classified as an association. Petitioners contend, however, that if the partnership used Estero as its instrument in the development of Foster City, then Estero's characteristics should be attributed to the partnership for the purpose of determining the latter's status. In this regard, they maintain that Estero possessed the corporate characteristics of continuity of life, limited liability, and free transferability of interests. Although we agree with petitioners' premise that the partnership used Estero, we disagree with their conclusion.

First, petitioners cite no authority whatsoever in support of their rather novel theory. Second, the classification regulations (secs. 301.7701-1 through 301.7701-4, Proced. & Admin. Regs.) do not even suggest, much less expressly sanction,

imputing corporate characteristics of one organization to another.[94] Third, it strikes us as illogical to attribute Estero's characteristics to the partnership, as petitioners would have us do, when it was the partnership that used Estero and not the converse. In other words, it was the partnership that directed the development of Foster City; Estero was merely one of the players in the drama. The partnership was neither coincident nor coextensive with the district, which was a separate and distinct juristic entity. 1961 Cal. Stat. ch. 82, p. 459 (1st Extra Sess. 1960); *Cooper v. Leslie Salt Co.*, 70 Cal. 2d 627, 451 P.2d 406, 75 Cal. Rptr. 766 (1969). Under these circumstances, we do not think that either the partnership's identity or its tax status should be subordinated to that of Estero.

In view of the foregoing, we hold that for tax purposes the Foster partnership was a partnership and not an association. Sec. 7701(a)(2) and (3); secs. 301.7701–1 through 301.7701–3, Proced. & Admin. Regs.

### G. PETITIONERS' AFFIRMATIVE USE OF SECTION 482

In the alternative, petitioners contend that if section 482 is to be applied in this case, it should be used to consolidate the Foster partnership with all of the Foster-controlled corporations (particularly Foster Enterprises)[95] purportedly involved in the development of Foster City. Their argument is based on the fact that "there was a single unitary business being conducted." Although we agree with the factual predicate of their contention, we disagree with the contention itself.

Section 482 may not be used by taxpayers as a sword; rather, it may be invoked only by the Commissioner. 3 B. Bittker, Federal Taxation of Income, Estates and Gifts, par. 79.2, p. 79–6 (1981). In this regard, section 1.482–1(b)(3), Income Tax Regs.,

---

[94]We should not be understood to imply that we necessarily agree with petitioners that Estero possessed the three corporate characteristics previously mentioned. Under the view we take, it is unnecessary to determine which corporate characteristics the district may have had.

[95]As will be recalled, Foster Enterprises experienced large net operating losses during the 1960's.

provides that "Section 482 grants no right to a controlled taxpayer[96] to apply its provisions at will, nor does it grant any right to compel the district director to apply such provisions." Petitioners do not attack the validity of this regulation, and that issue is therefore not before us. Nevertheless, we would like to briefly comment on what we perceive to be the firm foundation for the regulation.

As previously stated, section 482 can be traced to the consolidated return provisions of section 240(d), Revenue Act of 1921, ch. 136, 42 Stat. 227, 260. That section provided that—

in any case of two or more related trades or businesses (whether unincorporated or incorporated and whether organized in the United States or not) owned or controlled directly or indirectly by the same interests, the Commissioner may consolidate the accounts of such related trades or businesses, in any proper case, for the purpose of making an accurate distribution or apportionment of gains, profits, income, deductions, or capital between or among such related trades or businesses.

It was reenacted but amended by section 240(d), Revenue Act of 1924, ch. 234, 43 Stat. 253, 288. That section provided as follows:

In any case of two or more related trades or businesses (whether unincorporated or incorporated and whether organized in the United States or not) owned or controlled directly or indirectly by the same interests, the Commissioner may *and at the request of the taxpayer shall,* if necessary in order to make an accurate distribution or apportionment of gains, profits, income, deductions, or capital between or among such related trades or businesses, consolidate the accounts of such related trades or businesses. [Emphasis added.]

See. S. Rept. 398, 68th Cong., 1st Sess. (1924), 1939–1 C.B. (Part 2) 266, 286. It was reenacted without change by section 240(f), Revenue Act of 1926, ch. 27, 44 Stat. 9, 46.

In 1928, however, Congress enacted section 45, Revenue Act of 1928, ch. 852, 45 Stat. 791, 806,[97] from which section 482 is directly derived. Although that section was based on section 240(f) of the Revenue Act of 1926, it was different in two important respects. First, it authorized the Commissioner to

---

[96]The term "controlled taxpayer" is defined by sec. 1.482–1(a)(4), Income Tax Regs., to mean "any one of two or more organizations, trades, or businesses owned or controlled directly or indirectly by the same interests."

[97]See note 57, *supra,* for the full text of sec. 45, Revenue Act of 1928.

distribute, apportion, or allocate gross income or deductions between or among commonly controlled or commonly owned trades or businesses and eliminated any reference to the consolidation of accounts.[98] Second, it eliminated the right of taxpayers to invoke the benefits of that section. Both of these significant differences have been carried forward in section 482.

Section 45 of the Revenue Act of 1928 was reenacted without change in 1932[99] and reenacted with a minor amendment in 1934.[100] Shortly, thereafter, regulations were promulgated. Article 45–1(b), Regs. 86, provided as follows:

> Section 45 grants no right to a controlled taxpayer to apply its provisions at will, nor does it grant any right to compel the Commissioner to apply such provisions. * * *

This article thus reflected the statutory changes embodied in section 45 of the Revenue Act of 1928 and is the forefather of section 1.482–1(b)(3), Income Tax Regs. That section is identical in substance and obviously rests on a firm foundation.

---

Petitioners cite and rely on *Marc's Big Boy-Prospect, Inc. v. Commissioner*, 52 T.C. 1073 (1969), affd. sub nom. *Wisconsin Big Boy Corp. v. Commissioner*, 452 F.2d 137 (7th Cir. 1971), and *Hamburgers York Road, Inc. v. Commissioner*, 41 T.C. 821 (1964), for the proposition that the Commissioner has the authority under section 482 to consolidate "the several units of a unitary business into a single one for tax purposes." However, there is nothing in these cases to suggest that the

---

[98]In this regard, H. Rept. 2, 70th Cong., 1st Sess. (1927), 1939–1 C.B. (Part 2) 384, 395, provided as follows:

"Section 45 is based upon section 240(f) of the 1926 Act, broadened considerably in order to afford adequate protection to the Government made necessary by the elimination of the consolidated return provisions of the 1926 Act. * * *

"It has been contended that section 240(f) of the 1926 Act permits what is in effect the filing of a consolidated return by two or more trades or businesses, even though they are not affiliated within the meaning of the section. Section 45 of the bill prevents this erroneous interpretation by eliminating the phrase 'consolidate the accounts.'"

[99]Sec. 45, Revenue Act of 1932, ch. 209, 47 Stat. 169, 186.

[100]Sec. 45, Revenue Act of 1934, ch. 277, 48 Stat. 680, 695. The amendment consisted of the addition of the word "organizations" to the phrase "trades or businesses." See H. Rept. 704, 73d Cong., 2d Sess. (1934), 1939–1 C.B. (Part 2) 554, 572.

Commissioner *must* effect what is tantamount to a compulsory consolidated return,[101] and petitioners appear to concede the point. As previously stated, the Commissioner has broad discretion in applying section 482 and our focus is limited to determining whether under all of the facts and circumstances he acted arbitrarily, capriciously, or unreasonably in reallocating income and deductions from one enterprise to another. *Marc's Big Boy-Prospect, Inc. v. Commissioner, supra* at 1092–1094, 1105; *Hamburgers York Road, Inc. v. Commissioner, supra* at 833, 839–840.

Tenacious to the end, petitioners next contend that respondent's failure to consolidate income and deductions reflects an intent to maximize tax, "presumably on the theory [that] income is not clearly reflected unless it bears the maximum possible tax," and that this failure demonstrates an abuse of discretion sufficient to overcome his determination. The Ninth Circuit, however, had previously considered a similar "tax maximization" argument and rejected it. *Rooney v. United States*, 305 F.2d 681, 686 (9th Cir. 1962). Moreover, petitioners overlook the fact that section 482 is operative to prevent the avoidance of taxes as well as to clearly reflect the income of commonly owned or commonly controlled taxpayers. We have previously found as ultimate facts that the 127 acres of land in Neighborhood One and the single-family residential lots in Neighborhood Four were conveyed by the Foster partnership for the purpose of avoiding Federal income taxes. Petitioners also overlook the fact that they, themselves, elected to do business in the various forms in which they did. Having so elected, they must accept the tax disadvantages. *Higgins v. Smith*, 308 U.S. 473, 477 (1940). Finally, we have previously determined that the evidence in this case affirmatively establishes the reasonableness of respondent's action in allocating both the Neighborhood One income and the Neighborhood Four income to the Foster partnership as the true earner thereof.

In view of the foregoing, we hold that petitioners are not entitled to affirmatively use section 482 to effect a consolidat-

---

[101]See also sec. 1.482–1(b)(3), Income Tax Regs., which provides that sec. 482—

"is not intended * * * to effect in any case such a distribution, apportionment, or allocation of gross income, deductions, credits, or allowances, or any item of gross income, deductions, credits, or allowances, as would produce a result equivalent to a computation of consolidated taxable income * * * "

ed return and that respondent's failure to do so does not demonstrate any abuse of discretion on his part.

## *Issue 2*

### APPLICABILITY OF THE SUBSTANCE-OVER-FORM DOCTRINE TO THE WESTWAY TRANSACTION

We turn now to the third of the three major substantive issues involved in this case, namely, whether certain promissory notes, i.e., the "Westway notes," are part of the Foster partnership's basis in Neighborhoods Two and Three, as petitioners contend, or conversely whether they represent an obligation to pay additional interest on money borrowed for the purchase of Brewer's Island, as respondent contends. This issue requires that we decide the applicability of the substance-over-form doctrine to the "Westway transaction." Before we do so, however, we must first resolve a preliminary issue raised by petitioners.

#### A. ADEQUACY OF THE NOTICE OF DEFICIENCY

Petitioners contend that respondent's categorization of the Westway notes as interest is not an issue properly before the Court because it was not raised by him in either the notice of deficiency or the answer. In the alternative, they contend that if the issue is before the Court, the burden of proof should be shifted to respondent under *Helvering v. Taylor*, 293 U.S. 507 (1935), because of the allegedly "opaque" language used in the notice to describe the adjustment. We think both contentions are without merit.

The adjustment in question is described in the notice of deficiency as follows:

1.b. Cost of lot sales, neighborhoods 2 & 3

It has been determined [that] the cost of lot sales reported should be adjusted as shown in Exhibit G–3 and supporting exhibits referred to therein. The principal change is due to a disallowance of a $3,000,000 obligation incurred in the "Westway Transaction" as not being part of land basis because: (1) there is no business substance to such transaction and (2) if this is a valid business obligation, it is not a capital expenditure to be added to land basis.

A related adjustment is described as follows:

1.e. If it is ruled by a court that there is no business substance to the form of the "Westway Transaction" as specified in item (b) above, and thus should be disregarded, then it is held [that] the gain of $84,143.52 reported by the partnership on its exchange of 500 shares of Foster California Corporation stock for 196.38 acres of land received from that corporation, will also be disregarded, such exchange being part of the "Westway Transaction."

The above two explanatory paragraphs may not be models of clarity. However, we cannot say that when read together they fail to fairly apprise petitioners of respondent's position that the form of the Westway transaction was not in accord with its substance.[102] After all, the first paragraph expressly challenges petitioners' treatment of the Westway transaction on the ground that there was no substance to the transaction, and the second paragraph emphasizes respondent's position that the form of the transaction lacked substance. Petitioners must have comprehended the meaning of these paragraphs because in their petition they alleged that "Respondent's determination that the entire transaction was without substance is arbitrary."

In our opinion, the fact that the explanatory paragraphs of the notice of deficiency do not expressly categorize the Westway notes as interest is not of consequence. That categorization is purely derivative of respondent's position that the form of the Westway transaction was not in accord with its substance. In other words, it merely amplified his original determination by making it more specific. We are confident that petitioners realized this because the second reason given by the notice for excluding the Westway notes from basis is that those notes do not represent a capital expenditure. Moreover, in their trial memorandum, petitioners stated as follows:

> Respondent has suggested previously that the Westway Notes constitute additional interest for Republic National Bank loans; to which Petitioners respond that if that is true they elected to capitalize the interest under I.R.C. Section 266, and therefore have properly capitalized it. [Emphasis added.]

Finally, in his opening statement at trial, petitioners' senior counsel stated as follows:

---

[102]We should not be understood to imply that a notice of deficiency is invalid or otherwise legally defective if it fails to advise a taxpayer of the Commissioner's theory behind a particular adjustment. In this regard, see and compare Issue 7(a), particularly the discussion on pp. 229–231.

They [the Fosters as partners] capitalized these Westway notes as part of their basis, that being the indebtedness that they had, which they assumed in the course of this involved transaction that I have just described. The government denied this addition to basis. It was never very explicit in anything that it wrote, thirty day letter or ninety day letter about why, but *there were suggestions that it was in lieu of interest, and hence, it was an interest deduction that they should seek instead of capitalization.* [Emphasis added.]

In view of the foregoing, we are satisfied that respondent's categorization of the Westway notes as interest is an issue which is properly before us.

Much of what we have already said applies equally to the question whether the burden of proof should be shifted. We have already concluded that the notice of deficiency fairly apprised petitioners of respondent's position that the form of the Westway transaction was not in accord with its substance. Accordingly, we decline their invitation to shift the burden because of the allegedly "opaque" language used therein. Cf. *Nor-Cal Adjusters v. Commissioner*, 503 F.2d 359, 361–362 (9th Cir. 1974), affg. a Memorandum Opinion of this Court.[103] Moreover, the categorization of the Westway notes as interest does not constitute a "new issue" or "new matter" with respect to which respondent would bear the burden of proof. See *Achiro v. Commissioner*, 77 T.C. 881, 890 (1981), and cases cited therein; Rule 142(a). As previously stated, that categorization merely amplified his original determination and was perfectly consistent therewith. It did not serve to increase the amount of the deficiency nor did it require petitioners to introduce evidence different from what they would have otherwise presented. We therefore decline to shift the burden of proof to respondent. *Achiro v. Commissioner, supra.*

### B. THE WESTWAY NOTES AS INTEREST

We must now decide whether the Westway notes are part of the Foster partnership's basis in Neighborhoods Two and Three, or conversely, whether they represent an obligation to pay additional interest on money borrowed for the purchase of Brewer's Island. Respondent's determination that the notes represent interest is presumptively correct, and petitioners

---

[103]T.C. Memo. 1971–200.

bear the burden of proving that the notes are includable in basis. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Majestic Securities Corp. v. Commissioner*, 120 F.2d 12, 14–15 (8th Cir. 1941), affg. 42 B.T.A. 698 (1940); Rule 142(a).

The factual predicate of the present issue lies, of course, in the Westway transaction. That transaction had its origin in the financial inability of the Foster partnership to fund all of the downpayment ($2,500,000) needed for the purchase of Brewer's Island and its consequent agreement with the Republic National Bank to borrow most of that amount ($2 million). Under the terms of the agreement, the partnership agreed (1) to pay interest at the prevailing market rate, (2) to pay a bonus equal to the total amount borrowed, and (3) to structure the bonus so that it would be taxed to Republic as capital gain rather than ordinary income. We are concerned here with only the terms involving the 100-percent bonus. Those terms were applicable not only to the amount borrowed to make the downpayment but also to any amount subsequently borrowed in order to satisfy the periodic installments due to the sellers (Leslie and Schilling) for the balance of the purchase price ($10,300,000). In August 1961, the partnership borrowed $500,000 for one such installment and the same amount a year later. Accordingly, by August 1962, it had become obligated to pay a $3 million bonus to Republic and also to insure that the bank enjoyed that bonus in the form of a capital gain.

The complexity of the Westway transaction makes summarization difficult. Nevertheless, it would be helpful to briefly review the salient features of its various steps. The mechanics of the transaction are discussed above in greater detail at pages 87–91 and 87–101.

1. On August 4, 1961, the Foster partnership conveyed 200.17 acres of land in Neighborhoods Eight and Nine to Foster Bayou Corp. (Foster Bayou) in exchange for 100 percent of that corporation's stock.

2. On August 7, 1962, the Foster partnership "sold" its stock in Foster Bayou to Westway Investment Co. (Westway) for cash in the amount of $5,000 and a non-interest-bearing note due August 7, 1967, in the amount of $100,000. As will be recalled, Westway was a subsidiary of the Howard Corp.,

which in turn was owned by trustees for the benefit of Republic's shareholders.

3. On April 23, 1963, the Esteroy Corp. (Esteroy) was formed by the Foster partnership.

4. On December 3, 1963, the Foster partnership conveyed 196.638 acres of land in Neighborhoods Two and Three to Foster California Corp. (Foster California) in exchange for 50 percent of that corporation's authorized stock.

5. Also on December 3, 1963, the Foster partnership transferred its stock in Foster California to Foster Enterprises, Ltd. (Foster Enterprises).

6. In January and February 1964, Esteroy and Westway negotiated a "purchase and sale" of the Foster Bayou stock for $3,105,000. Of this amount, $5,000 was paid in cash, and non-interest-bearing promissory notes (the Westway notes) were executed for the balance, or $3,100,000. This sum was payable in the amounts of $2 million on August 19, 1966; $100,000 on August 7, 1967; $500,000 on August 19, 1967; and $500,000 on August 19, 1968. On May 4, 1964, Westway transferred the Foster Bayou stock to Esteroy.

7. On June 2, 1964, Esteroy liquidated Foster Bayou and entered on its books the 200.17 acres of land in Neighborhoods Eight and Nine at a basis of $3,105,000.

8. On June 5, 1964, Esteroy conveyed the 200.17 acres of land that it had received from Foster Bayou to Foster California in exchange for 50 percent of that corporation's stock.

9. On June 8, 1964, Esteroy was liquidated by the Foster partnership. On July 24, 1964, the Fosters assumed Esteroy's indebtedness to Westway in the amount of $3,100,000.

10. On July 31, 1964, the Foster partnership transferred to Foster California its stock in that corporation which it had obtained by virtue of the liquidation of Esteroy. In exchange therefor, Foster California transferred to the partnership on August 4, 1964, the 196.638 acres of land in Neighborhoods Two and Three which it had acquired from the partnership on December 3, 1963.

11. In December 1965, Westway sold to Republic one-half of the $2 million promissory note due August 19, 1966, which Esteroy had executed in 1964 as part of the "purchase price" of the Foster Bayou stock. Westway subsequently merged into

the Howard Corp., which then became the holder of the balance of the receivable ($2 million).

12. Because of financial difficulties experienced by the Foster partnership in the mid–1960's, Republic renewed the $2 million note due August 19, 1966, to August 19, 1967, and then to October 30, 1968; it also renewed the $500,000 note due August 19, 1967, to October 30, 1968. After that date, the partnership was delinquent in payment, not only with respect to those two notes but also with respect to the $500,000 note due August 19, 1968.

13. On June 1, 1970, Foster California was merged into its parent, Foster Enterprises, which entered the 200.17 acres of land in Neighborhoods Eight and Nine on its books at $3,105,000.

14. In October 1970, the Fosters withdrew from Foster City as developers. The purchaser, Centex West, Inc. (Centex), agreed to assume liability for the Westway notes. In a collateral agreement, Republic and the Howard Corp. agreed to release the Fosters from personal liability in exchange for the assumption by Centex and a release by the Fosters of any claim they might have against Republic and Howard for usury.

---

Emphasizing the form of the Westway transaction, petitioners contend that the Westway notes are part of the Foster partnership's basis in Neighborhoods Two and Three. Their theory assumes that the August 7, 1962, transfer of the Foster Bayou stock from the Foster partnership to Westway, and the May 4, 1964, transfer of that same stock from Westway to Esteroy were bona fide sales, and hence that the Westway notes represent the cost incurred by the Fosters in reacquiring the Foster Bayou stock.

Respondent, on the other hand, emphasizes the substance of the transaction and contends that the Westway notes represent an obligation to pay additional interest on money borrowed for the purchase of Brewer's Island. He does not, therefore, quarrel with either petitioners' subchapter C (Corporate Distributions and Adjustments) or subchapter O (Gain or Loss on Disposition of Property) analysis of the transaction, but rather challenges their assumption that the August 7,

1962, and May 4, 1964, transfers were bona fide sales, the assumption upon which their analysis depends. We agree with respondent's view.

The starting point for our analysis is the doctrine of substance over form. As early as 1921, the Supreme Court stated as follows:

> We recognize the importance of regarding matters of substance and disregarding forms in applying the provisions of the Sixteenth Amendment and income tax laws enacted thereunder. In a number of cases * * * we have under varying conditions followed the rule. [*United States v. Phellis*, 257 U.S. 156, 168 (1921).]

More recently, the Fifth Circuit has described the doctrine as "no schoolboy's rule" but rather "the cornerstone of sound taxation." *Weinert's Estate v. Commissioner*, 294 F.2d 750, 755 (5th Cir. 1961), revg. 31 T.C. 918 (1959). In our view, the substance of the Westway transaction is very different from its form. As previously stated, we think the Westway notes represent an obligation to pay additional interest on money borrowed for the purchase of Brewer's Island, rather than the cost of reacquiring the Foster Bayou stock.

Interest has been defined by the Supreme Court as "compensation for the use or forbearance of money." *Deputy v. du Pont*, 308 U.S. 488, 498 (1940). It has also been defined as an "amount which one has contracted to pay for the use of borrowed money." *Old Colony R. Co. v. Commissioner*, 284 U.S. 552, 560 (1932). Accordingly, "a negotiated bonus or premium to be paid the lender as a prerequisite to obtaining borrowed capital" qualifies as interest (*L-R Heat Treating Co. v. Commissioner*, 28 T.C. 894, 897 (1957)), even though it might be denominated otherwise in order to conceal a usurious contract or to accomplish some other objective personal to the parties concerned (*Wiggin Terminals, Inc. v. United States*, 36 F.2d 893 (1st Cir. 1929); *Arthur R. Jones Syndicate v. Commissioner*, 23 F.2d 833 (7th Cir. 1927), revg. 5 B.T.A. 853 (1926)).[104] In the present case, we think the Westway notes represent such a negotiated bonus or premium, and hence must be regarded as interest, for the following reasons:

---

[104]See also *Hale v. Commissioner*, T.C. Memo. 1965–274, 24 T.C.M. 1497, 1506–1507, 34 P-H Memo T.C. par. 65, 274, at 65–1651.

First, the genesis of the Westway transaction lay in the financial inability of the Foster partnership to fund all of the downpayment needed for the purchase of Brewer's Island. In order for the partnership to acquire the property and undertake the contemplated project, it had to acquire additional capital from a third party. The Fosters preferred to acquire such additional capital from a lender rather than from an equity investor. By borrowing capital, they would be able to retain complete control over the project and would more fully enjoy the financial rewards if it proved to be a success. In this regard, it should be recalled that as early as December 1959, Jack Foster arranged to buy out Richard Grant's interest in the project because he thought the property was worth far more than its option price ($12,800,000) and because he preferred to proceed with his sons as his only partners.

Second, the Fosters actually sought financial assistance from only one source, the Republic National Bank, a major lending institution. They specifically turned to Republic because they were frequent customers of that bank, having borrowed millions of dollars over the years and never having been refused a loan. In fact, Republic had historically been the Fosters' major source of financing for their real estate transactions. However, Republic had never acted in any capacity other than that of the Fosters' lender.

Third, the Foster partnership succeeded in obtaining additional capital from Republic.[105] It was necessary, however, to execute both a loan agreement and a promissory note. The capital obtained was repayable absolutely and in all events, and the maturity date was fixed. Moreover, interest at the prevailing market rate (6 percent per annum) was payable quarterly and unconditionally. The arrangement between the partnership and Republic was therefore indicative of a debtor-creditor relationship.

Fourth, Republic did not regard itself as anything other than the Fosters' lender. This is evident from the bank's internal correspondence (quoted above at pp. 98–100) in which the $3 million Westway obligation was consistently characterized as a "fee," a "debt," or a "fee debt." For

---

[105]In form, the $2 million advance was arranged by the Howard Corp. and made by a foundation affiliated with Republic. This matter will be discussed further, *infra*.

example, the last paragraph of a report prepared by Republic in November 1967 in preparation for an in-house conference concerning the Foster partnership stated as follows:

5. The Fosters are being urged by us to bring in an equity partner to give stability, financial respectability and stronger management to the project. It is hoped that *our debt* will be substantially reduced with no more than $3,000,000 having to be carried on a term basis of five to six years. *It should be noted that the latter debt [i.e., the $3 million] was, in fact, a fee the bank received from Foster in the early years of the project and does not represent any out-of-pocket money by either the bank or Westway, a Howard affiliate.* [Emphasis added.]

Clearly, therefore, Republic considered the $3 million fee to be "a negotiated bonus or premium to be paid the lender as a prerequisite to obtaining borrowed capital." Consistent with its view of the bonus, the bank never held itself out as having any equity interest in the Foster City project.

Fifth, the Fosters did not regard Republic as anything other than their lender. This is evident from the fact that they never represented that the bank had any equity interest in the Foster City project. Instead, they consistently portrayed the partnership as the sole developer. It is also evident from the October 31, 1967, letter of Jack Foster, Jr. (quoted above at pp. 98), in which he repeatedly referred to the $3 million as the "Westway debt," and from the fact that in 1969 the Fosters directed their attorneys to review their financial relationship with Republic with a view towards possibly instituting an action against the bank for usury.

Finally, we note that at the time the Fosters withdrew from Foster City as developers, they entered into an "Agreement of Release" (quoted above at pp. 100–102) with Republic and the Howard Corp. Under the terms of that agreement, the Fosters were released from personal liability for the Westway notes, which were assumed by Centex, their buyer. In exchange therefor, the Fosters released Republic and the Howard Corp. from any claim they might have against them for usury. That those parties should have so contracted is again indicative that they viewed their relationship as one of debtor-creditor.

Our view that the Westway notes represent an obligation to pay additional interest also finds support in the transparency which characterizes the Westway transaction, particularly the two key steps involving the transfer of the Foster Bayou stock

from the Foster partnership to Westway on August 7, 1962, for $105,000, and the transfer of that same stock from Westway to Esteroy on May 4, 1964, for $3,105,000. In our opinion, those transfers were simply the means by which the partnership attempted to satisfy its obligation to Republic (1) to pay the $3 million bonus on the money borrowed for the purchase of Brewer's Island and (2) to structure that bonus so that it would be taxed to the bank as capital gain rather than ordinary income. The artificiality of the Westway transaction becomes apparent when one examines these transfers in detail.

(1) On August 7, 1962, Westway "purchased" the Foster Bayou stock from the Foster partnership for $105,000. Of this amount, $5,000 was paid in cash and a non-interest-bearing note due August 7, 1967, was executed for the balance. This transaction raises two important questions: First, why would Westway want to purchase the Foster Bayou stock? Second, why would the Foster partnership want to sell that stock? As we shall show, the puzzling answers to these questions are incompatible with petitioners' contention that the transfer of the stock was a bona fide sale.

Because the Foster Bayou stock had little, if any, value apart from the 200.17 acres of land in Neighborhoods Eight and Nine,[106] Westway's motivation in "purchasing" that stock must logically have been to acquire the land. However, there is nothing in the record to even suggest that Westway, itself, was equipped to develop the land. Indeed, during the period that it held the Foster Bayou stock (August 7, 1962—May 4, 1964), Westway did nothing to improve the 200.17 acres. It is also unlikely that Westway wanted to hold that particular acreage for investment purposes. Correspondence exchanged in April 1962 between Jack Foster and his attorney, Roy Lytle (quoted above at pp. 93–95 indicates that the precise acreage held by Foster Bayou in anticipation of the "sale" of its shares was of no concern to either the Fosters or Republic and that the 200.17 acres of land that were actually transferred to that corporation were selected strictly for reasons of expediency,

---

[106]Foster Bayou had no assets other than the 200.17 acres of land which had been transferred to it by the Foster partnership at the time of its incorporation in August 1961. Moreover, it had no bank account and never paid any dividends. The corporation's only business activity was a lease to the Federal Aviation Administration. The lease, however, was managed by the partnership and Likins-Foster Honolulu Corp. for a substantial fee.

i.e., because that parcel had a legal description (metes and bounds) and could therefore be more readily conveyed.

The Foster partnership's desire to sell the Foster Bayou stock must also be questioned when one considers the fact that Foster Bayou owned a significant tract of land on Brewer's Island. After all, the partnership had worked hard to acquire and plan the development of all of Brewer's Island, and by August 1962, had actually succeeded in getting the Foster City project off to a respectable start. Certainly, the need for capital could not have motivated the "sale" because the purported consideration consisted of only $5,000 in cash and a non-interest-bearing note due 5 years later.

In addition, during the period that Westway held the Foster Bayou stock, the Foster partnership and Likins-Foster Honolulu Corp. paid the expenses of Foster Bayou (such as real estate taxes) whenever the latter's rental income was insufficient. In our opinion, the fact that Westway did not assume the burdens of ownership belies petitioners' contention that the August 1962 transfer of stock constituted a bona fide sale. See *Harmston v. Commissioner*, 61 T.C. 216, 228–229 (1973), affd. per curiam 528 F.2d 55 (9th Cir. 1976).

(2) On May 4, 1964, Esteroy "purchased" the Foster Bayou stock from Westway for $3,105,000. Of this amount, $5,000 was paid in cash at the closing and non-interest-bearing promissory notes were executed for the balance, or $3,100,000. This sum was payable in the amounts of $2 million on August 19, 1966, $100,000 on August 7, 1967; $500,000 on August 19, 1967; and $500,000 on August 19, 1968. In this transaction, Westway recovered the $5,000 in cash that it had paid in August 1962 in order to "purchase" Foster Bayou stock; moreover, its $100,000 note due August 7, 1967, was effectively canceled by Esteroy's $100,000 note due the same date. Westway's gain on the transaction was therefore $3 million. This was precisely the amount of the bonus that the Fosters had agreed to pay under their 1960 agreement with Republic. Furthermore, the $3 million appeared on its face to be gain derived from the sale of corporate stock, i.e., capital gain. This, too, was just as the Fosters had agreed.

Petitioners argue that the $3 million gain realized by Westway in May 1964 was attributable to the appreciation of the 200.17 acres of land in Neighborhoods Eight and Nine

during the 21 months that Westway held the Foster Bayou stock. We find this argument to be lame, however. Neighborhoods Eight and Nine were not scheduled for early development. In fact, when the Foster Bayou stock was transferred to Westway in August 1962, the 200.17 acres were in essentially the same condition as when they were originally acquired by the Foster partnership in August 1960. As previously stated, Westway did nothing to improve that acreage during the period that it held the Foster Bayou stock. Furthermore, Neighborhoods Eight and Nine were not even completely filled and ready to be improved until 1966. Under these circumstances, we think a 30-fold increase in value over 21 months was most unlikely.

Apart from the remarkable coincidence between the amount and character of Westway's gain and the Foster partnership's bonus obligation to Republic, the May 1964 transfer of the Foster Bayou stock raises two additional questions. First, why would Westway sell to Esteroy? The latter corporation had no assets other than its capital contribution ($10,000). On the two Federal income tax returns which it filed during its relatively brief existence (April 23, 1963—June 8, 1964), Esteroy reported no gross income whatsoever. With no income and no meaningful assets, one must question whether Westway could have reasonably expected payment from Esteroy. Although Esteroy came into possession of the 200.17 acres of land by liquidating Foster Bayou shortly after acquiring its stock, it had no resources to develop that land, and Westway must certainly have been aware of that fact at the time of the "sale."

Second, because the transaction was actually with the Foster partnership,[107] one must again ask why the partnership would have "sold" the Foster Bayou stock only to "buy" it back less than 2 years later for $3 million more than it originally received. This is particularly questionable because the only "advantage" in doing so was the use of $5,000 during that

---

[107]In this regard, it should be recalled that at the time Esteroy pledged its shares as collateral for the "purchase" of the Foster Bayou stock, it reserved the right to liquidate and substitute the personal guarantee of the Fosters for the pledged shares. On June 8, 1964, Esteroy was liquidated by the Foster partnership, and on July 24, 1964, the Fosters expressly and unconditionally assumed the Westway notes. In addition, Esteroy was formed, owned, and controlled by the partnership.

interim period. It is no answer to argue that the partnership did not anticipate reacquiring the stock at the time that it transferred it. Such a contention is flatly contradicted by the April 1962 correspondence between Jack Foster and Roy Lytle (quoted above at pp. 93–95). That correspondence, exchanged subsequent to the formation of Foster Bayou but prior to the transfer of its stock to Westway, demonstrates that the parties to the Westway transaction contemplated the "sale" and subsequent "repurchase" of corporate stock by the Fosters for the purpose of disguising the agreed-upon bonus as a capital gain.

As to the above two questions, once again the record offers no satisfactory answers which are compatible with a bona fide sale.

(3) We find it curious that the corporations which played a role in the Westway transaction generally had little in the way of income, business activity, or assets (other than the two parcels of land which were so frequently transferred). In this regard, we have already noted that Foster Bayou, the corporation whose stock was in such demand, had no assets, maintained no bank account, and never paid any dividends, and that its only business activity was a lease which it did not even manage. We have also noted that Esteroy never reported any gross income during its abbreviated existence (April 23, 1963— June 8, 1964). Finally, we should mention that Foster California, another key corporation in the Westway transaction, had no assets (other than its initial capital contribution of $1,200), maintained no bank account, conducted no business activity, and paid no dividends.

(4) Yet another feature of the Westway transaction which leads us to look beyond its form is its very complexity. The record suggests no justification for such a mind-boggling succession of incorporations, transfers, liquidations, and mergers other than the desire to disguise the payment of interest and to achieve favorable tax consequences. In this regard, it is clear that Republic was interested in obtaining its $3 million bonus in the form of a capital gain. As previously stated, Republic and the Fosters sought to achieve that objective by causing the Foster partnership to "sell" its stock in Foster Bayou to Westway for $105,000 in August 1962, and by causing Esteroy to "repurchase" that stock from Westway for

$3,105,000 in May 1964. It is equally clear that the Fosters were interested in raising $3 million in order to pay the bank its bonus. They attempted to do this by reducing their taxes. From their point of view, the Westway transaction was designed to step up basis in the two parcels of land previously mentioned, by $6,210,000, but at a cost of only $3 million. The vital importance to the Fosters of the tax savings inherent in the Westway transaction is strikingly evident in a letter from Del Champlin, their tax adviser and the principal architect of the Westway transaction, to Roy Lytle:

The financial effect on the Fosters * * * is a substantial reduction in income taxes because of the much higher basis. *This situation affects their ability to carry out their agreements with the bank.* [Emphasis added.]

Republic and the Fosters also attempted to disguise the character of the 100-percent bonus for non-tax reasons. Thus, at the time that the bonus was negotiated, interest in excess of 10 percent per year was usurious under Texas law. Tex. Const. Ann. art. 16, sec. 11 (Vernon 1955) ("All contracts for a greater rate of interest than ten percent per annum shall be deemed usurious"); Tex. Rev. Civ. Stat. Ann. art. 5071 (Vernon 1962) ("The parties to any written contract may agree to and stipulate for any rate of interest not exceeding ten per cent. per annum on the amount of the contract"). In order to circumvent State usury laws, taxpayers have long sought to disguise interest by calling it something else, and we are convinced that this was what happened here.[108] However, it is clear that the Federal internal revenue laws do not abide such semantic prestidigitation. *Wiggin Terminals, Inc. v. United States,* 36 F.2d 893 (1st Cir. 1929); *Arthur R. Jones Syndicate v. Commissioner,* 23 F.2d 833 (7th Cir. 1927).[109]

---

[108]Petitioners have raised no issue concerning the effect, if any, that a usurious rate of interest may have on the status of interest. See *Peterson v. United States,* 344 F.2d 419, 425–427 (5th Cir. 1965); see also *Russo v. Commissioner,* 68 T.C. 135, 146–147 (1977); see generally 2 B. Bittker, Federal Taxation of Income, Estates and Gifts, par. 31.1.2, at 31–8/9 (1981). Accordingly we have not addressed that issue but rather have confined ourselves to the issue of substance over form.

[109]See also *Hale v. Commissioner,* T.C. Memo. 1965–274, 24 T.C.M. 1497, 1506–1507, 34 P-H Memo T.C. par. 65,274, at 65–1651. We are also reminded of Juliet's famous line:

What's in a name? that which we call a rose
By any other name would smell as sweet.
*Romeo and Juliet,* Act II, sc. 2, 1.43.

Petitioners spend many pages on brief emphasizing the form of the Westway transaction and the tax consequences which flow therefrom. However, we have already explained why we think it is necessary to look beyond the form of that transaction to its substance. Accordingly, we find it unnecessary to address most of their arguments. There are, however, a few which we shall briefly discuss.

First, petitioners contend that the manner in which the Commissioner handled the Westway issue during his audit of the Westway Investment Co. is "persuasive" in this case. We disagree. In our opinion, that matter is simply irrelevant.

Second, petitioners suggest that Republic and the Fosters were originally partners or joint venturers and that the bank simply liquidated its "profit sharing participation" for $3 million in 1964. Again we disagree. It is true that Republic's chairman did remark, "I guess we're partners," at the conclusion of the Dallas conference at which the Fosters sought financing for the downpayment on Brewer's Island. However, we do not think that either Republic or the Fosters ever intended to enter into a partnership or any relationship other than that of debtor-creditor. See *Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949). In our opinion, the remark must be construed in light of the fact that the bank's bonus was originally payable only from half of the profits to be derived from the Foster City project in 5-years time. Receipt of the bonus was therefore subject to the success of the project. The fortunes of the Fosters were also hostage to the project's success. In view of this shared risk,[110] it is understandable that Mr. Florence spoke of Republic and the Fosters as "partners."

Moreover, the fact that the bonus was originally payable only from the project's profits does not negate a debtor-creditor relationship. *Dorzback v. Collison*, 195 F.2d 69 (3d Cir. 1952); *Wiggin Terminals, Inc. v. United States*, 36 F.2d at 896; *Arthur R. Jones Syndicate v. Commissioner, supra*; see 1 W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, par. 3.03[3] (1977); G. Robinson, Federal Income Taxation of Real Estate, par. 8.03, at 8–24 (3d

---

[110]We must emphasize, however, that the bank's risk only involved the 100-percent bonus; the underlying principal was payable absolutely and in all events, as was interest at the prevailing market rate.

ed. 1979). The presence of indicia of a debtor-creditor relationship has already been noted. Furthermore, Republic's right to share in the profits was strictly limited in amount, the bank bore no risk of loss except with respect to its loan, and it was not entitled to participate in the management of the project.

Finally, we do not ascribe any particular significance to the fact that payment of the bonus was made absolute in 1964 with the execution of the Westway notes. In this regard, the record reveals that the Fosters were unable to repay the $2 million originally borrowed for the downpayment on Brewer's Island on the scheduled due date. In order to induce Republic to extend that date, they proposed that the bonus obligation be made absolute. The bank agreed, and a few months later the "negotiations" for the "repurchase" of the Foster Bayou stock commenced. The character of the bonus as additional interest never changed; only the contingency was removed.

Third, petitioners complain that respondent fails to treat the "Texas parties," i.e., Republic, Westway, the Howard Corp., and the Hoblitzelle Foundation,[111] as separate entities, and, instead, focuses exclusively on Republic. In our opinion, their complaint is not well founded because it ignores the substance of the Westway transaction.

As will be recalled, it was to Republic, not Westway, Howard, or the Hoblitzelle Foundation, that the Fosters turned in 1960 when they needed to borrow money, and it was with Republic, not the other entities, that they negotiated the terms for the loan, specifically including the 100-percent bonus. It was also in cooperation with Republic that they designed the Westway transaction and from Republic that they requested extensions and other modifications in their agreement. The Fosters thus acted as if all of their arrangements were with the Republic National Bank.

Moreover, the Texas parties were all related. The Hoblitzelle Foundation was affiliated with Republic and shared key

---

[111]In form the original $2 million loan was arranged by the Howard Corp. and made by the Hoblitzelle Foundation. The Fosters satisfied this loan in August 1963 by borrowing $2 million from Republic. They also borrowed $1 million directly from Republic in August 1961 ($500,000) and August 1962 ($500,000).

personnel. The Howard Corp. was owned by trustees for the benefit of Republic's shareholders.[112] Westway, of course, was a subsidiary of Howard.

In any event, petitioners overlook the fundamental fact that the 100-percent bonus represented compensation for the use of money. The manner in which the "Texas parties" may have agreed among themselves to make the loan and receive the bonus is therefore irrelevant.

In view of the foregoing, we hold that the Westway notes represent an obligation to pay additional interest on money borrowed for the purchase of Brewer's Island.[113]

### C. THE WESTWAY NOTES AS CARRYING CHARGES

In the alternative, petitioners contend that if the Westway notes represent an obligation to pay additional interest, then under section 266 such interest can be capitalized at the election of the Foster partnership and treated as part of the basis of the land acquired. They contend, further, that the partnership made the requisite election.[114]

Respondent, on the other hand, disputes that the partnership elected to capitalize the Westway notes. Even if it did, he contends that its election was invalid because it failed to capitalize other interest which it incurred with respect to the Foster City project. More fundamentally, however, he contends that petitioners are not entitled to invoke section 266 because the partnership never paid the notes during the years in issue. For reasons which we will develop, we agree with respondent.

---

[112]Here, the relationship was apparently so close that petitioners also stipulated that Howard was owned by the bank.

[113]We might add that Bert Levit, the Fosters' attorney in the State court action involving Del Champlin (see pp. 120–121, *supra*), came to the same conclusion that we have reached. At the deposition of Jack Foster, Jr., in 1971, Levit stated as follows:

"It seems clear to me that, from the point of view of the Fosters, it [the 100-percent bonus] was a payment of additional interest—although illegal interest—for the loaning of the money and presumably would have been a cost of doing business."

[114]Petitioners appear to assume that if we accept their alternative contention, the Westway notes will be added to the partnership's basis in Neighborhoods Two and Three, thereby eliminating that part of the deficiencies involved in this case which are attributable to the Westway issue. They overlook the fact, however, that the indebtedness which spawned the notes was incurred to acquire *all* of Brewer's Island and not just those two neighborhoods.

At the outset, we should emphasize that the present issue arises only because the Foster partnership utilized the cash method of accounting and did not pay the Westway notes during the years in issue. If it had, respondent would presumably have allowed an interest expense deduction under section 163(a).

Section 266 provides as follows:

> No deduction shall be allowed for amounts *paid or accrued* for such taxes and carrying charges as, under regulations prescribed by the Secretary or his delegate, are chargeable to capital account with respect to property, if the taxpayer elects, in accordance with such regulations, to treat such taxes or charges as so chargeable. [Emphasis added.]

Section 1.266–1(b)(1), Income Tax Regs., expands on the statute as follows:

> The taxpayer may elect * * * to treat the items enumerated in this subparagraph which are otherwise expressly deductible under the provisions of subtitle A of the Code [relating to income taxes] as chargeable to capital account either as a component of original cost or other basis, for the purposes of section 1012, or as an adjustment to basis, for the purposes of section 1016(a)(1). The items thus chargeable to capital account are—

> &ast; &ast; &ast; &ast; &ast; &ast; &ast;

> (ii) In the case of real property, whether improved or unimproved and whether productive or unproductive:
> (a) Interest on a loan (but not theoretical interest of a taxpayer using his own funds),

> &ast; &ast; &ast; &ast; &ast; &ast; &ast;

> *paid or incurred* for the development of the real property * * * [Emphasis added.]

The term "paid or accrued," as used in the statute, and the term "paid or incurred," as used in the regulation, must both be construed "according to the method of accounting upon the basis of which the taxable income is computed under subtitle A." Sec. 7701(a)(25); sec. 301.7701–16, Proced. & Admin. Regs.[115] As we have already observed, the Foster partnership utilized the cash method of accounting in computing its

---

[115]Sec. 301.7701–16, Proced. & Admin. Regs., provides that terms which are defined in sec. 7701 but not in the corresponding definitional sections of the regulations "shall, *when used in this chapter*, have the meanings assigned to them in sec. 7701." (Emphasis added.) The reference to "this chapter" does not contemplate ch. 79 of the Internal Revenue Code, the chapter within which sec. 7701 falls, but rather ch. 1, tit. 26 C.F.R., the chapter within which sec. 1.266–1, Income Tax Regs., falls.

taxable income. Under the cash method, interest is taken into account for the year in which *paid* rather than the year in which accrued.[116] Secs. 461(a), 446; secs. 1.461–1(a)(1), 1.446–1(c)(1)(i), Income Tax Regs. Accordingly, it would appear from a straightforward construction of the foregoing sections of the Code and regulations that the partnership cannot capitalize interest which it did not pay.

Our conclusion is consistent with the fact that the sole effect of section 266 is to offer a taxpayer the option of capitalizing an expense which he could otherwise deduct. Sec. 1.266–1(b)(2), Income Tax Regs.; S. Rept. 1631, 77th Cong., 2d Sess. (1942), 1942–2 C.B. 504, 578; H. Rept. 2333, 77th Cong., 2d Sess. (1942), 1942–2 C.B. 372, 434–435. "An item not otherwise deductible may not be capitalized under section 266." Sec. 1.266–1(b)(2), Income Tax Regs. As we have already said, interest which is not paid is not deductible by a cash-basis taxpayer; therefore, such interest cannot be capitalized under section 266.[117] To conclude otherwise would enable a cash-basis taxpayer to derive a tax benefit from an unpaid expense, a result which is contrary to the intendment of section 266. See sec. 1.266–1(b)(3), Income Tax Regs.

Apparently in search of another theory by which to justify capitalizing the Westway notes, petitioners cite *Crane v. Commissioner*, 331 U.S. 1 (1947), and contend that the "doctrine of capitalization" does not depend on the item in question being paid. What petitioners overlook, however, is the fact that interest is not an element of cost for purposes of either section 263(a) or section 1012, but, rather, is an item of expense, provision for which has been expressly made by Congress in the form of a deduction. Sec. 163(a); see *Chapin v. McGowan*, an unreported case (W.D. N.Y. 1958, 1 AFTR 2d 1354, 58–1

---

[116]However, interest which is paid is not deductible if the deduction would result in a material distortion of income. *Baird v. Commissioner*, 68 T.C. 115, 130–131 (1977). For the congressional solution to the issue concerning the deductibility of prepaid interest by a cash-basis taxpayer, see sec. 461(g), enacted by sec. 208(a), Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1520, 1541–1542.

[117]Compare *Parkland Place Co. v. United States*, 248 F. Supp. 974, 977 (N.D. Tex. 1964), affd. per curiam 354 F.2d 916, 918 (5th Cir. 1966), in which an accural-basis taxpayer was not permitted to capitalize interest because the interest was "not otherwise deductible" within the meaning of sec. 1.266–1(b)(2), Income Tax Regs., by virtue of sec. 267(a)(2) (relating to the disallowance of deductions for unpaid expenses and interest).

USTC par. 9469), affd. per curiam 271 F.2d 856 (2d Cir. 1959); cf. *Purvis v. Commissioner*, 65 T.C. 1165 (1976); *Megibow v. Commissioner*, 21 T.C. 197, 198–199 (1953), affd. 218 F.2d 687 (3d Cir. 1955). See also Note, "Premature Deductions for Taxes and Carrying Charges," 22 U.C.L.A. L. Rev. 1342 (1975); Sandison & Waters, "More on Tax Planning for Land Developers: Allocations, Deductions, Reporting Income," 37 J. Tax. 154, 155–157 (1972). It is only by virtue of section 266 that taxpayers can *elect* to treat interest as chargeable to capital account.[118] See 2 B. Bittker, Federal Taxation of Income, Estates and Gifts, par. 42.2, at 42–6 (1981) ("the primary function of IRC §266 is to authorize the Treasury to *permit* carrying charges to be capitalized"). And, as we have already shown, that section does not grant cash-basis taxpayers the right to capitalize interest which they have not paid.

We realize that there may be some disparity between the treatment of interest for tax purposes and the treatment of interest for purposes of financial accounting. See 1 Financial Accounting Standards Board, Accounting Standards, Current Text, sec. I67, at 26971–26979 (1982); 1 L. Seidler & D. Carmichael, Accountants' Handbook, sec. 20, at 26–28 (6th ed. 1981). However, as the Supreme Court has recognized, the prescriptions of the tax law are not, and cannot be, perfectly consonant with accounting principles. *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 538–544 (1979). Nevertheless, by affording taxpayers the option of capitalizing interest under section 266, Congress sought to harmonize the tax law's treatment of interest with "proper accounting methods." H. Rept. 2333, *supra*, 1942–2 C.B. at 410–411; see *Purvis v. Commissioner*, 65 T.C. at 1169. Of course, that option is only available to a taxpayer who brings himself within the intendment of that section and its related regulation.

In our view, the failure of the Foster partnership to pay the Westway notes during the years in issue precludes it from capitalizing that interest. Nevertheless, we would like to

---

[118]Compare secs. 189 and 461(g), which *compel* taxpayers to capitalize interest under certain circumstances. These sections, however, were enacted subsequent to the taxable years involved herein (see secs. 201(a) and (c) and 208(a) and (b), Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1520, 1525–1527, 1541–1542) and are not otherwise applicable to the present case.

briefly address the question concerning the validity of its purported election.

Section 1.266–1(c)(1), Income Tax Regs., provides that "if expenditures for several items of the same type are incurred with respect to a single project, the election to capitalize must, if exercised, be exercised as to *all* items of that type." (Emphasis added.) In the case of an item such as interest which may be treated as chargeable to capital account under section 1.266–1(b)(1)(ii), Income Tax Regs., *supra*, the term "project" is defined as "a particular development of, or construction of an improvement to, real property." Sec. 1.266–1(c)(1), Income Tax Regs.

On its information returns for the calendar years 1963 through 1967, the Foster partnership claimed deductions for interest in the following amounts:

| Year | Amount |
|---|---|
| 1963 ................. | $114,733.94 |
| 1964 ................. | 475,900.62 |
| 1965 ................. | 418,552.69 |
| 1966 ................. | 241,082.34 |
| 1967 ................. | 488,275.46 |

The partnership did not provide any details concerning the deductions in the appropriate schedules of its returns. Moreover, the record does not disclose the indebtedness which generated such interest. However, in view of the partnership's preoccupation with the Foster City project, we are confident that most of it related to that project. In any event, the burden of proof rests with petitioners (*Welch v. Helvering*, 290 U.S. 111, 115 (1933); Rule 142(a)), and they have not established that the interest deducted related to some other project.[119] In other words, they have not established the requisite consistency demanded by the regulation. See 2 B. Bittker, *supra* at par. 42.2, p. 42–8. Accordingly, their purported election to capitalize the Westway notes is invalid under section 1.266–1(c)(1), Income Tax Regs.

---

[119]We have implicitly assumed that Foster City, itself, constitutes a "project" for purposes of sec. 1.266–1(c)(1), Income Tax Regs. However, it is possible that some unit thereof, such as a neighborhood, may constitute a project. See Sandison & Waters, "More on Tax Planning for Land Developers: Allocations, Deductions, Reporting Income," J. Tax. 154, 156 (1972). Even if that were the case, petitioners have still not carried their burden of proof.

In view of the foregoing, we hold that the Foster partnership is not entitled to capitalize the Westway notes under section 266.

## Issue 4

### APPLICABILITY OF THE COST RECOVERY METHOD TO THE GRANT OF THE SWAY EASEMENT

In 1964, Pacific Gas & Electric Co. (PG & E) paid $425,000 to the Foster partnership for a right-of-way immediately adjacent to an existing easement which stretched across Brewer's Island. PG & E then constructed additional, and even taller, steel towers from which to suspend new, high-voltage electric transmission lines. Because these towers and lines were aesthetically objectionable and negatively affected the value of all of the land in Foster City, the partnership characterized the entire payment as severance damages and reduced its basis in all of its land by that amount.

After the towers were constructed, the Fosters discovered that under certain wind conditions, the powerlines swayed outside the scope of the easement. When this fact was brought to the attention of PG & E, the utility paid the partnership and Foster Enterprises, the record titleholders, an additional $72,000 (in 1967) for a sway easement in order to perfect the right-of-way easement which it had acquired in 1964. The partnership[120] again characterized the entire payment as severance damages and reduced its basis in all of its land by that amount.

Under section 61(a)(3) gains derived from dealings in property constitute an item of gross income. Gain is measured by the difference between the amount realized from the sale or other disposition of property and the adjusted basis. Sec. 1001(a). Frequently, however, a taxpayer sells just part of a particular piece of property. If the property as a whole has a unitary basis, a question arises whether, and if so how, to apportion that basis to the part sold. In this regard, section 1.61–6(a), Income Tax Regs., provides as follows:

---

[120]For the sake of convenience, we shall refer only to the partnership.

When a part of a larger property is sold, the cost or other basis of the entire property shall be equitably apportioned among the several parts, and the gain realized or loss sustained on the part of the entire property sold is the difference between the selling price and the cost or other basis allocated to such part. The sale of each part is treated as a separate transaction and gain or loss shall be computed separately on each part. Thus, gain or loss shall be determined at the time of sale of each part and not deferred until the entire property has been disposed of.

See also *Heiner v. Mellon*, 304 U.S. 271, 275–276 (1938). This rule is applicable not only to the subdivision of real estate into lots but also to the grant of an easement where the grantor retains all other ownership rights with respect to the underlying property. *Fasken v. Commissioner*, 71 T.C. 650, 655–656 (1979).

An exception to the apportionment rule of the regulations applies if it is impossible or impracticable to rationally allocate basis to the particular interest sold. In that situation, the amount received may be applied against the taxpayer's basis in the entire property. *Inaja Land Co. v. Commissioner*, 9 T.C. 727, 735–736 (1947).[121] Cf. *Burnet v. Logan*, 283 U.S. 404 (1931).

In *Inaja Land Co.*, the taxpayer granted a right-of-way and certain other easements to a municipality to discharge foreign waters into a river which flowed through its property. The discharge was of such quantity that it was expected to change the course of the river, and the extent of the flood was unpredictable. The easements were not described by metes and bounds. Because it was impossible to ascertain the specific portion of the property that would be adversely affected by the flooding, we held that the amount received should be treated as a return of capital and applied against the taxpayer's basis in the entire tract. 9 T.C. at 736.

On the other hand, if it is possible to rationally quantify that part of a taxpayer's acreage which is adversely affected by an easement and allocate his basis thereto, the principle of *Inaja Land Co.* is not applicable.[122] *Fasken v. Commissioner*, 71 T.C.

---

[121]Acquiesced, 1948–1 C.B. 2. See also Rev. Rul. 77–414, 1977–2 C.B. 299, for an example of respondent's application of the cost recovery approach sanctioned by *Inaja Land Co.* in an analogous situation.

[122]The principle of *Inaja Land Co.* is applicable, however, in that the taxpayer's basis

650 (1979).[123] Whether a taxpayer's basis in an entire tract can be rationally allocated to the affected and nonaffected acreage is, of course, a question of fact. *Fasken v. Commissioner, supra* at 657.

In the present case, only the propriety of the partnership's treatment of the $72,000 payment for the 1967 sway easement is at issue. Respondent has not challenged the cost recovery treatment of the $425,000 received for the 1964 right-of-way easement. To the contrary, he adopted that treatment in his land cost schedule in the notice of deficiency. His rationale, as stated on brief, was that "the power transmission lines built on the 1964 easement were ugly, and caused damage to all of Foster City, and that petitioners were entitled to apply the compensation received * * * to a reduction in basis."

Respondent seeks to justify the different treatment of the amount received for the 1967 sway easement on the ground that it was the erection of the towers and the suspension of the lines permitted by the 1964 right-of-way easement which caused the damage to the land in Foster City. He argues that there is no evidence that the sway easement caused any *additional* damage to the land in the development. Consequently, he concludes that the $72,000 should be treated as proceeds from the sale of land in the ordinary course of business and that gain should be determined by reducing said amount by the partnership's basis in the particular acreage described by the sway easement.

Respondent's position assumes that the 1967 sway easement was independent of, and unrelated to, the 1964 right-of-way easement. However, our findings of fact reflect otherwise. The $72,000 that PG & E paid for the sway easement in 1967 represented additional consideration for what it had intended to acquire in 1964. In other words, had the utility known in 1964 the actual catenary of the powerlines, it would have condemned an even wider right-of-way and would have paid a correspondingly greater amount to the partnership. Had this happened, respondent in effect concedes that he would not

---

allocable to the land affected by the easement need not be further allocated to the easement and the rest of the property rights which he retains. In other words, the question of allocating basis arises with respect to property rights, just as it does with respect to acreage, in those instances in which part, but not all, is sold.

[123]See also Rev. Rul. 68–291, 1968–1 C.B. 351; Rev. Rul. 59–121, 1959–1 C.B. 212.

have questioned the partnership's basis adjustment. We see no reason for him to penalize the partnership now for PG & E's failure to initially condemn a sufficient easement for its purposes. Thus, we think the amounts received for the 1964 right-of-way easement and the 1967 sway easement should be treated in the same manner.

Notwithstanding the fact that the sway easement was specifically described, this approach is justified under the facts of this case. That easement was integrally related to the right-of-way easement and did not adversely affect just the land within its defined scope. Rather, it detracted from the entire Foster City development and decreased the value of all of the land therein. Accordingly, we hold for petitioners on this issue.

## Issue 5

### DEDUCTIBILITY OF THE SCHOOL AND CHURCH SITES

The Foster partnership conveyed three parcels of land in Foster City with respect to which it claimed deductions for charitable contributions on its information returns for 1964 and 1965. The first parcel, consisting of 7.4 acres in Neighborhood One, was conveyed in 1964 to the San Mateo Elementary School District for use as an elementary school site. The second parcel, consisting of 2 acres, was sold in 1964 for $40,000 to the United Church of Christ for use as a church site. The third parcel, consisting of 1.844 acres, was sold in 1965 for $36,880 to the United Church of Christ for use as a church site. The partnership valued all three parcels at $40,000 per acre. It therefore claimed a deduction for the school site in the amount of its alleged fair market value or $296,000 (7.4 acres $\times$ $40,000/acre), and deductions for the two church sites equal to the amount by which their alleged fair market value (2 acres $\times$ $40,000/acre = $80,000; 1.844 acres $\times$ $40,000/acre = $36,880) exceeded the amount received ($40,000; $36,880) or $40,000 and $36,880, respectively.[124]

---

[124]Prior to the Tax Reform Act of 1969, the amount of a deduction for a part-gift/part-sale transfer of ordinary income property was determined by the fair market value of the property at the time of the transfer, reduced by the proceeds received. Secs. 1.170–0 and 1.170–1(c)(1), Income Tax Regs.

A. SCOPE OF THE ISSUE

Respondent treats the deductibility of the school and church sites as a function of the Fosters' intention in conveying all three parcels. Petitioners, on the other hand, contend that the notice of deficiency does not raise the issue of intent with respect to the deductibility of the two church sites. In this regard the explanation of adjustments provides as follows:

The $296,000.00 charitable contribution claimed for a transfer of 7.4 acres of land to the San Mateo City School District during 1964 has been disallowed on the grounds that (1) the transfer was not made with donative intent but was made to benefit the remaining portions of partnership property and (2) if made with donative intent, the partnership has not established the fair market value of such property as claimed.

The $40,000.00 charitable contribution claimed for a transfer of 2 acres of land to the United Church of Christ during 1964 at a sales price of $40,000.00 has been disallowed on the grounds the partnership has not established the sales price received is less than fair market value of the 2 acres.

The $36,880.00 charitable contribution claimed for transfer of 1.844 acres of land to the United Church of Christ during 1965 at a sales price of $36,880.00 has been disallowed on the grounds the partnership has not established the sales price received is less than fair market value of the 1.844 acres.

We agree with petitioners that the notice of deficiency does not, on its face, raise the issue of intent with respect to the deductibility of the two church sites. Nevertheless, we think the issue is properly before the Court.

We have previously held that the Commissioner's determination may be sustained for a reason other than that set forth in the notice of deficiency. *Estate of Horvath v. Commissioner*, 59 T.C. 551, 555 (1973). On the other hand,

it is equally clear that the Court must determine whether there has been surprise and substantial disadvantage to the petitioner in the presentation of his case because of the manner in which the statutory notice and pleadings were drawn when compared to the issues raised at the trial. In this Court's opinion, it is appropriate to determine whether surprise and disadvantage are present prior to making the often esoteric finding that a particular theory advanced by the respondent has characteristics more like new "reasons" than new "issues" or "matters." This is so because once surprise and substantial detriment are found, the theory, whether a new reason or new issue, need not be heard by this Court. [*Estate of Horvath v. Commissioner, supra*; citations and fn. refs. omitted.]

See also *Fox Chevrolet, Inc. v. Commissioner*, 76 T.C. 708, 733–736 (1981). In the absence of surprise or substantial disadvan-

tage, the burden of proof remains with the taxpayer if the Commissioner merely advances a new reason; however, the burden shifts to the Commissioner if a new issue or matter is presented. *Achiro v. Commissioner*, 77 T.C. 881, 890 (1981); *Estate of Horvath v. Commissioner, supra* at 555 n. 2; see Rule 142(a).

We turn now to the question of surprise and disadvantage. Respondent maintains that petitioners were well acquainted with his position prior to the issuance of the notice of deficiency. Although he offered no testimony at trial to support this contention, other parts of the record tend to support it. For example, in their petition, the petitioners alleged as follows:

[5.](g) The partnership sold lots in Foster City to various churches for one-half of the price those lots commanded from commercial purchasers. The difference was deducted on the tax returns of the partnership as contributions to churches. In addition, the partnership made a gift to a school district of a site for a school, to be erected within Foster City, and a deduction was taken on the tax return for that gift as a gift to a political subdivision of California. *Each of those transfers was made with donative intent.* [Emphasis added.]

In his answer, respondent expressly denied the allegations of that subparagraph. In our view, his denial satisfied the requirements of Rule 36(b) ("The answer shall be drawn so that it will advise the petitioner and the Court fully of the nature of the defense") and Rule 31(a) ("The purpose of the pleadings is to give the parties and the Court fair notice of the matters in controversy and the basis for their respective positions").

Moreover, for reasons which will appear below, the Fosters' intent in conveying the church sites was not materially different from their intent in conveying the school site. For all practical purposes, therefore, the issue of intent has been tried and briefed as to all three parcels. Cf. Rule 41(b)(1).

Finally, petitioners have never claimed to be surprised by respondent's interpretation of the notice of deficiency. Their arguments on brief strike us as technical in nature and not based on any prejudice to their position. See *Schuster's Express, Inc. v. Commissioner*, 66 T.C. 588, 593–594 (1976), affd. without published opinion 562 F.2d 39 (2d Cir. 1977); *Nat Harrison Associates, Inc. v. Commissioner*, 42 T.C. 601, 617

(1964); cf. *Graham v. Commissioner*, 79 T.C. 415, 423–424 (1982).

We turn now to the question of the burden of proof. Fortunately, we need not decide whether respondent has presented a new matter or merely a new reason with respect to the issue of intent and the deductibility of the two church sites because our disposition of that issue does not depend on which party bears the burden of proof.

### B. CHARITABLE INTENT

As a general rule, section 170(a)(1) allows as a deduction any charitable contribution payment of which is made within the taxable year. The term "charitable contribution" is defined by section 170(c) to mean a contribution or gift to or for the use of several types of donees described therein. Neither the statute nor the regulations, however, define what is meant by "contribution or gift."

In *Commissioner v. Duberstein*, 363 U.S. 278 (1960), the Supreme Court, in defining the term "gift" for purposes of section 22(b)(3), I.R.C. 1939, the predecessor of section 102(a), stated as follows:

the Court has shown that the mere absence of a legal or moral obligation to make such a payment does not establish that it is a gift. * * * And, importantly, if the payment proceeds primarily from "the constraining force of any moral or legal duty," or from "the incentive of anticipated benefit" of an economic nature, * * * it is not a gift. And, conversely, "where the payment is in return for services rendered, it is irrelevant that the donor derives no economic benefit from it." * * * A gift in the statutory sense, on the other hand, proceeds from a "detached and disinterested generosity, * * * out of affection, respect, admiration, charity or like impulses." * * * And in this regard, the most critical consideration * * * is the transferor's "intention." [*Commissioner v. Duberstein*, 363 U.S. at 285; fn. ref. omitted.]

*Duberstein's* detached and disinterested generosity test has been generally adopted by the courts as the appropriate standard by which to determine whether an individual has made a charitable contribution under section 170. See, e.g., *DeJong v. Commissioner*, 309 F.2d 373, 379 (9th Cir. 1962), affg. 36 T.C. 896 (1961); *Fausner v. Commissioner*, 55 T.C. 620, 624 (1971), affd. per curiam on another issue 472 F.2d 561 (5th Cir. 1973), and 413 U.S. 838 (1973); *Wolfe v. Commissioner*, 54 T.C. 1707, 1713–1714 (1970). See generally *Southern Pacific Trans-*

*portation Co. v. Commissioner*, 75 T.C. 497, 602 n. 114 (1980).[125] However, that test has been criticized as inappropriate to determine whether a business entity, such as a partnership, has made the requisite contribution or gift. See, e.g., *Singer Co. v. United States*, 196 Ct. Cl. 90, 449 F.2d 413 (1971); cf. *Marquis v. Commissioner*, 49 T.C. 695, 702 (1968). The Ninth Circuit, to which an appeal in this case would lie, has been particularly active in refining *Duberstein's* standard for cases involving business entities.

In *United States v. Transamerica Corp.*, 392 F.2d 522, 524 (9th Cir. 1968), the Court of Appeals held that an indirect business benefit, "such as one incidental to the public use or to public recognition of its act of generosity," would not disqualify a transfer as a charitable contribution but that a direct economic benefit would.[126] In *Stubbs v. United States*, 428 F.2d 885, 886–887 (9th Cir. 1970), it held that the expectation of a benefit need not be the sole purpose, but rather only the dominant purpose, of a transfer in order to disqualify it for purposes of section 170. See *Allen v. United States*, 541 F.2d 786, 787–788 (9th Cir. 1976). The Ninth Circuit has not departed from *Duberstein*, however, insofar as it holds that the critical consideration in determining whether a transfer qualifies as a charitable contribution is the transferor's intention. *Collman v. Commissioner*, 511 F.2d 1263, 1267 (9th Cir. 1975), affg. in part and revg. in part a Memorandum Opinion of this Court.[127]

In light of these Ninth Circuit cases, we will now decide whether the partnership's dominant purpose in conveying the three sites was the expectation of a direct economic benefit. This is, of course, a factual inquiry. *Allen v. United States*, 541 F.2d at 788; see *Duberstein v. Commissioner*, 363 U.S. at 289 ("Decision of the issue presented * * * must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of

---

[125]See also *Dockery v. Commissioner*, T.C. Memo. 1978–63.

[126]In *Sutton v. Commissioner*, 57 T.C. 239, 243 (1971), this Court stated that—

"Only where the anticipated or potential economic benefit, if any, to the taxpayer was not significant, or was only "incidental" to an important public-spirited, altruistic, or charitable benevolence, has the court allowed the claimed charitable contribution."

[127]T.C. Memo. 1973–93.

the facts of each case"). On the record before us, we sustain respondent because we think the partnership conveyed the sites in order to enhance the value of its remaining land in Foster City and promote its sale.[128]

The transfers of the three sites cannot be divorced from the partnership's overall plan for the development of Foster City. As detailed in our findings, Foster City was conceived, designed, and promoted as a totally planned community. Estero's prospectuses,[129] for example, promised that "full and adequate provision" would be made for "all community facilities and services required by the resident population," and referred specifically to churches. The prospectuses also emphasized the neighborhood school plan and regularly reported the progress in school construction. These same matters were also highlighted in newspaper and magazine advertising, as well as in the promotional and public relations newsletter published by the partnership. The transfers of the sites were therefore designed to encourage the construction of facilities which "helped to make credible the 'sales pitch' of the partnership" that Foster City was a planned community. See *Perlmutter v. Commissioner*, 45 T.C. 311, 318 (1965).

The Fosters' "sales pitch" obviously assumed that the availability of community facilities such as schools and churches would attract buyers to Foster City and stimulate the demand for land. The transfers of the three sites were therefore also designed to enhance the value of the partnership's remaining land and promote its sale. See *Stubbs v. United States*, 428 F.2d at 887; *Perlmutter v. Commissioner*, 45 T.C. at 318; cf. *Sutton v. Commissioner*, 57 T.C. 239, 242–244 (1971). As previously found, the presence of schools and churches did, in fact, enhance the value of land in Foster City.

The partnership also received a quid pro quo from the local school district in return for the transfer of the school site. In

---

[128] Accordingly, we find it unnecessary to address the valuation issue.

[129] For the reasons set forth above in our discussion of Issue 1, we cannot (unlike petitioners) meaningfully distinguish between the partnership and Estero. We therefore feel comfortable in attributing representations made in the latter's prospectuses to the partnership. Moreover, the general plan ultimately prepared for Estero by Wilsey, Ham & Blair was essentially the same plan originally commissioned by the partnership. It should also be noted that Estero's 1967 prospectus specifically identified the Fosters as the developers of the district.

this regard, it must be kept in mind that Foster City was expected to have an eventual population of approximately 35,000 people. San Mateo school officials were quite concerned about the obvious impact that such a population would have on their school system. Turmoil developed as Foster City continued to grow. The Fosters, however, could not afford such turmoil because they needed the cooperation of the school district if their highly publicized school plan were to succeed. In order to make peace with the district and secure its cooperation, they offered to donate the site for the first school.

The Fosters also used the school site as leverage to persuade the district to abandon its threat to cancel bus service to the school children of Foster City. The cancellation of such service would have upset the existing residents and would have made Foster City less attractive to many prospective buyers. The district agreed to continue the service only after the Fosters threatened to withdraw their offer to donate the site.

### C. AMORTIZATION CAPITALIZATION OF THE SCHOOL SITE

In the alternative, petitioners contend that if the transfers were not made with the requisite charitable intent, the cost of the school site[130] should either be amortized over the period during which there was no elementary school operating in Neighborhood One or capitalized as part of the partnership's basis in only the residential acreage of that neighborhood. In the notice of deficiency, respondent capitalized the cost of that site as part of the partnership's basis in all of its remaining land in Foster City, including the other neighborhoods.

Petitioners' amortization argument assumes that the partnership conveyed the school site solely in exchange for the local school district's agreement to continue to provide bus service pending construction of the first elementary school in Foster City. In other words, petitioners view the transfer of the site as a cost of securing bus service during that period, which cost should be amortized in full over the period benefited. As

---

[130]This issue does not involve the two church sites because the partnership completely recovered its cost in the "bargain sales." See sec. 1.1001–1(e)(1), Income Tax Regs. Sec. 1.1011–2, Income Tax Regs., which requires allocation of basis in part-gift/part-sale transfers to charitable organizations, applies only to sales and exchanges made after Dec. 19, 1969. Sec. 1.1011–2(d), Income Tax Regs.

discussed above, however, this was simply not the case. The need to make peace with the school district and secure its cooperation was the motivation for the partnership's original offer to convey the site; it was only subsequently that it expressly conditioned the transfer on continued busing. Moreover, the transfer was ultimately intended to enhance the value and promote the sale of the partnership's other land. The reasonable life of these benefits was not confined to the period during which there was no elementary school operating in Neighborhood One.

Petitioners' capitalization argument assumes that the transfer of the school site benefited only the residential land in Neighborhood One because each neighborhood was designed to have its own elementary school. Although we tend to agree that the transfer's impact was greater on the residential land in Neighborhood One, it cannot be said that the other neighborhoods were not also benefited to some degree. The transfer was the first step in implementing the partnership's neighborhood school plan. Moreover, it gave credibility to its "sales pitch" that Foster City was a planned community. Both of these factors enhanced the value and promoted the sale of land in all of the neighborhoods and not just in Neighborhood One.

For similar reasons, we think the transfer of the school site also benefited the nonresidential land in Foster City. The Fosters anticipated that business and industry would be attracted to Foster City by the ability to offer prospective employees the benefits of nearby housing and access to a comprehensive array of community facilities and services. As concluded in Estero's 1961 prospectus, "This is expected to provide added inducement to industrial development." Moreover, in a community planned to be "relatively more self sufficient than other Peninsula communities," the value of commercial land was obviously enhanced by facilities and services designed to attract a population of 35,000 people.

In view of the foregoing, we hold that respondent properly capitalized the cost of the school site as part of the partnership's basis in all of its remaining land in Foster City. See *Perlmutter v. Commissioner*, 45 T.C. at 319; cf. *Lots, Inc. v. Commissioner*, 49 T.C. 541, 550–551 (1968), affd. per curiam

sub nom. *Christie v. Commissioner*, 410 F.2d 759 (5th Cir. 1969).

## Issue 6

### DEDUCTIBILITY OF THE PAYMENT
### FOR LEGAL SERVICES

This issue involves the deductibility of a $5,000 payment made by the Foster partnership to Roy Lytle's Oklahoma City law firm "for services rendered in connection with advice on income tax matters (state and federal) relating to Brewer's Island, where the work was in conjunction with Senator Richard J. Dolwig." Respondent disallowed the deduction on the ground that the "services of Senator Dolwig [were] not shown to be for business purposes."

Based on his cross-examination of petitioners' witnesses, it appears that respondent thinks the $5,000 represents either an under-the-table payment for legislative favors or a campaign contribution. The record does not demonstrate, however, that Senator Dolwig was the ultimate recipient of the funds. Even if he were, the $5,000 would not necessarily be nondeductible because Dolwig was also a practicing attorney whom the Fosters occasionally retained to provide legal services. In any event, we have found as a fact that the partnership made the payment for legal services. Whether the services were rendered by Roy Lytle or Senator Dolwig or both is of no consequence. The payment was a legitimate business expense and is therefore deductible under section 162(a). Accordingly, we hold for petitioners on this issue.

## Issue 7

### ADJUSTMENTS RELATED TO THE PAYMENT
### OF THE FOSTERS' PERSONAL EXPENSES

Respondent determined that certain expenses paid by the Foster partnership were personal to the Fosters. Accordingly, he disallowed the corresponding business deductions claimed by the partnership on the ground that those expenses represent "nondeductible personal expenses of the partners." Petitioners concede the propriety of part of the disallowance.

Respondent also determined that certain expenses paid by

Likins-Foster Honolulu Corp. and two of its subsidiaries were personal to the Fosters. He characterized these payments as "informal dividends-travel" and charged the Fosters with ordinary income in an equivalent amount. Petitioners dispute that any part of these payments constitute dividends.

Petitioners challenge the adjustments made by respondent on three grounds. First, they contend that respondent bears the burden of proof on this issue and that he has not successfully discharged it. Second, they contend that even if they bear the burden of proof, they have carried it through evidence descriptive of the mechanics of their recordkeeping system. Third, they contend that the disallowance of a deduction under section 274 does not give rise to a dividend. We shall consider each of these contentions in turn.

### A. BURDEN OF PROOF

Petitioners recognize that "A statutory notice ordinarily carries with it a presumption of correctness that, except where provided in the Internal Revenue Code or the Tax Court Rules of Practice and Procedure, places the burden of proof and the burden of going forward with the evidence on [them]." *Llorente v. Commissioner*, 74 T.C. 260, 263–264 (1980), revd. in part 649 F.2d 152 (2d Cir. 1981). See *Welch v. Helvering*, 290 U.S. 111, 115 (1933); Rule 142(a).[131] They argue, however, that (1) respondent's "interminable delay" in issuing the notice of deficiency, (2) his failure to identify therein the specific partnership and corporate expenditures which were disallowed, and (3) the alleged misconduct of his revenue agent in "scrambling" their records serve to shift the burden of proof.[132] We disagree.

### 1. *Delay*

The defense of laches is a purely equitable doctrine which is generally peculiar to courts of equity. See generally 27 Am. Jur. 2d, Equity, secs. 152–176 (1966); 30A C.J.S., Equity, secs.

---

[131]See also *Adamson v. Commissioner*, T.C. Memo. 1982–371.

[132]We are uncertain whether petitioners advocate shifting just the burden of going forward with the evidence or the ultimate burden of persuasion. On this matter, see *Helvering v. Taylor*, 293 U.S. 507 (1935), and *Solimene v. Commissioner*, T.C. Memo. 1982–370, slip op. at 9 n. 5.

112–132 (1965). Compare *Pesch v. Commissioner*, 78 T.C. 100, 130–131 (1982), with *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. 497, 840–842 (1980). It is not available where a period of time in which an action may be brought is fixed by statute. *United States v. Manufacturers Hanover Trust Co.*, 229 F. Supp. 544, 545–546 (S.D. N.Y. 1964).

We have previously held that this Court is not at liberty to modify a fixed period prescribed by a statute of limitations in which the Commissioner is authorized to act. *Saigh v. Commissioner*, 36 T.C. 395, 424–425 (1961).[133] In the present case, section 6501 expressly defines the period in which respondent is authorized to assess deficiencies against taxpayers. See also section 6503(a). Petitioners do not contend that the issuance of the notice was untimely under that section.[134]

## 2. *Nonspecificity*

Neither section 6212(a), which authorizes the sending of the notice of deficiency, nor any other section of the Internal Revenue Code prescribes the form of a notice or specifies the contents or information required to be included therein. *Jarvis v. Commissioner*, 78 T.C. 646, 655–656 (1982). The Treasury regulations are also silent. See, e.g., sec. 301.6212–1, Proced. & Admin. Regs. All that we have required is that the notice fulfill its purpose of providing formal notification that a deficiency in tax has been determined. *Pietz v. Commissioner*, 59 T.C. 207, 213–214 (1972); *Mayerson v. Commissioner*, 47 T.C. 340, 349 (1966); *Standard Oil Co. v. Commissioner*, 43 B.T.A. 973, 998 (1941), affd. 129 F.2d 363 (7th Cir. 1942). Accord *Olsen v. Helvering*, 88 F.2d 650, 651 (2d Cir. 1937), wherein Judge Learned Hand stated that "the notice is only to advise the person who is to pay the deficiency that the Commissioner means to assess him; anything that does this unequivocally is good enough." In other words, the notice must (1) fairly advise

---

[133]See also *Davies v. Commissioner*, T.C. Memo. 1981–438, on appeal (9th Cir., Mar. 2, 1982).

[134]Apart from the above, which is dispositive of the issue, we question whether petitioners are factually positioned to assert the defense of laches. For example, they voluntarily agreed to extend the normal period within which a deficiency must be assessed. Sec. 6501(c)(4). Moreover, as discussed earlier in this opinion, delay, at least during the period that Del Champlin was their tax adviser, was part of their modus operandi in dealing with respondent.

the taxpayer that the Commissioner has, in fact, determined a deficiency and (2) specify the year and amount. *Commissioner v. Stewart*, 186 F.2d 239, 242 (6th Cir. 1951), revg. on other grounds a Memorandum Opinion of this Court.[135]

Petitioners do not cite any case in support of their position that the burden of proof is shifted to respondent if he fails to identify in the notice of deficiency the specific expenditures which are disallowed. We have previously considered similar contentions and rejected them. See, e.g., *Pietz v. Commissioner*, 59 T.C. at 213–214; *Mayerson v. Commissioner*, 47 T.C. at 348; *Barnes Theatre Ticket Service, Inc. v. Commissioner*, T.C. Memo. 1967–250, affd. sub nom. *Barnes v. Commissioner*, 408 F.2d 65, 68 (7th Cir. 1969).[136] We can see no reason to take any different position here.

We are not unsympathetic to a taxpayer's desire to simplify his burden of proof by ascertaining the specific expenditures which respondent has disallowed.[137] In fact, our Rules provide a mechanism by which to achieve this objective. Thus, they contemplate that after the case is at issue the parties will informally confer in order to exchange necessary facts, documents, and other data with a view towards defining and narrowing the areas of dispute. Rules 38, 70(a)(1), 91(a). See *Branerton Corp. v. Commissioner*, 61 T.C. 691, 692 (1974). If a party is frustrated by his adversary in an effort to obtain needed information voluntarily, he may resort to discovery under Rules 70 through 72, including interrogatories under Rule 71. If his adversary unjustifiably refuses to respond he may seek an enforcement order and sanctions under Rule 104. A party may also request a pretrial conference under Rule 110. In appropriate cases, the Court will undertake to confer with the parties in order to, inter alia, narrow the issues, simplify the presentation of evidence, and otherwise assist in

---

[135]Dated Nov. 22, 1949. See also *Stevenson v. Commissioner*, T.C. Memo. 1982–16.

[136]See also *Arlex Oil Corp. v. Commissioner*, T.C. Memo. 1967–235.

[137]We must confess that in the present case our sympathy is tempered by petitioners' success in reducing the disallowance by presenting additional information regarding the expenses in question during the administrative appeal stage of their case. Our sympathy is also somewhat tempered by references in the record to a revenue agent's massive report. The entire document was not introduced as an exhibit so that we do not know exactly how much detail it may have contained. The few, selected pages which petitioners introduced in order to establish a paucity of detail appear to us, however, to be incomplete.

the preparation for trial. Rule 110(a). Appropriate pretrial orders may be issued in furtherance of these objectives. Rule 110(e).

### 3. *Misconduct*

We come now to petitioners' contention that the examining revenue agent "so scrambled the Fosters' files that many vouchers, payments and supporting documents are permanently disassociated, and as to them the evidence * * * is no longer available. Proof is impossible, as to some items, through Respondent's own wrongdoing."

We think it is conceivable that a revenue agent's conduct could be so reprehensible that the integrity of the judicial process would demand that we take appropriate remedial action. Such action might very well include shifting the burden of going forward with the evidence, or even shifting the burden of proof, to the Commissioner. However, we do not think that this is such a case.

Petitioners undercut their position by their previous contention that the notice of deficiency failed to identify the specific expenditures which were disallowed. By complaining of that failure they admit, in effect, that had they only known what specific expenditures were in question, they would have been able to prove that those expenditures were business-related rather than personal.

Petitioners also undercut their position by their admission that during the administrative appeal stage of their case they were able to effect a reduction in the disallowance of the expenses in question by presenting additional information to the appeals officer.[138] Such settlement simply belies their contention that they were unable to offer proof as to this issue.

We note that petitioners do not claim that the revenue agent scrambled all of their records but only "many," so that proof as to "some" items became impossible. Nevertheless, petitioners did not introduce evidence on any of the disputed expenses. The only records which they introduced at trial were for the purpose of illustrating the mechanics of their recordkeeping

---

[138]According to petitioners' lead counsel, the revenue agent "proposed heavy adjustments in this area, which were *greatly modified* in the appellate division, but not eliminated." (Emphasis added.)

system. (See B., *infra.*) Oddly enough, these records appear to be in perfect shape, despite the fact that they were selected at random.

We also note that even if petitioners' records were in such a "scrambled" state that documentary support could not be located, they were not precluded from presenting oral testimony as to the nature of the expenses. However, they offered no specific testimony whatsoever that the disallowed expenses were business related.

Finally, the revenue agent examined petitioners' records in their offices in the Foster Building in Foster City and did not remove them from the premises. Thus, the records were under their ultimate control at all times. In addition, petitioners' former office manager testified that he was aware during the examination that the agent was "disassociating" records. Apparently, however, he did not think the problem was serious enough to either restrict the agent's access to the file room or to assign an employee to oversee his treatment of the documents or to substitute copies for the original records.

---

In support of their effort to shift the burden of proof, petitioners rely heavily on *United States v. Janis*, 428 U.S. 433 (1976), and *Weimerskirch v. Commissioner*, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977). However, we think both cases are inapposite to the issue before us.

In *United States v. Janis, supra,* the Commissioner assessed under section 4401 wagering excise tax against the taxpayer. The assessment was based exclusively on evidence obtained by the Los Angeles police pursuant to a search warrant, which was subsequently quashed after a hearing as to the adequacy of the supporting affidavit. The issue involved the question whether evidence illegally seized by a local law enforcement officer was admissible in a civil tax proceeding brought by or against the United States. In deciding that issue, the Supreme Court briefly discussed the presumption of correctness enjoyed by the Commissioner and the circumstances under which the burden of proof may be shifted. Citing *Helvering v. Taylor*, 293 U.S. 507, 514–515 (1935), the Court stated that if the illegally seized evidence could not be used as the basis for the assessment, "The determination of tax due then may be one

'without rational foundation and excessive,' and not properly subject to the usual rule with respect to the burden of proof in tax cases." *United States v. Janis*, 428 U.S. at 441. It characterized such an assessment as "naked."

*Janis* is therefore inapposite for two reasons. First, given the nature of the present issue it cannot be said that respondent's determination was "utterly without foundation." *United States v. Janis*, 428 U.S. at 442. Deductions are a matter of legislative grace and it is ordinarily incumbent upon a taxpayer to prove his entitlement thereto.[139] *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). Second, as we observed in *Llorente v. Commissioner*, 74 T.C. at 265, the Supreme Court's reference to a "naked assessment" was made in the context of illegally seized evidence. There is absolutely no suggestion in the present case that the notice of deficiency was predicated on such evidence.

In *Weimerskirch v. Commissioner*, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977), the Commissioner determined that the taxpayer had unreported income from the sale of narcotics. He relied on the presumption of correctness and at trial called no witnesses and introduced no evidence to link the taxpayer to the alleged income-producing activity. The Court of Appeals held that "before the Commissioner can rely on this presumption of correctness, the Commissioner must offer some substantive evidence showing that the taxpayer received income from the charged activity." *Weimerskirch v. Commissioner, supra* at 360. The rationale for this holding was the difficulty that such a taxpayer might have in proving a negative, absent such a showing by the Commissioner.

In deduction cases, however, the taxpayer is not required to prove a negative but rather must adduce positive evidence to establish his entitlement to a particular deduction. *Beck v. Commissioner*, 74 T.C. 1534, 1548 (1980), affd. 678 F.2d 818 (9th Cir. 1982).[140] The adjustments in question made by respondent to the partnership's returns involve the disallowance of deductions. His determination that petitioners received con-

---

[139]It should be kept in mind that respondent's determination of constructive dividends was predicated on his disallowance of deductions claimed by Foster-controlled corporations. ·

[140]See also *Churukian v. Commissioner*, T.C. Memo. 1980–205.

structive dividends from Likins-Foster Honolulu Corp. and certain of its subsidiaries is predicated on his disallowance of deductions claimed by corporations owned and controlled by the Fosters. Thus, *Weimerskirch* is inapposite because that case involved unreported income.

### B. SUFFICIENCY OF PETITIONERS' EVIDENCE

Having decided that petitioners bear the burden of proof on the present issue, we turn now to the sufficiency of their evidence. We begin by noting that they introduced no specific evidence whatsoever to establish that the expenses in question were business related rather than personal. Rather, they presented considerable evidence, principally testimony, which in their view was designed to show—

1. The existence of a system for claiming reimbursement for travel and entertainment expense devised by two certified public accountants specifically to obtain the supporting documentation required to comply with Section 274;

2. Examples selected at random of the form used to elicit supporting facts and documentation, which can be seen to be effective to satisfy Section 274;

3. Administration of the system by an executive vested with the authority to deny reimbursement where the forms did not contain sufficient substantiation to satisfy Section 274, whose authority extended alike to principals and employees;

4. That executive's impartial employment of his authority to deny many claims of reimbursement by partners or owners;

5. Preparation of the tax returns by the independent firm of auditors, who paid particular attention to compliance with Section 274 including random sampling and checking.

6. There is testimony from both [CPAs] that each made a determined effort to prevent any incomplete or inadequate claims for reimbursement from producing deductions in the tax return.

In effect, petitioners ask us to substitute their judgment for our own in deciding this issue. To do so, however, would stultify the judicial process and render nugatory our statutory mandate to redetermine deficiencies. See generally secs. 6211–6215 and 7442. This we are unwilling to do. One might ask what taxpayer would impeach his own recordkeeping system or what taxpayer would deny his entitlement to a deduction. It must be apparent that self-certification cannot be a substitute for proper proof. Accordingly, we decline petitioners' invitation to evaluate their recordkeeping system. Whatever their evidence might tend to prove about the adequacy of that

system to accomplish its intended purpose is simply insufficient to carry their burden of proof.[141] Cf. *Halle v. Commissioner*, 7 T.C. 245, 247–248 (1946), affd. 175 F.2d 500 (2d Cir. 1949).

### C. ROLE OF SECTION 274

Petitioners maintain that "Section 274 does not categorize as personal a travel or entertainment expense not supported by the technical recordkeeping requirements of Section 274." Accordingly, they argue, the disallowance of a deduction under that section should not give rise to a dividend.

Petitioners' argument misses the mark. They overlook the fact that respondent disallowed the item denominated "travel and entertainment" not because of the partnership's failure to comply with the recordkeeping requirements of section 274, but rather because he determined that the expenses in question were personal and not business-related.[142] Although the record does not include a copy of the notice of deficiency issued to Likins-Foster Honolulu Corp. and its subsidiaries, it would appear (based on the notices issued to petitioners) that respondent disallowed the corporations' deductions for the very same reason. Thus, the factual predicate for petitioners' argument is lacking.

Petitioners' argument falls short for yet another reason. Although we agree that an expenditure which is rendered nondeductible under section 274(d) is not necessarily converted into a dividend (*Ashby v. Commissioner*, 50 T.C. 409, 417–418 (1968)), the taxpayer is still required to present some proof that the expenditure was not made for his personal benefit (*Henry Schwartz Corp. v. Commissioner*, 60 T.C. 728, 743–744 (1973)).[143] See also *Erickson v. Commissioner*, 598 F.2d 525, 530–531 (9th Cir. 1979), revg. and remanding on this issue a Memorandum Opinion of this Court.[144] Petitioners, however,

---

[141]Were we inclined to do so, we might question the adequacy of petitioners' recordkeeping system on the basis of their concession of the disallowance of substantial personal expenses at both the partnership and corporate levels.

[142]More fundamentally, petitioners' argument is simply inapposite insofar as the consequences of the disallowance of a deduction at the partnership, rather than corporate, level are concerned. In other words, the disallowance of a deduction at the partnership level for whatever reason necessarily affects the partners.

[143]See also *Halpern v. Commissioner*, T.C. Memo. 1982–31.

[144]T.C. Memo. 1976–147.

did not do this but rather chose to rely on evidence descriptive of the mechanics of their recordkeeping system. We have already held that such evidence is insufficient to carry their burden of proof.

*Issue 8*

### CHARACTERIZATION OF THE PAYMENTS MADE TO GLADYS FOSTER

On her 1963 through 1967 income tax returns, Gladys Foster reported compensation received from Likins-Foster Honolulu Corp. and certain of its subsidiaries in the aggregate amount of $60,000. In the notice of deficiency, respondent determined that this amount was understated by $10,761.82. He also determined that the revised amount, in its entirety, represents dividends rather than compensation. In contrast, petitioners contend that Gladys Foster rendered services as a decorator to several Foster-controlled entities and received a salary.

On brief, petitioners appear to concede this issue insofar as it relates to the *amount* of income.[145] On the other hand, they vigorously dispute respondent's *characterization* of that income.

We think the income characterization issue is moot because it has no apparent impact on the computation of the deficiencies determined by respondent in Jack and Gladys Foster's income taxes for 1963 through 1967.[146] See *Roemer v. Commissioner*, 79 T.C. 398, 410–411 (1982), on appeal (9th Cir., Nov. 15, 1982). Whether the payments are viewed as dividends or compensation, the result is additional ordinary income under section 61(a). We recognize, of course, that characterization is

---

[145]For example, in their proposed findings of fact, petitioners request that we find as follows:

"345. Gladys Foster's compensation for her decorating work of *$15,380.16 in 1963, $14,827.68 in 1964, $15,053.63 in 1965, $21,794.07 in 1966,* and *$3,706.31 in 1967,* was reasonable in amount, for each year, for the services rendered to the relevant Foster entities. [Emphasis added; transcript reference deleted.]"

The underscored amounts and years correspond exactly (except for a 3¢ discrepancy in the amount for 1965) with respondent's determination in the notice of deficiency.

[146]Characterization would, of course, affect Gladys Foster's liability for her share of FICA taxes. However, this Court does not have jurisdiction over such taxes. See generally sec. 7442; cf. *Shaw v. United States*, 331 F.2d 493, 494–495 (9th Cir. 1964); *Wilt v. Commissioner*, 60 T.C. 977, 978 (1973).

occasionally necessary in order to properly apply particular sections of the Internal Revenue Code.[147] However, petitioners have not isolated, nor are we aware of, any such section *relevant to this case* which necessitates that we characterize the payments received by Gladys Foster. We suspect that petitioners would like us to decide this issue because the deductibility of the payments in question is an issue in a related case involving Likins-Foster Honolulu Corp.[148] That case, however, has not been consolidated with the present one. Under these circumstances, we think it would be ill advised for us to decide the issue of deductibility at the corporate level in the context of this case. Accordingly, we express no opinion on the matter. Respondent's determination of additional income is sustained.

## Issue 9

### ADDITIONS TO TAX

Respondent determined that Jack Foster and Gladys Foster are liable for additions to tax under section 6653(a) for negligence or intentional disregard of rules and regulations for the taxable years 1963 through 1967. He did not determine that any of the other petitioners are liable for that addition.

We have repeatedly held that taxpayers bear the burden of proving error in the Commissioner's determination of their liability for the addition to tax under section 6653(a). See, e.g., *Bixby v. Commissioner*, 58 T.C. 757, 791–792 (1972); *Enoch v. Commissioner*, 57 T.C. 781, 802 (1972). Although petitioners cite no cases in support of their position, they contend that respondent bears the burden of proof on this issue in the present case. In this regard, they maintain that his determination of the addition was based, in their words, on the "travel and entertainment expenses taken as deductions in the partnership return or in the returns of corporations, which the deficiency letters would treat as dividends." They then argue that a negligence penalty based on an arbitrarily determined

---

[147]An obvious example is sec. 116 which affords individuals a partial exclusion of certain dividends.

[148]See *Likins-Foster Honolulu Corp. and Subsidiaries v. Commissioner*, docket No. 5361–78, which is presently before this Court.

substantive adjustment is itself arbitrary, and doubly so when it is asserted against just one person rather than everyone who is subject to the substantive adjustment.

Petitioners' contention is without merit because its factual predicate is faulty on two grounds. First, as we have already held (see Issue 7, *supra*), there was nothing arbitrary in respondent's determination related to the payment of the Fosters' personal expenses by the partnership and corporations. Second, the record does not support petitioners' assertion that the addition to tax was predicated on that particular determination. Indeed, on brief, respondent argues that we should sustain the addition because "T. Jack Foster, a lawyer himself, directed his inhouse tax advisor, A. O. Champlin to avoid Federal income tax by devising schemes to cover up the true economic substance of transactions."

Admittedly, the adjustments which respondent relies on in support of the additions to tax, i.e., the section 482 and Westway adjustments (see Issues 1 through 3, *supra*), are partnership adjustments which affect all of the Fosters. However, in *Marcello v. Commissioner*, T.C. Memo. 1964–299, affd. on this issue 380 F.2d 499, 505–507 (5th Cir. 1967), we recognized the possibility that special circumstances could justify assertion of the addition against fewer than all of the partners. In the present case, as will be recalled, Jack Foster was the ultimate authority among the Fosters. In our view, this fact provides a rational basis for respondent to only assert the addition against him.[149]

We think that the burden of proof rests with petitioners. In our judgment, they have failed to carry it. On brief, they confined themselves to the question of whether respondent acted arbitrarily and presented no alternative argument. Moreover, the evidence relevant to the section 482 and Westway issues, and hence to this issue, favors respondent.[150] Accordingly, we sustain him on this issue.[151]

---

[149]We express no opinion whether we necessarily agree that respondent's failure to assert a foundationally sound addition to tax against all similarly situated taxpayers is itself arbitrary, requiring that the burden of proof be shifted.

[150]We might add that we find petitioners' arguments that they were the innocent victims of the Westway transaction and that the regulations precluded them from self-assessing the sec. 482 adjustments to be disingenuous.

[151]See *Solimene v. Commissioner*, T.C. Memo. 1982–370, for an example of a recent case in which we also sustained the Commissioner on the negligence penalty where the taxpayer

When we began this case, we were reminded that Lao-tzu once said "A journey of a thousand miles must begin with a single step." Having completed it, we prefer to recall Ecclesiastes 7:8, "Better is the end of a thing than the beginning thereof."

In order to give effect to the parties' concessions and our disposition of the disputed issues,

*Decision will be entered under Rule 155.*

---

presented no evidence with respect to the addition and merely alleged that it must have been arbitrarily determined.